**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|   |   |   |
|---|---|---|
| TRUEPOSITION, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION |
| LM ERICSSON TELEPHONE COMPANY | : | |
| (TELEFONAKTIEBOLAGET LM ERICSSON), | : | |
| QUALCOMM, INC., | : | No. 11-4574 |
| ALCATEL-LUCENT USA, INC., | : | |
| EUROPEAN TELECOMMUNICATIONS | : | |
| STANDARDS INSTITUTE, and | : | |
| THIRD GENERATION PARTNERSHIP | : | |
| PROJECT a/k/a 3GPP | : | |
| | : | |
| Defendants. | : | |

_____:

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **JANUARY 6, 2012**

Presently before the Court are Motions to Dismiss Plaintiff, TruePosition, Inc.'s

("TruePosition") Complaint submitted by Defendants Qualcomm, Inc. ("Qualcomm"), LM

Ericsson Telephone Company (Telefonaktiebolaget LM Ericsson) ("Ericsson"), Alcatel-Lucent

USA, Inc. ("ALU"), and European Telecommunications Standards Institute ("ETSI")

(collectively, "Defendants").  Also before the Court are three Oppositions to the Motions to

Dismiss submitted by TruePosition.  The first of TruePosition's Oppositions to Motions to

Dismiss is in response to the Motion to Dismiss submitted by Qualcomm only.  The second of

TruePosition's Oppositions to Motions to Dismiss is in response to the Motions to Dismiss of

ALU, Ericsson, and ETSI.  The third and final of TruePosition's Oppositions to Motions to

Dismiss is in response to the Motion to Dismiss of ETSI only.  Defendants have each submitted

Replies, which are also before the Court.  For the reasons provided below, the Defendants'

Motions to Dismiss will be granted.

I.    **FACTS**

    A.    **BACKGROUND**

      This action stems from the alleged anticompetitive conduct of major players in the

international telecommunications market within the context of a standard-setting organization

("SSO").[1]  (Compl. ¶ 1.)  TruePosition alleges that Ericsson, Qualcomm, and ALU (collectively,

the "Corporate Defendants") conspired to exclude its positioning technology, Uplink Time

Difference of Arrival ("UTDOA"),[2] from standards promulgated by a SSO, Third Generation

Partnership Project ("3GPP").[3]  (Id. ¶ 34.)  According to TruePosition, the Corporate Defendants

were able to exclude UTDOA by collaboratively manipulating 3GPP's processes and procedures.

(Id. ¶ 4.)  TruePosition further alleges that ETSI and 3GPP ("SSO Defendants") participated in

the conspiracy to exclude UTDOA from 3GPP standards by failing in their obligations to ensure

that the Corporate Defendants complied with 3GPP Rules.  (Id. ¶¶ 128-29.)

    1.    **The Parties**

      TruePosition describes itself as a "leading innovator in developing and marketing high

accuracy location products that operate over cellular telecommunications networks."  (Compl.

---

[1] A SSO such as 3GPP brings together providers of mobile phone network equipment and related technologies to set global standards for advanced mobile telecommunications systems.  (Compl. ¶ 3.)

[2] "Positioning technology" refers to technology used to locate mobile handsets.

[3] 3GPP has not yet been served in this action and thus, has not submitted a motion to dismiss. There is a pending motion for default judgment filed by TruePosition based on 3GPP's allegedly improper refusal to accept service.  We include TruePosition's allegations against 3GPP because they are integral to the Complaint and the alleged conduct that took place within 3GPP.

¶ 2.)  It devotes substantial resources annually to research and development for positioning

technology.  (Id. ¶ 41.)  As of 2002, TruePosition's positioning technologies were being

incorporated with Global System for Mobile Communications ("GSM") networks, GSM

networks being one of the 2G technologies.[4]

The Corporate Defendants are alleged "leader[s] in the development, manufacture, and

sale of equipment" relating to mobile telecommunications.  (Id. ¶¶ 8-10.)  According to

TruePosition, Ericsson specializes in equipment (and related software) for mobile telephone

communications, including the sales of network equipment to U.S. telecommunications carriers

and handsets to such carriers and United States consumers."  (Id. ¶ 8.)  TruePosition alleges that

Qualcomm specializes in "semiconductor chips and software for use in mobile telephone

handsets."  (Id. ¶ 9.)  TruePosition alleges that ALU specializes in "equipment and software for

mobile telephone communications, including the sales of network equipment to U.S.

telecommunications carriers."  (Id. ¶ 10.)

In contrast to the Corporate Defendants, TruePosition alleges that 3GPP and ETSI are

"not-for-profit" SSOs located in France.  (Id. ¶¶ 11-12.)  TruePosition alleges that the

membership of 3GPP comprises hundreds of international companies through six associations of

telecommunications companies (each association referred to as an "organizational partner)."  (Id.

¶ 11.)  The alleged business of 3GPP is "fairly and impartially to create global standards for

mobile telecommunications technologies that are designed to be implemented in equipment sold

---

[4] Terms such as "Second Generation"("2G"), "Third Generation" ("3G"), and "Fourth
Generation" ("4G") describe successive stages in the evolution of wireless communications
technology for voice and data service.  (Compl., Glossary of Acronyms at 61.)  3GPP is currently
engaged in setting standards for the next generation of mobile communications known as Long
Term Evolution ("LTE"), which is a 4G technology.  (Compl. ¶ 3.)

internationally, including in the United States." (<u>Id.</u>)  According to TruePosition, 3GPP is

responsible for managing the conduct of its standard-setting activities and to assure that its

mandate is properly performed by its participating members.  (<u>Id.</u>)  TruePosition asserts that the

Corporate Defendants exert strong influence over 3GPP through their control of the Chair

positions of key committee groups and through their general industry dominance.  (<u>Id.</u>)

TruePosition alleges that ETSI is comprised of more than 700 member companies from 62

countries, including countries outside of Europe.  (<u>Id.</u> ¶ 12.)  According to TruePosition, "[t]he

business of ETSI is fairly and impartially to create standards within Europe and globally for

information and telecommunications technologies, including for mobile telecommunications."

(<u>Id.</u>)  TruePosition asserts that ETSI is an "organizational partner" of 3GPP and that it is "the

primary provider of office space, staffing, and administrative support for 3GPP."  (<u>Id.</u>)

TruePosition further alleges that the Corporate Defendants similarly "are members of, and

actively participate in, and exert strong influence over ETSI."  (<u>Id.</u>)

### 2.    TruePosition's Technology

According to TruePosition, "more than 55 million cellular callers in the United States

each year are located by [its] products, assisting police, fire, and ambulance services in saving

lives and enabling law enforcement to combat criminal activity and terrorist threats."  (<u>Id.</u> ¶ 2.)

TruePosition's positioning technology, called UTDOA, works by using equipment located at

multiple cell towers (referred to as "location measurement units" or "LMUs"), which

collaboratively collect timing information necessary to calculate a mobile handset's location by

measuring the difference in the time they receive a signal sent over a cellular network in the

ordinary course from the handset.  (<u>Id.</u> ¶ 19.)  This aspect of UTDOA is exclusive to

TruePosition. (Id.) Other positioning technologies depend on the handset to perform calculations. (Id.) TruePosition asserts that UTDOA is uniquely well-suited for locating mobile handsets in difficult areas such as indoor areas and so-called "urban canyons." (Id. ¶¶ 19a, 21.) TruePosition further asserts that, because its technology does not rely on calculations performed in the handset, it can locate any phone, not just those that are equipped with positioning technology, and that it can locate the phone even when it is not in use. (Id. ¶ 22.)

TruePosition does not manufacture Radio Access Network ("RAN") equipment. (Id. ¶ 42.) TruePosition sells high accuracy positioning and networking technology as a standalone LMU. (Id.) These standalone LMUs are collocated with, and must interoperate (work correctly together) with, the RAN equipment at a cell site. (Id.) Therefore, the ability of an LMU to interoperate with multiple vendors' RAN equipment is crucial to the ability of TruePosition to compete in the markets for positioning equipment. (Id. ¶ 43.) TruePosition also offers products with supplemental location technologies, including A-GPS[5] and other technologies in combination with UTDOA. (Id. ¶ 45.) To ensure that its technologies will interoperate with RAN equipment, TruePosition has been actively participating in organizations that set operability standards for mobile telecommunications, including ETSI and 3GPP, since the 1990's. (Id. ¶ 43.)

### 3. SSOs for Mobile Phone Services

TruePosition alleges that 3GPP and ETSI are "SSOs that develop standards for wireless and mobile telecommunications services." (Id. ¶ 24.) Apparently, each of the SSOs "includes as members companies that compete against each other for the development, manufacture, and sale of products and services relating to mobile telecommunication." (Id.) TruePosition alleges that

---

[5] A-GPS or "Assisted GPS" is a satellite based location positioning technology. (Compl., Glossary of Acronyms at 61.)

3GPP is currently in the process of setting standards for the next generation of mobile telecommunications systems known as LTE, which is a fourth generation ("4G") mobile telephone technology.  (Id. ¶ 3.)  TruePosition further alleges that "inclusion in the 3GPP standard is vital to commercial success.[6]  Exclusion from the standard guarantees commercial failure and, in most cases, absolute foreclosure from the market."  (Id.)

The conduct that forms the basis of TruePosition's claims occurred within 3GPP during the process of setting standards for LTE technology.  TruePosition describes 3GPP's standardization procedure as follows: 3GPP's standards are embodied in a series of technical documents known as "Specifications," to which updates are issued sequentially in a series of "Releases."  (Id. ¶ 26.)  TruePosition alleges that "[o]nce a Release is completed by 3GPP, it is adopted and promulgated as a standard by 3GPP's regional organizational partners, including ETSI."  (Id.)

TruePosition describes 3GPP's organizational structure as comprised of four Technical Specification Groups ("TSGs") that are responsible for creating Specifications for accepted work items.  (Id. ¶ 27.)  Each TSG is broken down into one or more Working Groups that perform the technical work of evaluating proposed work items and developing the draft Specification.  (Id.)  The several Working Groups meet in Plenary sessions to determine the content of each

---

[6] Indeed, other courts have recognized that:

> 3GPP sets standards throughout the entire wireless communications industry to ensure compatibility of equipment.  If telecommunications equipment is not in compliance with 3GPP standards it will not be compatible with the telecommunications networks and other equipment.  Accordingly, it will be essentially useless.

Golden Bridge Tech. v. Nokia, Inc., 416 F. Supp. 2d 525, 532 (E.D. Tex. 2006).

Specification.  (Id.)  According to TruePosition, Working Groups may meet separately or in conjunction with the TSG Plenary meetings.  (Id. ¶ 28.)  The TSG that is primarily responsible for development of standards pertaining to mobile device positioning is the RAN TSG.  (Id.)  The RAN TSG has five Working Groups, RAN1 through RAN5.  (Id.)

Each TSG has a Chairman and generally three Vice Chairmen, and each Working Group has a Chairman and generally two Vice Chairmen.  (Id. ¶ 29.)  TruePosition alleges that the position of Chairman is "extraordinarily powerful" in determining what technologies will be included in the Specification and that Chairmen effectively control the entire process of inclusion into the Specification and, therefore, the standard.  (Id.)  With this power, alleges TruePosition, also comes the potential for abuse, especially because Chairmen and Vice Chairmen positions are most often filled by major players in the telecommunications equipment market, including the Corporate Defendants.  (Id. ¶¶ 29-30.)

TruePosition alleges that 3GPP has adopted "due process policies, procedures, and rules with respect to the development of 3GPP standards so as to ensure fairness in the process and compliance with antitrust and other laws (the "SSO Rules")."  (Id. ¶ 31.)  TruePosition alleges that the SSO Rules include the following requirements:

a.   Technologies provided for in existing standards should be provided for in future standards, particularly where the technologies already have been deployed and are clearly applicable to the future work.  *See* 3GPP Scope and Objectives for Third Generation Partnership Project Agreement at 2.3 (Aug. 31, 2007).

b.   Technical work should proceed in a transparent manner according to specific rules and procedures.  ETSI Guidelines for Antitrust Compliance, C.2.1.-C.2.2.

c.   Chairmen are responsible to conduct meetings in accordance with policies and procedures; to maintain strict impartiality and act in the interests of the

7

organization and its members; and not to conduct these procedures so as to bias or favor the business interests of a company they represent. *See*, ETSI Technical Working Procedures, 1.3.3; ETSI Guidelines for Antitrust Compliance, D.1.2 and D.1.4; 3GPP Working Procedures, Art. 23.

d.      Technical contributions on which decisions will be based must be distributed to the Working Group members well in advance of meetings. *See* 3GPP Working Procedures, Art. 25.

e.      The 3GPP specifications must provide technology options to satisfy regulator requirements of one or more nations or regions, without debate over the inclusion or rejection of such options. *See* 3GPP Working Procedures, Art. 3.

(Id. ¶ 31(a)-(e).)[7]  TruePosition further alleges that representatives of the Corporate Defendants held Chairmen and Vice Chairmen positions of the RAN TSG and Working Groups that made decisions concerning the standardization of its UTDOA positioning technology.  (Id. ¶ 32.) Moreover, TruePosition alleges that the representatives abused the authority of these positions to "highjack" the standardization process to advance their companies' shared business interests by accelerating standardization of the technologies in which they held financial interests, and by impeding the standardization of UTDOA positioning technology for LTE networks.  (Id.) According to the Complaint, this was specifically the case in standalone LMUs, which the Corporate Defendants viewed as a competitive threat.  (Id.)

### 4.      TruePosition's Entry into the Positioning Market

TruePosition alleges that RAN equipment is situated on cellular telephone towers and connects the mobile device handset to the mobile phone network.  (Id. ¶ 33.)  TruePosition further alleges that Ericsson and ALU are the largest RAN vendors and are without close competition in the United States.  (Id. ¶ 34.)  RAN equipment is manufactured to meet standards

---

[7] We assume that TruePosition includes some ETSI Rules because of its status as an organizational partner to 3GPP.

intended to enable handset and network equipment from different vendors to interoperate with RAN equipment.  (Id. ¶ 35.)  TruePosition alleges that, in the late 1990s, ETSI introduced a standard for 2G mobile telecommunications technology known as Global System for Mobile Telecommunications ("GSM"), for which later standards were developed by 3GPP.  (Id. ¶¶ 36-37.)  TruePosition further alleges that the initial GSM release included several positioning technologies, Uplink Time of Arrival ("UL-TOA")[8] and Enhanced Observed Time Difference ("E-OTD").[9]  Apparently, the GSM market at that time was dominated by RAN vendors, including Ericsson, who favored E-OTD.  (Id. ¶ 38.)  TruePosition offers two possible explanations for the RAN vendors' favoritism of E-OTD: (1) they held patents essential to E-OTD and stood to receive substantial royalties; and (2) they could incorporate E-OTD into their RAN equipment, thereby eliminating competition from third party vendors.  (Id.)  UL-TOA was ultimately not picked up by carriers and was dropped from the 2000-2001 Releases of the ETSI GSM standard.  (Id. ¶ 39.)

In 2001-2002, the E-OTD technology offered by Ericsson and other RAN vendors proved to be a failure because it did not meet FCC regulatory requirements.[10]  (Id. ¶ 40.)  As a result,

---

[8] UL-TOA is a cellular network-based location positioning technology similar to UTDOA. (Compl. ¶ 37; Compl., Glossary of Acronyms at 63.)

[9] E-OTD is a handset-based location positioning technology and the first version of OTDOA technology.  (Compl. 10-11; Compl., Glossary of Acronyms at 61.)

[10] The FCC has proposed and promulgated regulations requiring mobile carriers to provide for increasingly accurate location of mobile handsets that call E-911 services.  (Compl. ¶ 16.)  The current regulation provides that the location provided must be accurate, measured at the county level, for cellular network-based positioning technologies (such as the technology offered by TruePosition) within 100 meters 67% of the time, and within 300 meters 90% of the time, and for handset-based technologies (such as manufactured by Apple, Ericsson, Motorola, Samsung, and others), within 50 meters 67% of the time and within 150 meters 90% of the time.  (Id.)

major U.S. carriers that invested heavily in GSM RAN equipment required an alterative solution that would fulfill the FCC requirements.  (Id.)  However, no ETSI standard specified the method for interoperability with UL-TOA or UTDOA technology because those technologies had been dropped.  (Id. ¶ 47.)  TruePosition created a "work around" solution so that its LMUs could obtain from the GSM RAN equipment the information necessary to calculate a position.  (Id. ¶ 48.)  While this solution fulfilled the FCC requirements, it was costly for carriers.  (Id. ¶ 49.) Accordingly, the carriers requested their RAN vendors join with TruePosition in a study group to create a standard interface for TruePosition's LMUs to interoperate with the RAN equipment. (Id.)  Faced with this demand from the carriers, a study group was formed and it quickly formulated a standard that was submitted to ETSI within a year.  (Id.)  By 2004, UTDOA was included in the ETSI standard for GSM, including TruPosition's standalone LMUs.  (Id.)  In 2004, in response to a major U.S. carrier's request to interface TruePosition LMUs with Universal Mobile Telecommunications System ("UMTS"),[11] another study group was formed and UTDOA was incorporated in the 3GPP standard for UMTS, including TruePosition's standalone LMUs.  (Id. ¶ 50.)  As a result of the foregoing activities, UTDOA in standalone LMUs is currently supported in the 3GPP GSM and UMTS standards, and TruePosition has successfully marketed UTDOA-based standalone products.  (Id. ¶ 51.)

Despite the commercial success of UTDOA with 3G technologies, TruePosition alleges that Defendants have conspired to "unlawfully exclude[] UTDOA and standalone LMU implementations from any 3GPP Release for LTE systems."  (Id. ¶ 52.)  TruePosition further alleges that this conspiracy foreclosed competition in the relevant positioning and RAN

---

[11] UMTS is one of the 3G mobile telecommunications technologies.  (Compl., Glossary of Acronyms at 62.)

equipment markets and injured it by preventing it from marketing its innovative standalone LMU products.  (Id.)

## B.   ALLEGED ANTICOMPETITIVE CONDUCT OF THE CORPORATE DEFENDANTS

Throughout its lengthy Complaint, TruePosition alleges numerous acts and omissions on the part of the Corporate Defendants that it characterizes as "anticompetitive" and that it alleges are evidence of a conspiracy to wrongfully exclude UTDOA from Release 9.[12]  Most of the alleged anticompetitive conduct took place within RAN Plenary meetings or TSG Working Groups.  The first instance of such conduct is the allegedly improper exclusion of UTDOA from 3GPP's Release 9 of the LTE systems.  (Id. ¶ 62.)  According to TruePosition, under 3GPP's procedures and practices, technology that was previously included in a standard (i.e., UTDOA), should have automatically been carried forward in subsequent Releases and UTDOA's exclusion from the standard can only be explained by the existence of a conspiracy between the Corporate Defendants to exclude it.[13]  (Id. ¶¶ 63-64.)

TruePosition alleges that Qualcomm improperly submitted a work item that was co-sponsored by ALU and Ericsson at a RAN Plenary, held in Athens, Greece, in December of 2008 ("2008 Work Item").  (Id. ¶ 65.)   The 2008 Work Item proposed to include positioning technologies in the LTE standard, incorporating OTDOA and expressly excluding UTDOA.  (Id.)  TruePosition further alleges that the work item was submitted well beyond the deadline for

---

[12] A Release is an update to a Specification, which is the technical document that comprises a standard.

[13] TruePosition does not allege how technologies previously included in a standard are carried forward.  It seems that, in the past, a demand for TruePosition's technology was raised by major United States carriers and that the SSOs responded to those demands.

making technical submissions and that it was intentionally deprived of any meaningful opportunity to review or object to it.  (Id. ¶¶ 67-68.)  Moreover, TruePosition alleges that the late submission was not only accepted but also made the sole topic of discussion at the Plenary under the leadership of the Chair of the RAN Plenary - an ALU employee.  (Id. ¶ 67.)

TruePosition alleges that it was again subjected to unlawful conduct at the next RAN Plenary, held in Biarritz, France, which occurred in March of 2009.  (Id. ¶ 69.)  At this RAN Plenary, TruePosition submitted a proposal to add UTDOA to the existing work item on positioning, which had been assigned to the RAN2 Working Group.  (Id.)  However, according to TruePosition, a representative of Ericsson insisted that evaluation of UTDOA be assigned to RAN1, allegedly because the same Ericsson representative was the Chairman of RAN1 and could ensure that UTDOA standardization would be delayed while OTDOA gained a substantial "headstart" in the standardization process.  (Id. ¶¶ 69-70.)  As a result of the proposal's assignment to RAN1, UTDOA was pushed into a separate work item.  (Id. ¶ 70.)

TruePosition further alleges that, when its proposal was finally taken under consideration in RAN1, the RAN1 Chairman/Ericsson representative imposed "double standards" against UTDOA.  (Id. ¶ 71.)  First, the RAN1 Chairman required TruePosition to prove that UTDOA would deliver added benefits over other technologies to be considered for inclusion in the LTE standard.  (Id. ¶ 70a.)  Second, the RAN1 Chairman delayed evaluation of the UTDOA proposal for three months, allegedly to ensure OTDOA a solid "headstart" in the standardization process. (Id. ¶ 70b.)  TruePosition alleges a host of other acts by the Corporate Defendants within the RAN1 Working Group including: (1) shuffling evaluation of UTDOA inclusion proposal between RAN Work Groups under the control of one or more of the Corporate Defendants (Id.

¶ 78); (2) imposing discriminatorily high technical performance demands on UTDOA (Id. ¶ 80); and (3) submitting sham simulation reports on the performance ability of UTDOA at a Plenary held in Jeju, South Korea.  (Id. ¶ 80e).

Allegedly, at the March 2010 Plenary, held in Vienna, Austria, due to the controversy surrounding UTDOA's performance ability generated by the "sham" simulation results, UTDOA was not included in the Specifications for Release 9 and was pushed back to Release 10.  (Id. ¶¶ 81-82.)  Several months after the decision to push UTDOA back to Release 10, OTDOA officially became a part of Release 9 in June of 2010.  (Id. ¶ 82.)

According to the allegations of the Complaint, the Corporate Defendants were not satisfied by UTDOA's exclusion from Release 9 and continued in their conspiratorial efforts to thwart UTDOA's standardization at a September 2010 RAN Plenary held in San Antonio, Texas. (Compl. ¶¶ 83-84.)  TruePosition alleges that Ericsson was an especially vocal objector to UTDOA's standardization at that Plenary.  (Id.)  Ericsson allegedly continued to press for UTDOA simulations that would be conducted under more rigorous standards than other positioning technology and it spoke out strongly against moving UTDOA from the preliminary evaluation phase in RAN1 to the specification work of RAN2 and RAN3.  (Id.)  TruePosition also alleges that the Ericsson representative improperly attended planning meetings of the RAN Group leadership even after its RAN1 Chairmanship ended to lobby the leadership to delay and prejudice the standardization of UTDOA.  (Id. ¶ 85.)

At an October 2010 RAN1 Working Group meeting held in Xi'an, China, TruePosition alleges that ALU and Ericsson "persisted in their joint efforts to stymie progress on UTDOA." (Id. ¶ 86.)  At this meeting, it is alleged that TruePosition presented simulation results, which it

13

timely submitted prior to the meeting.  (Id.)  However, shortly after TruePosition's presentation, TruePosition asserts that Ericsson informed the ALU Chair that it posted its own revised contribution just moments earlier, which the ALU Chair accepted in violation of 3GPP Rules. (Id.)  TruePosition alleges that Ericsson surreptitiously included a new "Way Forward" in its contribution outlining a new process for future evaluations and standardization that was prejudicial to UTDOA.  (Id.)  Despite the untimeliness of Ericsson's submission, the ALU Chair allowed it and used the "Way Forward" as a baseline for the meeting record.  (Id. ¶ 87.)

At the November 2010 RAN1 Working Group meeting held in Jacksonville, Florida, TruePosition alleges that the Corporate Defendants manipulated the Group's reporting of UTDOA simulation results.  (Id. ¶ 88.)  Apparently, Ericsson submitted a table of results including the "facially-flawed" Qualcomm results, which it pretended to withdraw when TruePosition objected to them, but then covertly resubmitted the results with the approval of the ALU RAN Chair.  (Id.)

TruePosition summarizes conduct by ALU that it believes to be indicative of its participation in a conspiracy to derail UTDOA's standardization.  (Compl. ¶¶ 89-90.)  Aside from abusing its leadership positions within 3GPP, TruePosition alleges that ALU conspired with Ericsson and Qualcomm to preclude or delay standardization of UTDOA in both Release 9 and 10 because it was not then ready to produce RAN equipment with embedded UTDOA positioning technology. (Id. ¶ 89a.)  TruePosition further alleges that ALU sought to prevent UTDOA standardization of standalone positioning equipment such as TruePosition's standalone LMU, and to standardize only UTDOA implementations embedded into RAN equipment.  (Id. ¶ 89b.)  Additionally, TruePosition alleges that ALU sought to standardize only one type of

UTDOA known as the Sounding Reference Signal ("SRS"), rather than Semi-Persistent

Scheduling ("SPS"), which TruePosition developed and advocated within 3GPP.  (Id. ¶ 89c.)  At

the conclusion of the UTDOA evaluation period, ALU allegedly introduced questionable

simulation data showing better results from only SRS at an October 2010 RAN1 Working Group

meeting held in Xi'an, China.  (Id. ¶ 90.)  Although TruePosition wished to incorporate a hybrid

SRS/SPS method, the Corporate Defendants opposed it and would only support moving forward

with the SRS method, leaving TruePosition with little recourse except to place an objection on

the record, which it did. (Id.)

        In the December 2010 RAN1 Working Group meeting held in Istanbul, Turkey, UTDOA

was finally accepted as a work item for standardization.  (Id. ¶ 91.)  Thereafter, the Corporate

Defendants subjected UTDOA standardization to two explicit conditions: (1) UTDOA would

only be standardized for the SRS transmission method; and (2) UTDOA standardization would

be pushed out to Release 11, contemplated to be completed by September 2012 at the earliest.

(Id.)  ALU also opposed standardizing standalone LMU UTDOA, advocating only for the version

embedded into RAN equipment.  (Id.)  TruePosition also alleges that Ericsson attempted to

disrupt the process of rolling the UTDOA work item from Release 10 to Release 11 by waiting

until the last day of the meeting to present a long list of changes to the work item, which it

presented with rapid fire speed.  (Id. ¶ 93.)  TruePosition alleges that the Ericsson representative

did not provide the written comments to the Plenary but it had provided them in advance to ALU.

(Id.)  TruePosition alleges that Ericsson requested that the Chairman issue the work item and

note them as approved, without review.  (Id.)  TruePosition objected.  (Id.)  As evidence of a

conspiracy, TruePosition alleges that the ALU Chair already had prepared a version of the work

item from the written changes provided by Ericsson, and asked for their approval.  (Id.)
TruePosition again objected.  (Id.)

TruePosition alleges that the "normal course" would have been for the next work on the
UTDOA item to be assigned to RAN 2 (which already had begun work months earlier), chaired
by a representative from Samsung.  (Id. ¶ 94.)  However, Ericsson and Qualcomm argued that the
UTDOA work item instead should be consigned to the RAN3 Working Group, because those
Defendants occupied the positions of Chairman and Vice Chairman of RAN3.  (Id.)  Allegedly,
after a lengthy debate, the Plenary Chair, at the behest of Ericsson, determined that the work
would begin in RAN2, but that RAN3 would review the work of RAN2.  (Id. ¶ 96.)

During the April 2011 RAN2 Working Group meeting held in Shanghai, China, Ericsson
allegedly objected to standardization for TruePosition's technology by criticizing the complexity
of the standalone LMUs.  (Id. ¶ 97.)  A major U.S. carrier, presumably AT&T, countered that the
standalone LMUs had already been widely deployed and were successful in the U.S.  (Id.)

In the May/June 2011 RAN TSG Plenary meeting held in Bratislava, Slovakia, Ericsson
allegedly renewed its insistence that RAN3 review RAN2's work before UTDOA could be
included in the specification.  (Id. ¶ 98.)  TruePosition avers that the Samsung RAN2 Chairman
saw through Ericsson's ploy to delay standardization and denied Ericsson's request.  (Id.)

## C.      ALLEGED PARTICIPATION IN THE CONSPIRACY BY THE SSO DEFENDANTS

TruePosition's theory of liability against the SSO Defendants is one of acquiescence.  (Id.
¶¶ 99-101.)  TruePosition alleges that the SSO Defendants are tasked with monitoring and
enforcing compliance with the SSO Rules and that they failed to do so.  (Id. ¶ 99.)  According to
TruePosition, the SSO Defendants attended nearly all of the meetings referenced above, wherein

the alleged conduct could be witnessed firsthand.  (Id.)  Furthermore, TruePosition asserts that it

twice alerted the SSO Defendants' general counsel that anticompetitive conduct was occurring

within the 3GPP RAN TSG and RAN Working Groups, but that its complaints fell on deaf ears.

(Id.)  TruePosition avers that the SSO Defendants' inaction and refusal to enforce the SSO Rules

renders them part of the conspiracy.  (Id. ¶ 100.)

### D.    PROCEDURAL HISTORY

TruePosition filed a Complaint on July 20, 2011.  Therein, TruePosition alleges that the

conduct described above gives rise to two causes of action: (1) violations of § 1 of the Sherman

Act, 15 U.S.C. § 1 (Count I); and (2) violations of § 2 of the Sherman Act 15 U.S.C. § 2 (Count

II).  TruePosition's § 1 claim is asserted against all Defendants, while TruePosition's § 2 claim is

only asserted against Ericsson and ALU.

Qualcomm was the first Defendant to file a Motion to Dismiss, on September 8, 2011.

Therein, it argues that TruePosition simply fails to state claims against it under Federal Rule of

Civil Procedure 12(b)(6) because the allegations of the Complaint do not sufficiently allege that

it entered into an agreement to conspire, a necessary agreement of a § 1 claim.  On October 11,

2011, ETSI, Ericsson, and ALU filed individual Motions to Dismiss.  All Defendants argue that

TruePosition fails to allege a § 1 claim against them because the allegations of the Complaint fail

to sufficiently allege that they entered into an agreement.  Ericsson and ALU argue that

TruePosition also fails to allege a § 2 claim against them for the same reason, namely, failure to

allege that they entered into an unlawful agreement.  Additionally, ETSI, ALU, and Ericsson

argue that TruePosition's claims are not yet ripe for adjudication because TruePosition's claims

are based on uncertain future events, i.e., the exclusion of UTDOA from 3GPP standards.  ETSI

and Ericsson also argue that TruePosition lacks standing because it fails to allege that it suffered an antitrust injury.  Only ETSI argues that we lack personal jurisdiction over it.[14]

## II.     STANDARDS OF REVIEW

### A.  THE PLEADING STANDARD

Federal Rule of Civil Procedure 8(a)(2) mandates that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court held that to satisfy Rule 8(a)(2), a complaint must contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible."  W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010) (citing Twombly, 550 U.S. at 556, 569 n.4).  Importantly, this "does not impose a probability requirement at the pleading stage but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."  Id. at 98 (quoting Twombly, 550 U.S. at 556).  Put another way, "[t]o comply with this general pleading standard, the complaint, construe[d] . . . in the light most favorable to the plaintiff, must contain, enough factual matter (taken as true) to suggest the required elements[s] of the claims asserted."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010) (internal quotations and citations omitted).  In ruling on the sufficiency of a complaint, "courts should disregard the complaint's legal conclusions and determine whether the remaining factual allegations suggest that the plaintiff has a 'plausible-as opposed to merely conceivable-claim for relief.'"  UPMC, 627 F.3d at 98 (quoting Ashcroft v. Iqbal, 129 S.Ct.

---

[14] Originally, ALU also asserted lack of personal jurisdiction, but the parties have stipulated that any jurisidictional defect has been cured by their November 4, 2011 stipulation to substitute Alcatel-Lucent USA Inc. for Alcatel-Lucent, S.A.

1937, 1949-50 (2009)).

The parties, in their briefs and at oral argument, have expressed disagreement over the requisite level of pleading that a Sherman antitrust plaintiff is required to put forth to survive a motion to dismiss.  Specifically, Qualcomm argues that TruePosition's complaint fails to allege "a conspiracy or agreement . . . designed to achieve an unlawful objective, much less with the *specificity* and *foundation* required by the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)."  (Qualcomm's Mem. in Supp. of Mot. to Dismiss at 2.) (emphasis added).  Qualcomm further argues that the Third Circuit requires an antitrust plaintiff to allege factual detail in the Complaint that makes it more likely that the Defendants' conduct was the result of an unlawful agreement than the result of independent rational, and wholly lawful decisions by each defendant.  (See Qualcomm's 10/26/2011 Letter Reply) (citing Burtch v. Millberg Factors, Inc., No. 10-2818, - - F.3d - -, 2011 WL 5027511, at *13 (3d Cir. Oct. 24, 2011)).  TruePosition counters that Twombly does not require this level of pleading and that Qualcomm is advocating for the Court to transpose Twombly's "plausibility" requirement with a "probability" requirement.  (TruePosition's Resp. in Opp'n to Qualcomm's Mot. to Dismiss at 14 n.22 &15.)  TruePosition further argues that Burtch did not change Twombly's plausibility requirement and that Burtch was decided on factually distinguishable grounds.  (See TruePosition's 10/27/2011 Letter Reply.)

We find that Twombly requires a level of factual detail that makes it more likely that the Defendants' conduct was the result of an unlawful agreement rather than some other independent and lawful explanation and that such requirement is not a "probability" requirement.  In Twombly, the Supreme Court stated, "The need at the pleading stage for allegations plausibly

19

suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that 'the plain statement' possesses enough heft to 'sho[w] that the pleader is entitled to relief.'"  <u>Twombly</u>, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)).  The Supreme Court went on to state that:

> A statement of parallel conduct, even of conduct consciously taken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.  An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief."

<u>Id.</u> (alteration in original).  The Supreme Court drew the dividing line between "possibility"-the allegations suggest that the Defendants' conduct is the result of an unlawful agreement- and "plausibility"-the allegations suggest that the Defendants' conduct is more likely the result of an agreement.  To accept TruePosition's argument regarding the level of specificity necessary to survive a motion to dismiss would be to allow the complaint to "stop short of the line between possibility and plausibility."  <u>Id.</u>

In addition, we read <u>Burtch</u> as merely reinforcing <u>Twombly</u>'s plausibility requirements, not as creating a heightened standard.  In <u>Burtch</u>, the appellant argued that the magistrate judge, whose report and recommendation ("R & R") was adopted by the district judge, had improperly applied a probability standard rather than a plausibility standard.  <u>Burtch</u>, 2011 WL 5027511, at *13.  The relevant portion of the magistrate judge's R & R stated:

> At best, the Plaintiff has alleged that the Defendants *might* have reached an agreement to limit or decline credit to Factory 2-U and then acted on that agreement by doing just that, at approximately the same time as one another.  However, there is no factual detail in the Complaint that makes it any more likely that the Defendants' parallel conduct was the result of an unlawful agreement than, instead,

the result of independent rational, and wholly lawful decisions by each Defendant to
limit its exposure to Factory 2-U's deteriorating financial condition.

Id. (citation omitted).  The Third Circuit found that the magistrate judge had merely "mirrored

his reasoning after Twombly's proposition that parallel conduct is 'consistent with conspiracy,

but just as much in line with a wide swath of rational and competitive business strategy

unilaterally prompted by common perceptions of the market.'"  Id. (citing Twombly, 550 U.S. at

554).  The Third Circuit also found that the disputed portion of the R & R was entirely consistent

with Twombly's requirement that "allegations 'be placed in a context that raises a suggestion of a

preceding agreement, not merely parallel conduct that could *just as well* be independent action.'"

Id. (citing Twombly, 550 U.S. at 557) (emphasis in original).  Thus, Burtch did not impose a

heightened pleading standard over and above what Twombly requires.  Rather, Burtch reinforces

Twombly's plausibility requirement

## III.  DISCUSSION

### A.   ETSI'S 12(b)(2) MOTION TO DISMISS

First, we will determine whether TruePosition has made a *prima facie* showing that the

exercise of general personal jurisdiction over ETSI is appropriate.  If we conclude that we lack

personal jurisdiction over ETSI, then we will dismiss it from this action and our subsequent

discussion concerning whether TruePosition has adequately pled its claims against the remaining

Defendants will have no bearing on it.

ETSI is a not-for-profit organization located in Sophia Antipolis, France.  (Harkins Decl.,

Ex. 25 at 1.)  ETSI argues that we should dismiss the claims against it for lack of personal

jurisdiction because TruePosition fails to allege that it has systemic and continuous contact with

the United States.  (ETSI's Mem. in Supp. of Mot. Dismiss at 6-13.)  TruePosition alleges that

we may exercise personal jurisdiction over ETSI pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.[15]  (Compl. ¶ 14.)  ETSI denies that § 12 applies because it is not a corporation defendant but it concedes an "aggregate contacts analysis" may be appropriate given that Federal Rule of Civil Procedure 4(k)(2) permits a court to exercise personal jurisdiction over a foreign defendant based on the defendant's aggregate contacts with the United States as a whole. (ETSI's Mem. in Supp. of Mot. to Dismiss at 7-8.)  In any event, TruePosition and ETSI agree that the "aggregate contacts" analysis is the same under § 12 of the Clayton Act and Rule 4(k)(2). (TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 3 n.2.)  We find the parties' assessment of the standards to be correct.  See In re Auto. Refinishing Paint Antitrust Litig., 358 F.3d 288, 297 (3d Cir. 2004) (hereafter, "Automotive Paint") (". . . when personal jurisdiction is invoked under the Clayton Act, jurisdiction is based on the defendant's contacts with the United States as a whole.").  Therefore, we will examine ETSI's contacts with the United States using a Rule 4(k)(2) analysis.

Once a defendant challenges a court's exercise of personal jurisdiction over it, the plaintiff bears the burden of establishing personal jurisdiction.  D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001)).  "'The plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence . . . at no

---

[15] Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction.'" Koken v. Pension Benefit Guar. Corp., 430 F. Supp. 2d 493, 497 (E.D. Pa. 2006) (citing Provident Nat'l Bank v. CA Fed. Sav. & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987)).  If the District Court does not hold an evidentiary hearing, the plaintiff is only required to establish a *prima facie* case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor.  D'Jamoos, 566 F.3d at 102 (citing Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004)).  The plaintiff may meet its *prima facie* burden by "'establishing with reasonable particularity sufficient contacts between the defendant and the forum . . .'" Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd., 64 F. Supp. 2d 448, 450 (E.D. Pa. 1999) (quoting Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)).

"Rule 4(k)(2) applies to a defendant against whom a claim is made pursuant to federal law and who is not subject to personal jurisdiction in any state." Koken, 430 F. Supp. 2d at 499. Under Rule 4(k)(2), a court may look to the defendant's contacts with the United States in the aggregate to determine whether the exercise of jurisdiction is consistent with the due process clause of the Fifth Amendment.  Id. (citing Advisory Committee Note; Cent. States Se. & Sw. Areas Pension Fund v. Reimer Express World Corp., No. 99 C 2524, 2000 WL 1015937, at *4 (N.D. Ill. Jan. 31, 2000)).  "This is generally understood as permitting the district courts to assert personal jurisdiction over a non-resident of the state to the extent authorized and allowed by the law of the state where the district court sits." Am. Bd. of Internal Med. v. Oni, Civil Action No. 10-CV-2679, 2010 WL 3860444, at *2 (E.D. Pa. Sept. 30, 2010) (citing Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009); Time Share Vacation Club, 735 F.2d 61, 63 (3d

Cir. 1984)).  Under Pennsylvania's long-arm statute, 42 Pa. C.S. § 5322(b):

> [i]n addition to the provisions of subsection (a) the jurisdiction of the tribunals of this Commonwealth shall extend to all persons who are not within the scope of section 5301 (relating to persons)-to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States.

42 Pa. C.S. § 5322(b).[16]

The constitutional requirement of due process also mandates that a defendant have sufficient "minimum contacts" with the forum state such that the exercise of jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice." Oni, 2010 WL 2860444, at *2 (citing Wolk v. Teledyne Indus., Inc., 475 F. Supp. 2d 491, 501 (E.D. Pa. 2007)). "'Minimum contacts must have a basis in some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Id. (quoting Asahi Metal Indus. Co. v. Superior Court of CA, 480 U.S. 102, 109 (1987); Wolk, 475 F. Supp. 2d at 501).  Thus, "having minimum contacts with another state provides "fair warning" to a defendant that he or she may be subject to suit in that state." Id. (citing Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007)).  "As a threshold matter then, the defendant must have taken 'action purposefully directed toward the forum State,' though the defendant's physical entrance into the forum is not necessary to meet this requirement." Id. (quoting D'Jamoos, 566 F.3d at 103).

In this case, TruePosition only claims that we may exercise personal jurisdiction over

---

[16] Although ETSI suggests that Pennsylvania's long-arm statute, 42 Pa. C.S. § 5322(b), imposes a more restrictive due process analysis, this is not the case.  The Third Circuit, discussing the reach of Pennsylvania's long-arm statute, stated that "its reach is coextensive with the limits placed on the states by the federal Constitution." Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 150 (3d Cir. 1996) (citing 42 Pa. C.S. § 5322(b)).

ETSI on the basis of ETSI's general contacts with the United States (general jurisdiction) rather

than its claim-specific contacts (specific jurisdiction).  (TruePosition's Resp. in Opp'n to ETSI's

Mot. to Dismiss at 1) ("ETSI has been engaged in substantial and continuous activity in the

United States for more than ten years and is, therefore, subject to general personal jurisdiction in

this federal antitrust action.")  This Circuit holds that the plaintiff must show significantly more

than mere minimum contacts to establish general jurisdiction.  Provident Nat'l Bank, 819 F.2d at

437 (citing Dollar Sav. Bank v. First Sec. Bank of Utah, 746 F.2d 208, 212 (3d Cir. 1984);

Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982)).

To establish general jurisdiction, the plaintiff must show that the defendant has maintained

"continuous and systematic" contacts with the forum.  Vetrotex, 75 F.3d at 151 n.3 (quoting

Helicopteros Nacionales de Columbia v. Hall, 466 U.S. 408, 414 n.9 & 416 (1984); Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 473 n.15 (1985)).  When evaluating a corporation's ties to a

forum, "a court should look to the forum's 'purposeful and extensive availment' of the forum.  A

court should also consider the degree to which a corporation's contacts with a given forum are

'central to the conduct of its business.'"  Molnlycke, 64 F. Supp. 2d at 450 (quoting Provident

Nat'l Bank, 819 F. 2d at 437-38).

Although it is the plaintiff's burden to demonstrate facts that support personal

jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the claim

is clearly frivolous.  Toys "R" Us, Inc. v. Step Two, SA, 318 F.3d 446, 456 (3d Cir. 2003)

(internal citations and quotations omitted).  If a plaintiff presents factual allegations that suggest

with "reasonable particularity" the possible existence of the requisite "contacts between the party

and the forum . . . the plaintiffs right to conduct jurisdictional discovery should be sustained."  Id.

25

(internal citations and quotations omitted).

### 1.      ETSI's Contacts with the United States

TruePosition has produced a sworn affidavit in response to ETSI's Motion to Dismiss on the ground of personal jurisdiction, the "Declaration of John G. Harkins, Jr." ("Harkins Declaration").  The Harkins Declaration lists and explains thirty-nine exhibits that were collected from ETSI's website and the websites of U.S. organizations with which ETSI has entered into partnerships or other collaborative agreements.  (Harkins Decl. ¶ 2.)

A substantial portion of TruePosition's Response to ETSI's Motion to Dismiss is devoted to describing ETSI's relationship with Co-Defendant and organizational partner, 3GPP. (TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 4-9.)  ETSI's website states that ETSI is one of the founding partners of 3GPP and that it supports 3GPP though a division of its Secretariat known as the Mobile Competence Center ("MCC").  (Harkins Decl. ¶ 3, Ex 1.)  The MCC was established to ensure the "efficient day-to-day running of 3GPP."  (Id. ¶ 6, Ex. 4.)  The MCC is comprised of ETSI employees who provide support to 3GPP.  (Id. ¶ 11, Ex. 9.)  The support for 3GPP includes providing support at 3GPP meetings, managing work items, updating and maintaining work plans for work items, editing specifications, and supporting relevant chairpersons by undertaking administrative functions.  (Id.)  Additionally, 3GPP is deemed by ETSI to be a Partnership Project of ETSI.  (Id. ¶ 4, Ex. 2.)

Through this connection to 3GPP, TruePosition seeks to impute some of the activities of 3GPP to ETSI.  For instance, TruePosition wishes to attribute the roughly 300 3GPP meetings that took place in the United States since 1998 to ETSI because of its administrative role in the planning of those meetings.  (TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 4.)

TruePosition also asks us to consider the following factors in connection with 3GPP for purposes our of jurisdictional analysis: (1) ETSI's application for and possession of U.S. trademarks in "3GPP," "ETSI," and "LTE"; (2) ETSI's joint ownership with 3GPP of the Technical Specifications and Technical Reports approved by 3GPP; and (3) ETSI's Director of Legal Affairs acts in the same capacity for 3GPP.  (Id. 5-6.)

Concerning ETSI's non 3GPP-related contacts with the United States, TruePosition has produced information that ETSI has independent contacts with the United States.  For example, ETSI's 2010 Annual Report ("Annual Report") shows that 51 of its own members are located in the United States and were able to participate in 3GPP via their membership in ETSI.  (Harkins Decl., Ex. 1 at 19.)  The Annual Report also provides that ETSI derives revenues in the form of dues and fees collected from its members.  (Id., Ex. 1 at 20.)  One of ETSI's partners in the 3GPP project is the Alliance for Telecommunications Industry Solutions ("ATIS"), located in Washington, D.C. and, furthermore, that ETSI has other U.S. "contacts" though 3GPP Market Representation Partners" that include several other entities located in the United States.  (Id., Exs. 5-6.)  Additional partnerships with United States corporations or organizations include partnerships with the following entities:

- American National Standards Institute ("ANSI"), located in Washington, D.C.;
- Telecommunications Industry Association ("TIA"), located in Arlington, Virginia;
- United States Department of Transportation; and
- ATIS, located in Washington, D.C.

(Id., Exs. 17, 15, 30, 31, 36.)  TruePosition alleges that ETSI has attended multiple meetings in the United States in connection with each of the partnerships listed above and that ETSI exchanges information with each of its various partners.

Furthermore, ETSI derives additional revenue from commercial activities in the United

States aside from its collection of dues and fees from its members.  For example, ETSI also collects revenue through two business ventures known as Forapolis and Interopolis.[17]  (Id., Ex. 1 at 20; Ex. 14; Ex. 38.)  ETSI has also scheduled and conducted at least six separate meetings of ETSI committees or working groups in the United States since January of 2008.  (Id., Ex. 22.)

Moreover, ETSI's website states that it holds copyright license agreements with three distributors that make available the complete library of ETSI standards for sale in the United States, from which ETSI derives revenue.  (Id. Ex. 15.)  Also, ETSI's website offers direct sales of its publications to customers in the United States.  (Id. Ex. 13.)

There is no record that ETSI maintains an office, permanent employees, or designated agents in the United States.  (TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 10.)  TruePosition has not alleged that ETSI is licensed to conduct business in the United States, that it maintains a bank account in the United States or that it otherwise maintains a physical presence in the United States.

## 2.     Analysis

ETSI argues that no single alleged contact is sufficient to show that it had continuous and systemic contact with the United States and, thus, taken together, the sum of the parts is still "zero."  (ETSI's Reply to TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 11.)  TruePosition counters that dissecting each of ETSI's contacts with the United States is a legally unsound approach and that even if no single act is sufficient to show continuous and systemic

---

[17] Forapolis offers a portfolio of business management services to organization worldwide, including the United States, and Interopolis offers a portfolio of protocol specifications and testing services to standardization groups worldwide, including the United States.  (Harkins Decl., Exs. 11-12.)

contact with the United States, the aggregate of these acts more than proves the propriety of exercising personal jurisdiction over ETSI.  (TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 9.)  While we acknowledge that the law requires an aggregate view of a foreign defendant's contacts, we reject TruePosition's view that aggregating individual contacts, which in and of themselves are insufficient to establish a continuous and systemic presence, warrants the exercise of general personal jurisdiction over a foreign defendant.  Accordingly, we will examine each contact alleged by TruePosition.

We first consider ETSI's attendance of over several hundred meetings in the United States.  ETSI, in its role as an organizational partner to 3GPP, has planned over 300 meetings in the United States since 1998 and over 70 of those meetings occurred since 2008.  (TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 4; Harkins Decl., Ex. 20.)  Additionally, ETSI scheduled and conducted at least six meetings of ETSI committees or working groups in the United States since January 2008.  (Harkins Decl., Ex. 22.)  Furthermore, ETSI has attended multiple meetings in the United States in connection with its many partnerships and collaborations with United States entities.  (Id.; Exs. 25-29, 30-32, 35-36.)  ETSI, relying on Provident National Bank, argues that these meetings are irrelevant to our jurisdictional analysis because they were not central to ETSI's core business.  TruePosition relies on the same case to prove that these meetings are in fact central to ETSI's core business.

In Provident National Bank, the Third Circuit held that a California bank had sufficient "continuous and systematic business contacts" within Pennsylvania to confer personal jurisdiction over it in an action filed against it in Pennsylvania.  Provident Nat'l Bank, 819 F.2d at 438.  The court found this to be the case despite the fact that the California defendant

29

"maintained no Pennsylvania office, employees, agents, mailing address, or telephone number." Id. at 436.  The California defendant's only contacts with Pennsylvania were relationships with three Pennsylvania institutions that serviced $10.2 million worth of loans for it and a bank account in Pittsburgh.  Id.  The bank account was a "zero balance" account, whereby the bank notified the California defendant every business day of the total amount of checks cleared through the account that day and the California defendant would then wire a transfer of funds for that amount to the bank that same day.  Id.  The Third Circuit held that the nature of the deposits and loans serviced by its bank account was "central to the conduct of [the California defendant's] business" and was, thus, sufficient to confer jurisdiction over the California defendant.  The Third Circuit also held that the "bread and butter" of the California Defendant's business was the borrowing and lending of money.  Id.  The court also noted that the bank account required daily communication with and transferring of funds to the bank in its decision.  Id.

Here, we must determine what activities constitute ETSI's "business."  ETSI argues that its business is to "develop globally applicable standards for Information and Communications Technologies" that "help to ensure the free movement of goods within the single European market, allowing enterprises within the EU to be more competitive."  (ETSI's Reply to TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 14-15) (quoting Harkins Decl., Ex. 1 at 2.)  TruePosition urges us to adopt a broad definition of ETSI's business that includes something akin to a lobbying component the goal of which is to expand the reach of its standards to foreign nations, including the United States.  (ETSI's Reply to TruePosition's Resp. in Opp'n to ETSI's Mot. to Dismiss at 10.)  TruePosition's definition of ETSI's business also includes providing administrative support to partnership projects such as 3GPP.

30

We find that the core business of ETSI is to promulgate standards for the EU.  The fact

that these standards may be adopted by other countries, does not change that.  The record is

certainly replete with references demonstrating that ETSI acknowledges its global presence and

influence, and that it has entered into partnerships in several countries to improve transparency

between SSOs in several countries.  Nevertheless, at oral argument, ETSI explained that its own

jurisdiction is confined to the EU and that other SSOs are responsible for implementing the

necessary steps for the adoption of its standards.  (12/2/2011 Hr'g Tr. 126:23-128:20.)

TruePosition did not contest the point and nothing in the extensive record that it produced

disputes the point.  Were we to adopt TruePosition's definition, we would hold that nearly all

activity by an entity is the "bread and butter" of its business.  <u>Provident Nat'l Bank</u>, 819 F.2d at

436.  This is not what the law mandates.  In fact, in , the foreign defendant that solicited

helicopter services in Texas, negotiated its contract for services there, had purchased roughly

80% of its helicopters, spare parts, and accessories for more than $4 million from a Texas

company over an eight year period and regularly sent employees to Texas for training and to

bring back helicopters.  <u>Helicopteros</u>, 466 U.S. 408, 409-12.  The Supreme Court held that the

contacts did not constitute the kind of "continuous and systemic general business contacts"

necessary to confer personal jurisdiction over it.  <u>Id.</u> at 416.  The Third Circuit distinguished

<u>Provident National Bank</u> from <u>Helicopteros</u> on the ground that the activities by the defendant in

<u>Helicopteros</u> were "important but not central to the defendant's business."  <u>Provident Nat'l Bank</u>,

819 F.2d at  438.  Here, as in <u>Helicopteros</u>, ETSI's provision of administrative support to 3GPP

may be important, but we opine that it is certainly not central to its business of promulgating

standards.[18]

Furthermore, we find that the remaining contacts with the United States do not confer jurisdiction over ETSI.  First, the fact that ETSI has 51 United States entity members does not confer jurisdiction over it.  In Brotherhood of Locomotive Engineers and Trainmen v. United Transportation Union, 413 F. Supp. 2d 410, 415 (E.D. Pa. 2005), the court held that "when considering whether general jurisdiction is appropriate over an unincorporated association, a court must assess: (1) the nature of the legal and institutional relationships between the particular association and its constituents; (2) the degree of control exercised over its members; and (3) the extent to which its members can be said to act for and on behalf of the association."  Bhd. of Locomotive Eng'rs & Trainmen, 413 F. Supp. 2d at 415.  Here, there is no record that ETSI's legal and institutional relationships with its United States members require it to have continuous and systemic contacts with the United States.  Also, there is no record that ETSI exercises any degree of control over those members with respect to their decisions on how to conduct its business in the United States.  At the most, there is an indirect effect on the members stemming from the possible adoption of ETSI or 3GPP standards by a United States SSO.  This is too tenuous a connection to satisfy due process.  In sum, there is simply no proof that these memberships with the United States entities demand the sort of continuous and systemic contacts necessary to confer jurisdiction over ETSI.

Additionally, as the record now stands, the many partnerships and agreements that ETSI

---

[18] Because we find that providing administrative support to partner SSOs is not central to the nature of ETSI's business and, therefore, that the meetings in the United States on account of providing such services do not confer jurisdiction over ETSI, we need not address whether In re Chocolate Confectionary Antitrust Litigation, 674 F. Supp. 2d 580, 603 (M.D. Pa. 2009), provides an additional basis to discount these meetings.

entered into with United States SSOs, the United States Department of Transportation and/or

licenses in the United States are insufficient to confer personal jurisdiction over ETSI because

TruePosition has only introduced evidence that ETSI entered into those relationships.  (See

Harkins Decl., Exs. 5, 6, 35, 36.)  In order to find that they are jurisdictionally relevant,

TruePosition must show "sufficient evidence to characterize its contacts with this forum as

continuous and substantial for the purpose of finding general jurisdiction."  Bizarre Foods, Inc. v.

Premium Foods, Inc., No. Civ. A. 02-CV-9061, 2003 WL 21120690, at *4 (E.D. Pa. May 16,

2003).  None of the information illustrates how the ETSI's formation of these various

relationships have led to "continuous and substantial" contacts with the United States.  However,

we find that TruePosition has presented factual allegations that suggest with "reasonable

particularity" the possible existence of the requisite "contacts between the party and the forum"

based on these relationships.  Toys "R" Us, 318 F.3d at 456.  Furthermore, TruePosition alleges

that these relationships require the parties to frequently meet and to exchange information.  Thus,

we will grant its request for jurisdictional discovery to cure this deficiency.

ETSI's ownership of a United States trademark is also insufficient to confer jurisdiction

over it.  See Black v. JP Morgan Chase & Co., Civil A. No. 10-848, 2011 WL 4102802, at *44

(W.D. Pa. Aug. 10, 2011) ("[M]ere ownership of a registered U.S. trademark does not subject a

[defendant] to personal jurisdiction . . ..").  Additionally, the evidence relating to ETSI's

involvement with Forapolis and Interopolis is insufficient to confer jurisdiction over it because

the evidence does not show that those entities have performed services in the United States.  It is

well settled that "'the possibility of future contact' with a forum '[d]oes not support general

jurisdiction.'"  Amp Inc. v. Methode Elecs. Inc., 823 F. Supp. 259, 264 (M.D. Pa. 1993) (quoting

33

Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 300 (3d Cir. 1985)).  Finally, the fact that

ETSI's products are available for direct purchase by United States customers is, as ETSI states,

"jurisdictionally meaningless" absent some allegation that ETSI's WEBstore specifically targets

United States customers.  (ETSI's Reply in Resp. to TruePosition's Resp. in Opp'n to ETSI's

Mot. to Dismiss at 18.)  Recently, a district court in this district reasoned: "To hold that the

possibility of ordering products from a website establishes general jurisdiction would effectively

hold that any corporation with such a website is subject to general jurisdiction in every state."

Molnlycke, 64 F. Supp. 2d at 451.  We find this reasoning sound and we note that our own visit

to the ETSI WEBstore revealed no indication that its products or its website were targeted to

United States customers.  In fact, the prices of items available for purchase were listed in Euro

denominations and the contact information included only French phone numbers.

     In conclusion, we find that, even in the aggregate, TruePosition has failed to establish that

exercise of personal jurisdiction over ETSI.  However, we see nothing frivolous about its claims

of jurisdiction with regard to ETSI's relationships with various United States SSOs and entities.

Thus, we will allow TruePosition jurisdictional discovery to determine whether those

relationships are the type that will cause it to engage in "continuous and substantial" contacts

with the United States.

### B.    CONSPIRACY CLAIMS

     TruePosition asserts conspiracy claims under § 1 and § 2 of the Sherman Act, 15 U.S.C.

§§ 1, 2.  Section 1 provides that "[e]very contract, combination in the form of trust or otherwise,

or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be

illegal."  15 U.S.C. § 1.  "Despite its seemingly absolute language, section 1 has been construed

to prohibit only *unreasonable* restraints of trade." UPMC, 627 F.3d at 99 (citing Standard Oil

Co. v. United States, 221 U.S. 1, 58 (1911) (emphasis in original); United States v. Brown Univ.,

5 F.3d 658, 668 (3d Cir. 1993)).  Some agreements are so plainly anticompetitive that they are

condemned *per se*; that is, they are conclusively presumed to unreasonably restrain trade." Id.

(citing United States v. Trenton Potteries Co., 273 U.S. 392, 397-400 (1927) (horizontal

agreements to fix prices); Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49-50 (1990) (per curiam)

(horizontal agreements to divide markets)).  Other agreements are condemned only if evaluation

under the fact-intensive rule of reason indicates that they unreasonably restrain trade. Id. (citing

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877 (2007) (vertical agreements to

maintain resale prices)).

      In this case the parties dispute whether the Defendants' conduct should be evaluated

under the *per se* or the rule of reason level of scrutiny.  TruePosition argues that the Defendants'

conduct amounts to "collusion to exclude competitive technologies and competitors under the

guise of a standards-setting organization," which is a *per se* violation of Section 1.

(TruePosition's Joint Resp. at 26.)  Alternatively, TruePosition argues that the allegations in the

Complaint meet the more stringent rule of reason requirements and a median standard known as

the "quick look."  The Defendants argue that whichever standard applies, either would be

irrelevant for determining the sufficiency of the Complaint for present purposes because their

attack is focused on TruePosition's deficiencies in pleading the predicate conspiracy.  (ALU's

Reply at 16-18; Ericsson's Reply at 4; Qualcomm's Reply at 3.)  Alternatively, they argue that

we should apply a rule of reason analysis.  (Id.)  We agree with the Defendants that a decision

concerning the standard we will use to determine whether the restraint on trade is unreasonable is

a premature question if the Complaint fails to allege a conspiracy.  Therefore, we will reach this

question only if we find that TruePosition has sufficiently alleged a conspiracy.

Section 2 imposes liability on "[e]very person who shall monopolize, or attempt to

monopolize, or combine or conspire to monopolize any part of the trade or commerce among the

several states." 15 U.S.C. § 2.  Commentators have noted that, to the extent it bans *conspiracies*

to monopolize, section 2 is largely superfluous, as conspiracies to monopolize will usually-if not

always-run afoul of section 1's prohibition of conspiracies that unreasonably restrain trade.

UPMC, 627 F.3d at 99 n.7 (citing Mark T.L. Sargent, Economics Upside-Down: Low Price

Guarantees as Mechanisms for Facilitating Tacit Collusion, 141 U. Pa. L.Rev. 2055, 2109

(1993)).

The Defendants advance several arguments in favor of dismissing TruePosition's

Complaint.  We address each in turn.

### 1.    Agreement

First, we address the Defendants' claim that TruePosition's conspiracy claims should be

dismissed because the Complaint fails to allege an agreement.  "To prevail on a section 1 claim

or a section 2 conspiracy claim, a plaintiff must establish an agreement, sometimes also referred

to as a 'conspiracy' or 'concerted action.'" Id. (quoting Twombly, 550 U.S. at 553; Gordon v.

Lewistown Hosp., 423 F.3d 184, 207 n.16 (3d Cir. 2005)).  "An agreement exists when there is a

unity of purpose, a common design and understanding, a meeting of the minds, or a conscious

commitment to a common scheme." Id. (citing Copperweld Corp. v. Indep. Tube Corp., 467

U.S. 752, 771 (1984) (additional citations omitted)).  A plaintiff must further allege how the

conspirators had a "conscious commitment to a common scheme *designed to achieve an*

*unlawful objective*."  Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)

(emphasis added).

"A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a

combination of the two."  UPMC, 627 F.3d at 99.  Allegations of direct evidence of an unlawful

agreement must be "explicit and require[] no inferences to establish the proposition or conclusion

being asserted."  In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999).  "If a

complaint includes non-conclusory allegations of direct evidence of an agreement, a court need

go no further on the question whether an agreement has been adequately pled."  UPMC, 627 F.3d

at 99 (citing Ins. Brokerage, 618 F.3d at 323).  It is for this reason that courts refer to direct

evidence of an agreement as the proverbial "smoking gun."  Rossi v. Standard Roofing, Inc., 156

F.3d at 452, 465 (3d Cir. 1998).  Examples of evidence that encompasses sufficient clarity to be

deemed direct evidence include:

> ●A direct threat to the plaintiff from a competitor that if he or she went into business
> his competitors would do anything they could to stop him, including cutting prices
> or supplies (Rossi, 156 F.3d at 468);
> ●Advising distributors that a supplier would cut off access if the distributor failed to
> maintain a certain price level (Monsanto, 465 U.S. at 765);
> ●A memorandum produced by a defendant conspirator detailing the discussions from
> a meeting of a group of alleged conspirators (Arnold Pontiac-GMC, Inc. v. Budd
> Baer, Inc., 826 F.2d 1335, 1338 (3d Cir. 1987); and
> ●A public resolution by a professional association recommending that its members
> withdraw their affiliation with an insurer (Pa. Dental Ass'n v. Med. Serv. Ass'n of
> Pa., 815 F.2d 270, 273 (3d Cir. 1987).

Intervest, Inc. v. Bloomberg L.P., 340 F.3d 144, 162-63 (3d Cir. 2003) (citing Intervest Fin.

Servs., Inc. v. S.G. Cowen Sec. Corp., 206 F. Supp. 2d 702, 713 (E.D. Pa. 2002)).

However, where a plaintiff fails to plead direct evidence of an agreement and relies

instead upon indirect or circumstantial evidence, such evidence must "plausibly show the

37

existence of an agreement." <u>Burtch</u>, 2011 WL 5027511, at *11.  "Circumstantial evidence of

parallel behavior must be pled in 'a context that raises a suggestion of a preceding agreement, not

merely parallel conduct that could just as well be independent action.'" <u>Id.</u> (citing <u>Twombly</u>, 550

U.S. at 557).  "Parallel conduct in itself is insufficient to state a claim for conspiracy because it is

'consistent with conspiracy, but just as much in line with a wide swath of rational and

competitive business strategy unilaterally prompted by common perceptions in the market.'" <u>Id.</u>

(quoting <u>Twombly</u>, 550 U.S. at 554).

      The Third Circuit requires that plaintiffs basing a claim of conspiracy on inferences from

consciously parallel behavior show that certain "plus factors" also exist.  <u>In re Flat Glass

Antitrust Litig.</u>, 385 F.3d 350, 360 (3d Cir. 2004) (citing <u>Baby Food</u>, 166 F.3d at 122; <u>Petruzzi's

IGA v. Darling-Delaware</u>, 998 F.2d 1224, 1230 (3d Cir. 1993)).  "Existence of these plus factors

tends to ensure that courts punish 'concerted action'-an actual agreement-instead of the

'unilateral, independent conduct of competitors.'" <u>Id.</u> (citing <u>Baby Food</u>, 166 F.3d at 122).

There is no finite set of plus factors and no exhaustive list exists.  <u>Id.</u>  The Third Circuit,

however, has identified three plus factors: (1) evidence that the defendant had a motive to enter

into a conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) "evidence

implying a traditional conspiracy."  <u>Id.</u> (quoting <u>Petruzzi's</u>, 998 F.2d at 1244).

           a.    The December 2008 work item is not direct evidence of an
                 unlawful agreement among the Corporate Defendants

      TruePosition argues that it has alleged direct evidence of an agreement among the

Corporate Defendants to violate 3GPP Rules and due processes to exclude competition and

competing technologies.[19]  (TruePosition's Joint Resp. at 30.)  TruePosition's "smoking gun" is

_____

[19] TruePosition does not seek to use these allegations of direct evidence against ETSI.

the December 2008 Work Item at the RAN Plenary that was co-sponsored by the Corporate Defendants along with nine other members of 3GPP.  (Id.)  The Complaint alleges that, under 3GPP procedures, it should have been a foregone conclusion that UTDOA in standalone implementations would also be included in this work item.  (Compl. ¶ 24.)  The Complaint further alleges that "[t]he sole reason" UTDOA was not included in the work item was because the Corporate Defendants "knowingly and deliberately conspired to exclude UTDOA from the 3GPP and LTE standards."  (Id. ¶ 25.)  As evidence of the conspiratorial intent of this exclusion, TruePosition asks us to consider that the submission was untimely submitted, circulated prior to the Plenary without its knowledge, and was accepted immediately by the ALU Chair when offered for submissions at the Plenary.  (Id. ¶¶ 65-68.)

In TruePosition's Joint Response, it argues that certain inferences may be drawn from UTDOA's exclusion from the 2008 Work Item.  First, it argues that there is "no doubt that the Corporate Defendants intentionally agreed to exclude UTDOA from the work item" because, under normal 3GPP rules, it should have been included and it was not.  (TruePosition's Joint Resp. at 10.)  Second, it argues that, "[g]iven TruePosition's long-standing active participation in 3GPP on positioning issues, it is reasonable to infer that the Corporate Defendants intentionally hid the draft from TruePosition in order to subvert the 3GPP processes to their competitive advantage.  (Id. at 11.)  Third, it argues that the ALU Chair's acceptance of the tardy work item necessarily indicates that the work item was the product of an unlawful agreement.  (Id. at 12.)

We are of the opinion that the mere fact that UTDOA was not carried forward in the 2008 Work Item alone is insufficient to constitute direct evidence of an unlawful agreement to exclude it.  When confronted with a similar antitrust action also within the context of 3GPP, the Fifth

Circuit has stated that it is "'axiomatic' that a [SSO] must exclude some products, and such exclusions are not themselves antitrust violations." Golden Bridge Tech., Inc. v. Motorola, Inc., 547 F.3d 266, 273 (5th Cir. 2008) (quoting Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 294 (5th Cir. 1998)).  Here, the 2008 Work Item requires us to draw multiple inferences to establish that it was drafted and submitted pursuant to an unlawful agreement. TruePosition acknowledges the necessity of drawing such inferences and even outlines those that could be drawn from the 2008 Work Item as we set forth above.  What is clearly lacking are allegations of evidence of the alleged agreement predating the drafting and submission of the work item.  Thus, we find that the allegations relating to the 2008 Work Item is, at best, circumstantial evidence of an agreement between the Corporate Defendants.  Accordingly, TruePosition is required to plead at least one plus factor to survive the Motions to Dismiss.  Ins. Brokerage, 618 F.3d at 323.

> b.    The Complaint fails to plead plus factors

We first find that TruePosition fails to allege that the Corporate Defendants had a motive to enter into a conspiracy.  Although TruePosition has set forth a myriad of allegations explaining why the Corporate Defendants would prefer that UTDOA be excluded from 3GPP standards, it utterly fails to allege any motive for entering into a conspiracy to achieve that purpose.  The Complaint alleges that the Corporate Defendants' motive for participating in the conspiracy to exclude UTDOA was to "quash innovative technologies in which Ericsson, Qualcomm, and ALU do not have dominant patents, and to seize unfair competitive advantages in the United States and internationally for which they hold substantial patent portfolios and commercial interests." (Compl. ¶ 57.)  With regard to Ericsson and ALU, the Complaint alleges that they

participated in the conspiracy to "further entrench their dominant positions in the market for

[RAN] equipment by preventing new entry by competing vendors." (Id. ¶ 4.) TruePosition

argues that Ericsson and ALU, by only supporting UTDOA integrated into RAN equipment,

sought to eliminate existing and potential competition in the positioning market; thereby,

enabling them to increase prices for RAN equipment with integrated positioning and to maintain

their pricing for their equipment and services to wireless carriers at supracompetitive prices.

(TruePosition's Joint Resp. at 38.)  With regard to Ericsson, TruePosition alleges that its motive

to enter into a conspiracy was to promote the standardization of its OTDOA positioning

technology and to ensure that OTDOA had a competitive head start in the standardization

process.  (Compl. ¶¶ 69, 70, 72, 76.)  With regard to ALU, the Complaint alleges that ALU

participated in the conspiracy because it was "not then ready to produce RAN equipment with

embedded UTDOA positioning technology."  (Compl. ¶ 89a.)  TruePosition does not allege that

ETSI had any motive to enter into a conspiracy whatsoever.

The Corporate Defendants argue that these alleged motives are entirely consistent with

furthering their own economic interests and that they fail to explain why they would find it

necessary to enter into a conspiracy to advance those interests.  We agree.  The only motive for

entering into an agreement that TruePosition identifies is the fact that "[a]ny work item required

the support of at least four companies."  (TruePosition's Joint Resp. at 39) (citing 3GPP Working

Procedures, Art. 39).)  This ignores the fact that the 2008 Work Item, which is the catalyst of

TruePosition's claims, was co-sponsored by nine other companies.[20]  Furthermore, the possibility

---

[20] TruePosition incorrectly argues that we may not consider the fact that nine other sponsors in
addition to Corporate Defendants signed the 2008 Work Item.  However, because TruePosition
relies on the 2008 Work Item in the Complaint and because it is integral to its claims, we may
consider its contents.  In re Burlington Coat Factory Sec. Litig., 113 F.3d 1410, 1426 (3d Cir.

of independent conduct cannot be excluded when a company with an economic motive to

disfavor a competing technology in fact disfavors that very technology.  See Golden Bridge

Tech., 547 F.3d at 272-73.  In fact, the "existence of an independent financial motive" to exclude

UTDOA might be an "independent reason" for each of the Corporate Defendants to support such

exclusion.  Id. at 272.  Thus, we find that the Corporate Defendants had no motive to conspire,

but merely had independent economic interests.

Next, we find that TruePosition has not alleged evidence that the Corporate Defendants

acted "contrary to its interests."  TruePosition makes a half-hearted attempt to diminish the

importance of this factor.  It argues that "[a]ctions against interest are not the *sine qua non* of

conspiracy cases generally, and specifically not in the standards-setting context."  (TruePosition's

Joint Resp. at 40.)  It then cites two cases, American Society of Mechanical Engineers, Inc. v.

Hydrolevel Corp., 465 U.S. 566 (1982) and Allied Tube & Conduit Corp. v. Indian Head, Inc.,

486 U.S. 492 (1998), for the proposition that this factor is inapposite in the context of a SSO.

However, TruePosition has not provided any analysis of Hydrolevel or Allied Tube.

Our review of Hydrolevel reveals that it was decided after the benefit of a full jury trial

where direct evidence of conspiracy had been introduced and, furthermore, that its discussion

was irrelevant to pleading requirements.  See Hydrolevel, 465 U.S. 566.  Similarly, our review of

Allied Tube & Conduit reveals that it was also decided after a full jury trial and that the appeal

concerned not the sufficiency of the allegations in the complaint, but the propriety of the district

court's grant of judgment n.o.v. on an immunity ground.  Allied Tube & Conduit, 486 U.S. at

497-98.  Because Hydolevel and Allied Tube do not discuss whether an antitrust plaintiff must

_____

1997).

allege actions against interest in the absence of direct evidence of a conspiracy, we conclude that it is required to plead that the conduct of the Corporate Defendants were against interest. This conclusion is in accord with our Court of Appeals' long-standing line of precedent that consistently acknowledges the requirement of pleading conduct against interest. See Ins. Brokerage, 618 F.3d at 321-22. See also In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir. 2004) (citing Baby Food, 166 F.3d at 122; Petruzzi's, 998 F.2d at 1230); Burtch, 2011 WL 5027511, at *12. Furthermore, because TruePosition does not identify any actions of the Corporate Defendants that were against their interest, we find that it has not alleged the second plus factor.

Next, we find that TruePosition fails to allege the third plus factor-evidence implying a traditional conspiracy. Evidence of this plus factor consists of "non-economic evidence that there was an actual, manifest agreement . . . which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." Ins. Brokerage, 618 F.3d at 322 (quoting Flat Glass, 385 F.3d at 361). TruePosition argues that the allegations in the Complaint "detail a traditional conspiracy whereby three companies colluded in a group boycott to restrain competition." (TruePosition's Resp. in Opp'n to Qualcomm's Mot. to Dismiss at 26.) In support of this proposition, TruePosition cites to Golden Bridge Tech., Inc. v. Nokia, Inc., 416 F. Supp. 2d 525 (E.D. Tex. 2006).

Like the present case, the facts giving rise to the Sherman antitrust plaintiff's conspiracy claims in Nokia also occurred within 3GPP. Nokia, 416 F. Supp. 2d at 527. TruePosition correctly argues that the plaintiff in that case pled significantly less factual allegations in support

of its conspiracy claims.  The district court identified the sum of all the plaintiff's allegations in

Nokia as:

> Defendants acted in concert with each other by voting and/or agreeing to remove
> CPCH from the next release of the 3GPP technical standards, without notice, without
> technical justification, and without a replacement, for the purpose of injuring and
> interfering with [the plaintiff's] business, in part because of [the plaintiff's] efforts
> to obtain favorable licenses for its technology.

> At the March 9-11 3GPP meeting, Defendants combined and conspired to refuse to
> deal with [the plaintiff] with respect to [its technology], and encouraged others to
> refuse to deal with GBT by eliminating [the plaintiff's technology] as an optional
> standard for 3GPP technology, contrary to Section 1

Id. at 529.  Referring only to those two paragraphs of the Complaint, the district court held that

the plaintiff sufficiently alleged that the defendants engaged in a conspiracy to overcome a

12(b)(6) motion to dismiss.  Id.  The district court thought this "especially true" because the

plaintiff had not had an opportunity to conduct extensive discovery at that point in the

proceedings to determine "exactly what occurred" among the defendants at the March 9-11

meeting.  Id.

   Nokia was decided on February 17, 2006 and premised its standard of review of 12(b)(6)

motions on the now-retired Conley v. Gibson, 355 U.S. 41 (1957).  The Conley standard required

a district court to deny a 12(b)(6) motion to dismiss unless it appeared "beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."

Conley, 355 U.S. at 45-46.  A little more than one year after the district court decided Nokia, the

Supreme Court ruled that Conley's "no set of facts" language, had "earned its retirement."

Twombly, 550 U.S. at 563.  It is very doubtful that the Nokia court would find the same way in

light of Twombly.  Thus, we are not persuaded that Nokia mandates that we should find

TruePosition's allegations "detail a traditional conspiracy and the perfect vehicle through which

44

the Corporate Defendants carried it out." (TruePosition's Resp. in Opp'n to Qualcomm's Mot. to Dismiss at 37.)

We further find that the final plus factor-evidence implying a traditional conspiracy is not alleged in the Complaint because there is simply no proof that the Corporate Defendants "'got together and exchanged assurances of common action or otherwise adopted a common plan.'" Ins. Brokerage, 618 F.3d at 322 (quoting Flat Glass, 385 F.3d at 361). The Complaint only alleges that Qualcomm drafted the 2008 Work Item which was co-sponsored by nine other companies in addition to the Corporate Defendants and that each time one of the Corporate Defendants attempted to stymie the progress of UTDOA at RAN Plenary meetings, members of the other Corporate Defendants supported those attempts. The allegations relating to sham UTDOA simulation results and objections by the Corporate Defendants to UTDOA's progress at RAN Plenary meetings similarly fail to allege a prior exchange of assurance of common action. Instead, given the economic interest that each Corporate Defendant had in opposing UTDOA's standardization, we find that the conduct is entirely consistent with lawful, independent, and unilateral conduct.

TruePosition asks us to consider two other plus factors that are not included in the traditional tripartite. First, TruePosition asks us to consider its allegations that the conditions imposed on UTDOA were pretextual as evidence of a conspiracy. (TruePosition's Joint Resp. at 40.) TruePosition refers to the various performance testing conditions, technology benefit comparisons required of it, and the sham performance results of UTDOA offered at the RAN Plenaries by the Corporate Defendants. However, we find that this putative plus factor fails for the same reason as the others. Namely, TruePosition has simply not sufficiently alleged that such

"pretext" was the result of concerted action or conspiracy.  Each Corporate Defendant had an independent reason for wanting to keep UTDOA out of the game but there is simply no plausible allegation supporting the existence of an agreement to exclude it.  Thus, introducing "pretext" into the SSO mix is entirely consistent with unilateral action.

Second, TruePosition asks us to consider Ericsson and ALU's alleged violations of 3GPP Rules as evidence of a conspiracy.  (TruePosition's Joint Resp. at 41-43.)  This is essentially a recycled argument on the third plus factor - evidence of a traditional conspiracy.  However, as we have already explained, Ericsson and ALU are both alleged to have independent motives for their actions that TruePosition deems violations of the 3GPP Rules.  To reiterate, TruePosition claims that Ericsson wished to preserve its profits that it earned through royalties on licenses and essential patents that were not used in UTDOA and TruePosition claims that ALU wished to stall OTDOA because it was not yet ready to incorporate UTDOA into its RAN equipment.  These motives are indicative of unilateral, independent behavior and TruePosition has not alleged facts that it is more likely that the conduct was done pursuant to an agreement.  Accordingly, this plus factor does not change our decision that TruePosition has failed to allege an agreement.

In light of TruePosition's failure to allege that the Corporate Defendants entered into an unlawful agreement and that their conduct is more likely the result of such agreement, we will not consider whether TruePosition satisfied the remaining elements of a Section 1 or Section 2 claim.  Furthermore, we need not address the Defendants' Article III arguments at present.  We will dismiss this Complaint without prejudice so that TruePosition may have an opportunity to Amend the Complaint to cure any deficiencies identified in this Memorandum Opinion.

**IV.**   **CONCLUSION**

First, we find that TruePosition has not met its burden to demonstrate facts that support personal jurisdiction over ETSI.  However, because courts are to "assist the plaintiff by allowing jurisdictional discovery unless the claim is clearly frivolous" and because we find that the claim of jurisdiction is not frivolous, we will allow TruePosition limited discovery to cure the jurisdiction defects with regard to ETSI.  See Toys "R" Us, Inc. v. Step Two, SA, 318 F.3d 446, 456 (3d Cir. 2003).  Second, we find that the Complaint comes close to stating a claim against the Corporate Defendants, but that it does not allege sufficient factual matter to indicate that the alleged conduct of the Corporate Defendants was more likely the result of an unlawful agreement than independent action.  See Twombly, 550 U.S. at 557.  However, rather than dismiss the Complaint, we will allow TruePosition the opportunity to cure this defect and to submit an amended pleading that more fully describes conduct placing the Defendants' conduct within the context of a preceding agreement.

An appropriate Order follows.