## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| TRUEPOSITION, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 11-4574 |
| | : | |
| LM ERICSSON TELEPHONE COMPANY | : | |
| (TELEFONAKTIEBOLAGET LM ERICSSON), | : | |
| QUALCOMM, INC., | : | |
| ALCATEL-LUCENT USA, INC., | : | |
| EUROPEAN TELECOMMUNICATIONS | : | |
| STANDARDS INSTITUTE, and | : | |
| THIRD GENERATION PARTNERSHIP | : | |
| PROJECT a/k/a 3GPP, | : | |
| | : | |
| Defendants. | : | |

_____:

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                **AUGUST 21, 2012**

      Presently before the Court is the Joint Motion to Dismiss the Amended Complaint of

TruePosition, Inc. Filed By Alcatel-Lucent USA, Inc. ("ALU"), LM Ericsson Telephone

Company (Telefonaktiebolaget LM Ericsson) ("Ericsson") and Qualcomm, Inc. ("Qualcomm"),

(collectively, the "Corporate Defendants"), the response in opposition by Plaintiff, TruePosition,

Inc. ("TruePosition"), the Corporate Defendants' Joint Reply, as well as the separate Memoranda

by ALU.  For the reasons provided below, the Joint Motion to Dismiss will be denied.

## I.  FACTUAL HISTORY[1]

      TruePosition describes itself as a "leading innovator in developing and marketing high

---

[1]A complete factual history of this action is set forth in TruePosition, Inc. v. Ericsson, et al., No. 11-4574, 2012 WL
33075 (E.D. Pa. Jan. 6, 2012).  Although this Memorandum Opinion is based upon the original Complaint, it gives a
sound factual history of the action.

accuracy location products that operate over cellular telecommunications networks." (Am. Compl. ¶ 3.) "More than 55 million cellular callers in the United States each year are located by TruePosition's products, assisting police, fire, and ambulance services in saving lives and enabling law enforcement to combat criminal activity and terrorist threats." (Id.) According to regulatory requirements set forth by the Federal Communications Commission ("FCC"), all mobile voice networks must be able to locate 911 callers. (Id.) In order to meet current FCC requirements, TruePosition's positioning technology, known as Uplink Time Difference of Arrival ("UTDOA"),[2] has been deployed on more than 90,000 cell tower sites in the United States. (Id.) TruePosition's UTDOA technology is implemented through Location Measurement Units ("LMU") that are located at multiple cell towers.[3] (Id. ¶ 24.) Multiple LMUs measure the difference in time that they receive signals sent over the cellular network by a handset (referred to as the "uplink" transmission). (Id.) These measurements enable the distance of the handset from each cell tower to be calculated. (Id.) By collecting multiple measurements, the handset location can be narrowed to within FCC requirements. (Id.)

This action stems from the alleged anticompetitive conduct of major players in the international telecommunications market within the context of a Standard Setting Organization ("SSO"). (Id. ¶¶ 1-9.) TruePosition alleges that Ericsson, Qualcomm and ALU conspired to exclude its positioning technology, UTDOA, from standards promulgated by Third Generation Partnership Project a/k/a 3GPP ("3GPP"). (Id.) 3GPP is a non-profit standard setting

---

[2] "Positioning technology" refers to technology used to locate mobile handsets.

[3] "In the United States, two major carriers (AT&T Wireless and T-Mobile) have implemented TruePosition LMUs at approximately 90,000 cell sites." (Am. Compl. ¶ 47.)

organization of which Plaintiff and the Corporate Defendants are members.[4]  (See Am. Compl.)

3GPP is a not-for-profit SSO whose business is to fairly and impartially create global standards

for mobile telecommunications technologies based on objective technical merit.  (Id.

¶ 14.)  The 3GPP standards are designed to be implemented globally through six regional SSOs,

known as Organizational Partners, including Defendant European Telecommunications

Standards Institute ("ETSI").[5]  (Id.)  This case arises from the alleged exclusion of TruePosition's

positioning technology from the 3GPP standard for the newest and most advanced 4G (Fourth

Generation) or Long Term Evolution ("LTE") mobile telecommunications networks.  (Id. ¶ 2.)

Inclusion in the 3GPP 4G LTE standard is vital to the commercial success of TruePosition's

UTDOA positioning technology.  (Id. ¶ 4.)  Notably, "[e]xclusion from the standard guarantees

commercial failure and, in most instances, absolute foreclosure from the market."  (Id.)

　　　According to TruePosition, the Corporate Defendants collaboratively manipulated

3GPP's processes and procedures to gain unfair advantages for their preferred location

technologies, and to prevent or delay standardization of TruePosition's technology.  (Id. ¶ 6.)

TruePosition further alleges that 3GPP participated in the conspiracy to exclude UTDOA from its

standards by failing in its obligations to ensure that the Corporate Defendants complied with

3GPP Rules.  (Id. ¶¶ 114-122.)  TruePosition alleges that the direct consequence of the

Defendants' conspiracy is that it, the UTDOA technology, and other competitors that market

---

[4]3GPP is named as a defendant in this action.  Truepositon only recently served the Amended Complaint on 3GPP. 3GPP filed a Motion to Dismiss Plaintiff TruePosition, Inc.'s Amended Complaint on August 15, 2012.  (Doc. No. 131.)  This Motion will be addressed at a later time.

[5]ETSI was voluntarily dismissed from this action on August 10, 2012.  (Doc. No. 130.)  Prior to its dismissal, ETSI filed a Motion to Dismiss.  (Doc. No. 102.)  In their Joint Motion to Dismiss, the Corporate Defendants joined in ETSI's dismissal motion.  (Doc. No. 103.)  We find that the only novel issue that is relatable to the Corporate Defendants is ETSI's argument concerning ripeness.  We will address the ripeness issue at the end of this Memorandum Opinion.  Infra Section IV.D.

UTDOA-based products, have been foreclosed from competition for 4G positioning products, and have been harmed in their continued ability to develop and market 2G (Second Generation) and 3G (Third Generation) products that can be upgraded for 4G networks.  (Id. ¶ 8.)

## II.  PROCEDURAL HISTORY

TruePosition filed a Complaint on July 20, 2011.  Therein, TruePosition alleged that the conduct described above violated United States antitrust law giving rise to two causes of action: (1) violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (2) violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.[6]  TruePosition's Section 1 claim was asserted against all Defendants, while TruePosition's Section 2 claim was only asserted against Ericsson and ALU.

A majority of Defendants moved to dismiss the Complaint.  Instead of dismissing the action, we allowed TruePosition to file an amended complaint curing any defects set forth in our January 6, 2012 Memorandum Opinion.  TruePosition filed an Amended Complaint on February 3, 2012.  (See Am. Compl.)  The Amended Complaint contains only one count asserted against all Defendants entitled "Combination Conspiracy in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1 )."  (Id. ¶¶ 139-153.)  TruePosition seeks monetary damages, treble damages, attorneys' fees and costs, prejudgment interest and injunctive relief.  (Id. ¶ 154.)  The Corporate Defendants filed a Joint Motion to Dismiss the Amended Complaint.  (Doc. No. 103.)  ALU also filed its own separate Memorandum in Support of the Corporate Defendants' Joint Motion to Dismiss.  (Doc. No. 104.)  TruePosition responded to the arguments made by the Corporate Defendants and they, in turn, filed their Replies.  (Doc. Nos. 106, 107, 110 and 112.)  For the reasons set forth below, the Corporate Defendants' Joint Motion to Dismiss TruePosition's

---

[6] Pursuant to 28 U.S.C. § 1331, federal question jurisdiction exists based upon the Sherman Act, 15 U.S.C. § 1.

Amended Complaint is denied.

## III.  <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the complaint must be construed in the light most favorable to the plaintiff.  <u>Burch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 220 (3d Cir. 2011) (citing <u>In re Ins. Brokerage Antitrust Litig.</u>, 618 F.3d 300, 314 (3d Cir. 2010)).  Federal Rule of Civil Procedure 8(a)(2) requires "only 'a short and plain statement of the claim showing the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).

"[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555.  In <u>Twombly</u>, the United States Supreme Court "set forth the 'plausibility' standard for overcoming a motion to dismiss and refined the approach in <u>Iqbal</u>."  <u>Burch</u>, 662 F.3d at 220 (citing <u>Twombly</u>, 550 U.S. at 557; <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 680 (2009)).  In other words, Rule 8 requires that a complaint contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible.  <u>West Penn Allegheny Health System, Inc. v. UPMC</u>, 627 F.3d 85, 98 (3d Cir. 2010).  "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  <u>Id.</u> (quoting <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 234 (3d Cir. 2008); <u>Twombly</u>, 550 U.S.

at 556).  When deciding the sufficiency of a complaint "courts should disregard the complaint's legal conclusions and determine whether the remaining factual allegations suggest that the plaintiff has a plausible - as opposed to merely conceivable - claim for relief."  Id. (citing Iqbal, 129 U.S. at 1949-50; Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)).

Under both Twombly and Iqbal, a court must take the following three steps in order to determine the sufficiency of a complaint:

> First, the court must take note of the elements a plaintiff must plead to state a claim.  Second, the court should identify the allegations that, because they are no more than conclusions, are not entitled to the assumption of truth.  Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief.

Id. (quoting Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010)).  "It is, of course, true that judging the sufficiency of a pleading is a context-dependent exercise."  West Penn, 627 F.3d at 98 (citing Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 567-68; Phillips, 515 F.3d at 232).

## IV.  DISCUSSION

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  Under Section 1 of the Sherman Act, a plaintiff must plausibly allege the following three elements: (1) an agreement; (2) imposing an unreasonable restraint of trade within a relevant product market; and (3) resulting in antitrust injury, that is "injury of the type the antitrust laws were intended to prevent and . . . that flows from that which make defendants' acts unlawful."  Ins. Brokerage, 618 F.3d at 315.

6

A. **Agreement**

To prevail on a Section 1 claim, a plaintiff is required to establish the existence of an agreement, at times also referred to as a conspiracy or concerted action.  West Penn, 627 F.3d at 99 (citing Twombly, 550 U.S. at 553; Gordon v. Lewistown Hosp., 423 F.3d 184, 207 & n.16 (3d Cir. 2005)).  The existence of an agreement "requires some form of concerted action, which we define as unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme."  Burtch, 662 F.3d at 221 (citations omitted). Regardless of the motivation, unilateral action is not a violation of Section 1.  Id. (citation omitted).  An agreement may be pleaded by a plaintiff by either alleging direct or circumstantial evidence or a combination of the two.  Id.

1. *Direct Evidence*

"Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'"  Burtch, 662 F.3d at 225 (quoting Ins. Brokerage, 618 F.3d at 324 n.23) ("A document or conversation explicitly manifesting the existence of the agreement in question is an example of direct evidence.")  In this case, TruePosition argues that it has presented direct evidence of an agreement between the Corporate Defendants.  Upon examination of the Amended Complaint, we find only conclusory allegations of direct evidence of an agreement.

TruePosition states that "[i]n November 2008, upon information and belief, the corporate defendants agreed to prevent standardization of TruePosition's positioning technology so that their preferred technologies would attain an insurmountable head start in relevant markets." (Am. Com. ¶ 2.)  Notably, the Amended Complaint neither contains any allegations that specify a

time or place that an actual agreement occurred, nor the identities of any particular individuals who made such an agreement.  See Twombly, 550 U.S. at 565 n.10 (stating that plaintiff's failure to allege a "specific time, place, or person involved in the alleged conspiracies" left "no clue as to which of the [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."); Great Western Mining & Mineral Co. v. Fox Rothchild LLP, 615 F.3d 159, 179 (3d Cir. 2010) ("The complaint sets forth merely a conclusory allegation of agreement at some unidentified point[, which] does not supply facts adequate to show illegality. . . .  Specifically, Great Western has failed to allege except in general terms the approximate time when the agreement was made, the specific parties to the agreement (i.e., which judges), the period of the conspiracy, or the object of the conspiracy.")  Nowhere in the Amended Complaint are there any substantive allegations specifically detailing any facts regarding direct evidence of an illicit agreement.

TruePosition's allegations and arguments of direct evidence of an agreement are conclusory in nature and, therefore, are not entitled to the assumption of truth.  See Burch, 662 F.3d at 224 ("Under Iqbal, we next identify allegations that are no more than conclusions, [and] are not entitled to the assumption of truth . . . [and] disregard naked assertions. . . ."); see also Twombly, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.")  Consequently, TruePosition has failed to adequately plead direct evidence of a specific agreement.

### 2. Circumstantial Evidence

In light of TruePosition's failure to plausibly allege direct evidence of an agreement, we must determine whether TruePosition has adequately alleged circumstantial evidence to plausibly

show that an agreement exists between the Corporate Defendants.  "Circumstantial evidence of parallel behavior must be pled in 'a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'"  Burtch, 662 F.3d at 226 (quoting Twombly, 550 U.S. at 557).  "The law is well-established that 'evidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement.'"  Id. (quoting Ins. Brokerage, 618 F.3d at 321).  "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  Twombly, 550 U.S. at 556-57.  In itself, parallel conduct is insufficient to state a plausible claim because "it is 'consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'"  Id. (quoting Twombly, 550 U.S. at 554).

"Alleging parallel conduct 'is thus much like a naked assertion of conspiracy in a § 1 complaint; it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557).  In In re Insurance Brokerage Antitrust Litigation, the Court of Appeals for the Third Circuit ("Third Circuit") identified at least three types of facts, often referred to as "plus factors," that tend to demonstrate the existence of an agreement.  Ins. Brokerage, 618 F.3d at 321-22.  The three "plus factors" are the following: "(1) evidence that the defendant had a motive to enter into a . . . conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."  Id. at 321-22 (citation and internal quotation marks omitted).  The Third Circuit ruled that "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus

factor.'"   Id. at 323.

Also, the Third Circuit has "cautioned that the first two plus factors may indicate that 'defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism.'"   Burtch, 662 F.3d at 227 (quoting Ins. Brokerage, 618 F.3d at 322); see also In re Baby Food Antitrust Litig., 166 F.3d 112, 117 (3d Cir. 1999).   "Evidence of the third plus factor is 'non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'"   Id. (quoting Ins. Brokerage, 618 F.3d at 322).

"[W]hen evidence shows communications which provided an opportunity for agreement, a plaintiff must still produce evidence permitting an inference that an agreement in fact existed." Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1013 (3d Cir. 1994) (citation omitted). "The evidence must give rise to more than speculation."   Id. (citation omitted).   "Requiring plausibility to infer an agreement from circumstantial evidence 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.'"   Id. (quoting Twombly, 550 U.S. at 556).

With these standards in mind, we review the Amended Complaint's allegations granting reasonable inferences to TruePosition's nonconclusory well-pleaded factual allegations.   Unlike TruePosition's unsuccessful attempt at plausibly alleging direct evidence, the Amended Complaint satisfactorily alleges parallel conduct.   The Amended Complaint is replete with

allegations of parallel conduct by the Corporate Defendants pertaining to their various roles within the standardization process.  In addition, the Amended Complaint details the standardization process of the 4G LTE Standard and the Corporate Defendants' alleged concerted acts to obstruct or stop the inclusion of UTDOA within the Standard.

TruePosition articulates the relevant times in which representatives of the Corporate Defendants held central positions of Chairmanship over key committees and working groups making crucial decisions about the standardization of the positioning technologies at issue.  (Am. Compl. ¶¶ 41.)  According to TruePosition, the Corporate Defendants needed each other in order to successfully obstruct the standardization of TruePosition's UTDOA technology.  (Id.)  "The corporate defendants . . . controlled the Chairmanships of, and had key members in, every committee essential to progress the corporate defendants' positioning work item."  (Id.) (listing the Corporate Defendants' positions).  TruePosition asserts that "the corporate defendants could not have foreclosed U-TDOA standardization and secured an insurmountable head start for [their preferred positioning technology], except by coordinating their violations of 3GPP rules and procedures at key points in the standardization process, and permitting those violations through their authority as Chairmen."  (Id.)

Although TruePosition has successfully alleged parallel conduct by the Corporate Defendants, "[t]he law is well-established that 'evidence of parallel conduct by alleged co-conspirators is not sufficient to show an agreement.'"  Burtch, 662 F.3d at 226 (quoting Ins. Brokerage, 618 F.3d at 321); see also Twombly, 550 U.S. at 556–57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.")  Thus, we now examine

whether the plus factors advanced by TruePosition lend plausibility to the allegations of conspiratorial parallel conduct.

     *a. Plus Factors*

As previously explained, when relying upon circumstantial evidence to sufficiently plead the existence of an agreement, as is this case, at least three types of facts, often referred to as "plus factors," tend to demonstrate the existence of an agreement: "(1) evidence that the defendant had a motive to enter into . . . conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." Ins. Brokerage, 618 F.3d at 321-22 (stating "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor'"). Here, viewing all of the non-conclusory allegations as a whole, we conclude that TruePosition's Amended Complaint plausibly alleges parallel conduct by the Corporate Defendants that is consistent with a conspiracy.

Regarding the first two plus factors (i.e., evidence that defendants had a motive to enter into a conspiracy and evidence that defendants acted contrary to their interests), we conclude that TruePosition has not adequately shown that these factors alone demonstrate the existence of an agreement. Without delving into a lengthy discussion about the two factors, it is sufficient to say that neither the first nor second plus factor set forth by TruePosition adequately raise a suggestion of a preceding agreement. In fact, they can be seen as merely parallel conduct that could just as well be independent action motivated by self-interest and legitimate business practices. We caution that "a fine line demarcates concerted action that violates antitrust law from legitimate business practices." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). We will, however, consider TruePosition's allegations concerning the first two plus

factors within our overall analysis of whether TruePosition's Amended Complaint has plausibly alleged parallel conduct that is consistent with conspiracy.  Although we conclude that TruePosition has not sufficiently alleged the first two plus factors, we do find that it has adequately presented allegations of the third plus factor (i.e, evidence implying a traditional conspiracy).  When viewing the Amended Complaint as a whole, TruePosition's allegations against the Corporate Defendants are plausible.

"[W]hen allegations of parallel conduct are set out in order to make a § 1 claim," that conduct must be placed in "some setting suggesting the agreement necessary to make out a § 1 claim."  Twombly, 550 U.S. at 557; see also In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 623, 631 (E.D. Pa. 2010) ("Twombly emphasized context.")  The unique backdrop of the alleged conspiracy in this case is within a standard setting organization and involves the evolving worldwide mobile telecommunications industry.  In order to explore the unique context of this lawsuit, we begin by examining the standard setting organizational role of 3GPP and positioning technology related to mobile telecommunication prior to, and after, 2008, the year in which the alleged conspiracy began.

<u>Background Prior To 2008</u>

Founded in 1994 as "Associated Radio Location Tracking, Inc.," TruePosition first started developing location products for analog mobile phones and a 2G digital phone technology used in the United States.  (Am. Compl. ¶ 18.)  By 2002, TruePosition developed UTDOA-based products that potentially could interface with 2G networks.  (Id.)  TruePosition sells high accuracy positioning and networking technology as a standalone Location Measurement Unit, LMU.  (Id. ¶ 19.)  These standalone LMUs are collocated with, and must interoperate with, the

RAN equipment at a cell tower site, but are separate from the RAN equipment.[7]  (Id.)  The ability

of TruePosition's LMUs to interoperate with multiple vendors' RAN equipment is crucial to the

ability of TruePosition (and other LMU vendors) to compete in the markets for positioning

equipment.  (Id. ¶ 20.)  TruePosition markets a universal LMU that is used to determine the

locations of mobile phones on networks for 2G mobile telecommunications technology, known

as Global System for Mobile Communications ("GSM"), and/or 3G mobile phone networks

based on the 3GPP standard known as Universal Mobile Telecommunications System

("UMTS").  (Id. ¶ 21.)   According to TruePosition, its customers can maximize their

investments in positioning hardware by using the same LMU hardware for current and future

networking technologies, and by upgrading their positioning technologies more quickly and

inexpensively than through the modification of positioning technology embedded in RAN

equipment because LMUs work in tandem with the network equipment and no upgrade of the

phones is needed.  (Id.)

TruePosition's high accuracy positioning technology, UTDOA, is primarily used in the

United States to locate mobile phones that call emergency services such as E-911 (enhanced 911

for 911 calls).  (Id. ¶ 22.)  The FCC requires mobile carriers such as AT&T Wireless (AT&T),

Verizon Wireless, T-Mobile, and Sprint, to provide for the increasingly accurate location of

mobile handsets that call E-911 services.  (Id.)  The FCC has recently promulgated more precise

requirements, and is considering even more stringent requirements for the future regarding

locating indoor calls.  (Id.)  Carriers that fail to satisfy FCC requirements are subject to

enforcement proceedings and fines.  (Id.)  TruePosition's UTDOA technology meets current FCC

---

[7]RAN stands for Radio Access Network.  (See Am. Compl. Glossary of Acronyms.)

requirements, can meet the recently announced future FCC requirements, and is uniquely adapted to provide indoor location.  (Id.)  TruePosition alleges that UTDOA alone provides a high level of accuracy that reliably meets the FCC regulatory requirements.  (Id. ¶ 25.)

As previously explained, TruePosition's UTDOA method is implemented in LMUs located at multiple cell towers.  (Id. ¶ 24.)  Multiple LMUs measure the difference in the time they receive signals sent over the cellular network by a handset (referred to as "uplink" transmission).  (Id.)  By collecting multiple measurements, the handset location can be narrowed within FCC requirements.  (Id.)  Special signals from the handset are not needed nor is there a need for special hardware or software in the handset.  (Id.)  No calculations are performed by the handset.  (Id.)  TruePosition asserts that its UTDOA is superior to the technology promoted by the Corporate Defendants known as "OTDOA" (Observed Time Difference of Arrival) because OTDOA is handset-based requiring a downlink transmission.  (Id. ¶ 29.)  That is, the handset calculates its location based on the difference in timing between signals received over a cellar network from several cell towers.  (Id.)  Consequently, OTDOA requires specialized hardware and software of the type manufactured by Qualcomm in every handset, as well as RAN equipment of the type manufactured by Ericsson and ALU.  (Id.)  TruePosition alleges that Ericsson and Qualcomm each hold patents that are essential to the implementation of OTDOA.[8]

---

[8]ALU, which does not have essential patents in OTDOA, argues that it does not have a vested interest in excluding UTDOA from the 4G LTE Standard.  (ALU's Supplemental Mem. Law Support Corp. Defs.' Joint Mot. to Dismiss Am. Compl. at 6.)  ALU argues that it would benefit, not suffer, from having another option to put into its RAN equipment, particularly if, as TruePosition contends, the UTDOA option is desired by ALU customers (i.e., U.S. telecommunications carriers).  (Id. at 7.)  TruePosition counters ALU's argument by stating that "[ALU] specifically sought to delay standardization until it could build UTDOA into its own RAN equipment; it successfully promoted standardization of its preferred UTDOA configuration, not one it could 'buy' from TruePosition; and then it proposed to standardize UTDOA so that only a RAN equipment manufacturer like [ALU] could compete to make and sell UTDOA equipment."  (TruePosition's Opp'n to Joint Mot. to Dismiss Am. Comp. and Supplemental Mem. of ALU at 37.)

(Id. ¶ 30.) According to TruePosition, OTDOA-based positioning equipment has not been

successfully deployed commercially. (Id. ¶ 31.)

Importantly, TruePosition asserts that the superiority of UTDOA was demonstrated in 2G

and 3G networks. (Id. ¶ 32.) Major United States mobile carriers attempted in 1999-2001 to

implement a predecessor of OTDOA technology, known as "EOTD" (Enhanced Observed Time

Difference), but discovered that it failed to locate 911 callers to the level of accuracy required by

FCC regulations. (Id.) In the late 1990s, a European-based ETSI (European

Telecommunications Standards Institute) standard for 2G GSM mobile telecommunication

technology proliferated throughout Europe and was beginning to be adopted by several major

United States carriers. (Id. ¶ 42.) Positioning for 2G GSM at that time was dominated by a few

large companies, including Ericsson, ALU and Qualcomm. (Id.) These vendors favored EOTD

positioning technology for the following two reasons: Ericsson and Qualcomm's alleged patents

essential to EOTD technology would mean substantial royalties if EOTD was included in the

standards; and since 3GPP (Third Generation Partnership Project) did not enable standalone

EOTD products, Ericsson and ALU could incorporate EOTD positioning within their RAN

equipment and prevent competition from standalone LMU vendors. (Id.)

The EOTD technology offered by the Corporate Defendants, and deployed by major

United States carriers in 1999-2001, was a failure because it did not meet FCC regulatory

requirements. (Id. ¶ 43.) As a result, the carriers that had heavily invested in GSM RAN

equipment faced millions of dollars in fines from the FCC for failing to meet the deadlines to

implement E-911 mobile phone location requirements. (Id.) The carriers rectified this failure by

implementing UTDOA products from manufacturers, including TruePosition and Andrew

16

Corporation, in standalone UTDOA products offered by TruePosition and Andrew Corporation. (Id. ¶ 44.)  However, no ETSI standard specified the method for interoperability with UTDOA technology.  (Id.)  In the absence of a standard, TruePosition created a "work-around" solution so that its LMUs could obtain from the GSM RAN equipment two necessary pieces of information, namely, the precise time when the E-911 call was placed and the radio channel information used by the handset to place the call.  (Id.)  Ericsson and ALU independently opposed TruePosition's efforts.  (Id.)

TruePosition's "work around" solution was successful, but costly for the carriers.  (Id. ¶ 45.)  As a result, the carriers required their RAN vendors, primarily Ericsson and ALU, to join with TruePosition in a "UTDOA System Study Group" to create a standard interface for TruePosition's LMUs to interoperate with RAN equipment.  (Id.)  Within approximately one year, the group completed and brought the work to ETSI, and, by 2004, UTDOA was included in the ETSI standard for 2G GSM, including standalone LMUs.  (Id.)  The standard for the next generation of mobile phone technology called UMTS or 3G was created by 3GPP.  (Id. ¶ 46.)  AT&T insisted that another study group be formed in 2004 because it wanted the ability to use TruePosition's standalone LMUs with 3G UMTS.  (Id.)  In 2005 (approximately within 18 months), UTDOA was incorporated within the 3GPP standards for 3G UMTS, including standalone LMUs, despite the independent opposition by both Ericsson and ALU.  (Id.)

Since 2005, UTDOA in a standalone implementation has been included in standards for 2G GSM and 3G UMTS systems and has been successfully deployed in standalone LMUs in the United States for public safety E-911 uses and in other countries of the world for security and law enforcement.  (Id. ¶ 47.)  TruePosition and other companies have successfully marketed

17

UTDOA-based standalone products in the United States, and in foreign countries of the world for security and law enforcement uses.  (Id.)  In the United States, two major carriers (AT&T Wireless and T-Mobile) have implemented TruePosition LMUs at approximately 90,000 cell sites which locate more than 55 million E-911 callers each year.  (Id.)

UTDOA technology is equally applicable to LTE or 4G systems.  (Id. ¶ 48.)  There is no technological reason why UTDOA in a standalone LMU configuration cannot interoperate with RAN equipment for a LTE network.  (Id.)  However, the "work around" that enabled UTDOA standalone implementations without standardization is not possible for 4G LTE network equipment due to the different architecture of LTE networks.  (Id.)  Thus, 3GPP standardization for UTDOA is necessary for standalone LMUs on a LTE network.  (Id.)  Exclusion from the 3GPP standard for LTE would render UTDOA useless for 4G networks, and make ungradable universal LMUs, such as those sold by TruePosition, virtually unmarketable for 2G and 3G networks.  (Id.)  It is the Corporate Defendants' alleged concerted actions attempting to foreclose UTDOA standardization in 4G LTE within 3GPP that is the crux of this action.

According to 3GPP policies, TruePosition alleges that it should have been a foregone conclusion that UTDOA in standalone implementations would be included in 3GPP Release 9 (the first release intended for actual deployment of LTE systems).[9]  TruePosition asserts that it should have been included due to the prior standardization of UTDOA in the standards for

---

[9]"The 3GPP organizational structure relies on a Radio Access Network Technical Specification Group ('RAN TSG' or 'RAN Plenary') to create technical documents, known as 'Specifications,' for the structure and operation of RAN networks and equipment."  (Am. Compl. ¶ 36.)  "The RAN TSG consists of five Working Groups (RAN1 through RAN5), each covering different aspects of the network, that perform that technical work of evaluating proposed work items and developing the draft Specification."  (Id.)  Updates to 3GPP Specifications are issued sequentially in a series of "Releases."  (Id. ¶ 38.)  The technologies and methods stated in each Release may build upon or add to a prior release.  (Id.)  When a Release is completed by 3GPP, it is adopted and promulgated as a standard by 3GPP's regional Organizational Partners.  (Id.)

earlier-generation 2G and 3G mobile communications technology, its proven effectiveness to meet regulatory standards, and its marketplace success.  (Id. ¶ 49.)  Likewise, TruePosition asserts that any standardization work for UTDOA for 4G should have progressed and been completed at least as quickly as the standardization of UTDOA for 2G GSM and 3G UMTS (i.e., within approximately 12-18 months).  (Id.)  As of today's date, it has not been included in Release 10 (the second release for actual deployment of 4G LTE systems).[10]

Release 8, TruePosition explains that it did not include any positioning
Release 9 And 3GPP Standards

2008 Work Item Alleged Conspiracy To Exclude UTDOA From Release 9 And 3GPP Standards

Focusing first on Release 8, TruePosition explains that it did not include any positioning technology; therefore, work needed to be done by the 3GPP System Architecture Group ("SA2 Group") to lay the technological foundation to provide for positioning in 4G networks.  (Id. ¶ 50.)  The positioning discussions were led by Stephen Edge ("Edge") of Qualcomm, and TruePosition actively participated in the effort because it wanted to ensure that a sound technological foundation would be established for UTDOA positioning for 4G LTE.  (Id. ¶ 51.) TruePosition alleges that in November 2008, before work was completed by the SA2 Group, Qualcomm, Ericsson and ALU agreed to privately prepare their own work item to include specific positioning technologies in Release 9 of the 3GPP standards.[11]  (Id. ¶ 52.)  The work item ("2008 Work Item") was written by Qualcomm's Edge.  (Id.)

TruePosition alleges that Qualcomm's early draft of the 2008 Work Item proposed to

---

[10] Release 11 of 3GPP's Specification for 4G LTE technology is to be completed, at its earliest, by September 2012. (Am. Compl. ¶ 91.)

[11] Work Items are proposals to include technology features in 3GPP standards initially created through private discussions among members of a Working Group outside of the formal meeting context.  (Id. ¶ 37.)  In order to be considered by the RAN Plenary Group, a Work Item proposal must list the support of at least four members although Work Item proponents often have a longer list including companies that have no direct interest in the outcome or do not intend to contribute to the project.  (Id.)

include UTDOA in the standardization effort, but Ericsson and ALU told Qualcomm that they would not support it if UTDOA was included and insisted that it be removed from the draft.  (Id. ¶ 53.)  Noting that the draft of the 2008 Work Item did not include UTDOA, TruePosition avers that Qualcomm acceded to the demands of Ericsson and ALU.  (Id.)  It is noteworthy that TruePosition argues that Ericsson and ALU had each unsuccessfully independently opposed TruePosition's efforts to create the "work-around" solution so that its LMUs could work with the 2G GSM RAN.  (Id. ¶ 44.)  This is important because one of the premises upon which TruePosition's conspiracy claim lies is that Ericsson and ALU needed to coordinate their efforts with each other and Qualcomm in order to successfully preclude and forestall TruePosition's UTDOA technology from being included in the 4G LTE standard.  (Id.)

TruePosition alleges that the SA2 Group met for several days in November 2008 to continue the foundational work.  (Id. ¶ 54.)  TruePosition asserts that Qualcomm kept the drafting of the 2008 Work Item, as well as its text, secret from the SA2 Group, and from TruePosition, whose representative had one or more one-on-one conversations with Edge regarding positioning, by never disclosing the draft nor the Corporate Defendants' intention of submitting the 2008 Work Item.  (Id.)  TruePosition alleges that the Corporate Defendants intended and agreed that the intention and the text of the draft would not be shared with TruePosition or other UTDOA manufacturers because they intended to use the Work Item in an effort to exclude or delay the standardization for UTDOA.  (Id.)

Interestingly, the draft of the 2008 Work Item contained a background section describing the "Justification" for the Work Item acknowledging that UTDOA technology is capable of meeting regulatory requirements for positioning.  (Id. ¶¶ 55-56.)  However, out of all of the

20

technologies listed in the "Justification" section, only UTDOA was omitted from the section of the document that proposed the technologies to be included within the 3GPP standard.  (Id.)

At the December 2008 RAN Plenary Group meeting in Athens, Greece, the Plenary Group met to determine the features to be included and prioritized for Release 9.  (Id. ¶ 57.) Several days after the deadline for making technical submissions passed, Qualcomm submitted the 2008 Work Item proposing to include positioning technologies in the 4G LTE standard.  (Id.) Such a late submission violated 3GPP rules.  (Id.)  TruePosition alleges that such a late submission had to be intentional because the Corporate Defendants held key chairman positions within 3GPP and, therefore, knew the rules and proper procedures.[12]  (Id. ¶ 58.)  TruePosition also argues that the Corporate Defendants had to agree and plan on the late submission because the only way that the 2008 Work Item would be accepted in violation of the rules is due to the fact that the Chairman of the RAN Plenary Group was a senior employee of ALU possessing the power to refuse any objection based on lateness of the submission by a Qualcomm representative.  (Id. ¶ 59.)  According to 3GPP rules, a Chairman must defer consideration of late submissions that prejudice 3GPP members and unfairly favor others.  (Id.)  TruePosition argues that if 3GPP's due process rules had been followed, the Corporate Defendants would not have gained any advantage by the dilatory filing of the Work Item, and it would have had a fair opportunity required by 3GPP rules to consider, review, and respond to the proposal.  (Id. ¶¶ 58-59.)  The late submission of the proposal was accepted by the ALU RAN Plenary Group

---

[12]In the Amended Complaint, TruePosition states that "the Chairman of the Plenary Group and of each RAN Working Group has extraordinary authority to determine which technologies will be included in the Specification, and the order in and speed at which each element of the Specification must be drafted, reviewed, simulated, and completed." (Am. Compl. ¶ 39.)  "Chairman positions are almost exclusively filled by representatives from major multinational telecommunications equipment manufacturers, such as the Corporate Defendants." (Id. ¶ 40.)

Chairman.  (Id. ¶ 59.)

TruePosition states that it was ambushed by the submission.  (Id. ¶ 60.)  TruePosition explains that it, as well as other companies, anticipated and understood that technologies already standardized in 3G would be rolled into the 4G standards once the SA2 Group's foundational work was completed in March 2009, and that any positioning work items for new technologies (such as OTDOA) would only be ripe for submission at that time.  (Id.)  TruePosition also expresses its surprise at the fact that Stephen Edge, who led the SA2 Group's effort to create the foundation for LTE positioning, did not mention the possibility of an imminent work item submission.  (Id.)  TruePosition also points out that the exclusion of UTDOA from the proposal was even more suspect given that UTDOA had been commercially successful, widely deployed, and demonstrably met the FCC positioning requirements in contrast to the OTDOA technology proposed in the submission which was unproven technology with no extant commercial implementations since it was derived from the failed EOTD technology and replaced in the United States with TruePosition's UTDOA-based LMUs.  (Id. ¶ 61.)

The 2008 Work Item submission listed nine supporting companies in addition to the Corporate Defendants.  (Id. ¶ 62.)   TruePosition asserts that some of the nine companies did not have any business interests in deploying UTDOA or OTDOA, and others, including AT&T Wireless, lent support to the 2008 Work Item because they mistakenly believed that it sought to standardize the technologies listed in the "Justification" section as "useful and even essential," specifically including UTDOA.  (Id. ¶ 63.)  TruePosition states that AT&T representatives learned that the 2008 Work Item excluded UTDOA standardization after it was submitted to the RAN Plenary Group in Athens, Greece.  (Id.)   On the day that the 2008 Work Item was going to

22

be considered by the RAN Plenary Group, TruePosition, AT&T, and Polaris Wireless convened a meeting with a representative of Qualcomm.  (Id. ¶ 64.)  At this meeting, a representative of AT&T told the Qualcomm representative that AT&T wanted UTDOA added to the 2008 Work Item.  (Id.)  Refusing AT&T's request, the Qualcomm representative's sole justification was that major companies that had signed on to the 2008 Work Item would oppose any work item that includes UTDOA.[13]  (Id.)  TruePosition alleges that it believes that the Qualcomm representative was referencing Ericsson and ALU as the "major companies."  (Id.)  AT&T is a major purchaser of Ericsson and ALU RAN equipment, as well as a major seller of mobile phones using Qualcomm chipsets.  (Id.)  According to TruePosition, the Corporate Defendants were able to collectively refuse AT&T's request because by acting together they wielded sufficient power in the marketplace to avoid serious commercial repercussions from a major customer that they could not, otherwise, face acting alone.  (Id.)

During the meeting when the RAN Plenary Group Chairman from ALU brought up the submission of the 2008 Work Item, a TruePosition representative requested that the discussion be deferred due to the prejudicial non-compliance with the 3GPP rules for submission deadlines.  (Id. ¶ 66.)  A representative from Polaris Wireless supported the deferral request based upon non-compliance and asserted that the proposal was premature since the SA2 Group had not completed its foundational work.  (Id.)  TruePosition's representative proposed to add UTDOA to the 2008 Work Item, but the Chairman refused the request reasoning the alleged complexity and potential delay of adding UTDOA.  (Id. ¶ 67.)  TruePosition asserts that such reasons were baseless because the only requirement needed for the proven UTDOA technology for standalone

---

[13] Trueposition argues that the Qualcomm representative's denial of AT&T's request is an act against its own interest in furtherance of the conspiracy due to AT&T's significant power within the mobile telecommunications market.

implementation was a method to deliver to the LMU the time and channel of the E-911 call, as

had been done in both the 2G and 3G standards.  (Id.)  Also, TruePosition asserts that such

reasons were baseless since OTDOA was unproven, more complex and would require extensive

new engineering work in the 4G standards.  (Id.)  TruePosition states that, in furtherance of the

agreement among the Corporate Defendants, the ALU Chairman denied the requests for delay,

but made the submission the sole focus of further discussions of positioning technologies at the

meeting.  (Id.)  TruePosition argues that the Chairman, who was a representative of ALU, acted

in furtherance of the agreement of the Corporate Defendants because he violated the 3GPP

safeguards against unfair and biased conduct by conducting the meeting in a manner that favored

one positioning technology submission to the prejudice of other proposals.  (Id. ¶ 68.)

 In light of the aforementioned facts, TruePosition asserts that the Corporate Defendants

needed an agreement between each other not only to exclude UTDOA from the 2008 Work Item

proposal, but to circumvent the due process safeguards set in place by the rules and regulations of

3GPP.  TruePosition argues that the exclusion of UTDOA from the proposal was deliberately

intended by the Corporate Defendants to preclude or delay UTDOA standardization for 4G LTE,

and to seize a first mover advantage for technologies in which those companies held substantial

patent portfolios and business interests.  (Id. ¶ 61.)

Corporate Defendants' Alleged Continuing Efforts To
Exclude Or Delay The Standardization Of UTDOA

 In addition to the allegations that the Corporate Defendants successfully colluded with

each other in order to foreclose UTDOA from being included in the 2008 Work Item,

TruePosition argues that they have been continuing to work together in order to exclude or delay

UTDOA standardization since that time.  At the March 2009 RAN Plenary Group meeting,

24

TruePosition submitted a proposal to add UTDOA to the positioning Work Item (which was supported by several companies, including AT&T), but the Corporate Defendants actively opposed it and the Chairman (a representative of ALU) rejected it.  (Id. ¶ 69.)

TruePosition also proposed a separate Work Item for UTDOA standardization ("UTDOA Work Item") which AT&T, among other companies, supported.  (Id. ¶ 70.)  ALU also signed on to TruePosition's UTDOA Work Item.[14]  (ALU's Supplemental Mem. Law Support Corp. Defs.' Joint Mot. to Dismiss at 5.)   TruePosition asserts that, in furtherance of the conspiracy, the Corporate Defendants sought to ensure that the work on the standardization of UTDOA would proceed before committees that they collectively controlled, so that they could derail or delay any separate work item for UTDOA.  (Am. Compl. ¶ 70.)  Additionally, TruePosition asserts that the Corporate Defendants coordinated their efforts so that they were able to assure control over the progress of the two positioning work items so as to guarantee a significant head start to OTDOA in the relevant markets.  (Id.)

Once securing the assignment of TruePosition's UTDOA Work Item to RAN1 Working Group, which is chaired by a representative of Ericsson, the Corporate Defendants allegedly furthered their conspiracy by the RAN1 Chairman proposing two rigorous restrictions on the UTDOA Work Item that were not imposed on OTDOA.  (Id. ¶ 71.)  Also, the Ericsson RAN1 Chairman delayed any work on the UTDOA Work Item until June 2009, which, TruePosition, points out is the same delay that ALU previously had requested privately from TruePosition.  (Id.)  This proposed delay by the Ericsson RAN1 Chairman, TruePosition alleges, was made in

---

[14]Although the fact that ALU signed on to TruePositon's UTDOA Work Item does not alone negate all of the allegations of its involvement in an illegal conspiracy, we have given this fact serious consideration in our evaluation of TruePosition''s claims against ALU.

coordination with ALU.  (Id.)  These restrictions, which TruePosition asserts are unfair and unprecedented, were approved and imposed by the ALU RAN Plenary Group Chairman.  (Id.)

In June and July 2009, the RAN1 Working Group began evaluating UTDOA.  (Id. ¶ 72.) At the meeting, TruePosition alleges that it timely submitted a list of simulation testing assumptions representing a reasonable range of field conditions for UTDOA.  (Id.)  TruePosition conducted extensive and burdensome simulations that demonstrated the ability of UTDOA to meet the set of requirements and that UTDOA for 4G was capable of meeting FCC requirements, as it had been doing for 2G and 3G networks.  (Id.)  Each time that TruePosition brought new simulation results proving the accuracy of UTDOA under the requested assumption to the RAN1 Working Group, the Chairman (an Ericsson representative) would insist that the last requested assumptions were insufficient, and make them more stringent.  (Id. ¶ 73.)  TruePosition alleges that no other positioning technology was subjected to these restrictions.  (Id.)  In spite of positive simulation results for UTDOA, the RAN1 Working Group Chairman from Ericsson ruled that UTDOA could not progress beyond an "evaluation" stage.  (Id.)

Regarding technical tests simulating how OTDOA would perform, the results yielded inconsistent results.  (Id. ¶ 76.)  Due to the unresolved technical issues, several companies were unwilling to approve progress for OTDOA.  (Id.)  TruePosition asserts that the Ericsson Chairman of the RAN1 Working Group, as well as the other Corporate Defendants, were able to get changes through the working group that supported OTDOA, and the Ericsson Chairman sealed the accelerated treatment of OTDOA to secure its inclusion in Release 9.  (Id.)

In October 2009, TruePosition was the only company to submit UTDOA simulations for the meeting.  (Id. ¶ 77.)  Just twelve hours before the UTDOA session was to start, and eight days

past the deadline for any submissions, Ericsson submitted a report to the RAN1 Working Group

regarding UTDOA subjects that were outside the purview of the RAN1 Working Group.  (Id.)

Relying on the report, Ericsson used it as an excuse to delay RAN1 Working Group's

consideration of UTDOA by insisting that the RAN2 and RAN3 Working Groups needed to be

consulted before the RAN1 Working Group could reach any decisions on UTDOA.  (Id.)

TruePosition asserts that Ericsson's argument was not legitimate because, in its first contribution

against UTDOA after its Chairman position expired, Ericsson insisted on the need for prior input

from the RAN2 and RAN3 Working Groups because the RAN3 Working Group was chaired by

a Qualcomm representative and the Vice Chairman was from Ericsson.  (Id. ¶ 78.)  Through the

Corporate Defendants' control of the RAN3 Working Group, TruePosition alleges that they

positioned themselves to create more roadblocks to the consideration of UTDOA which kept it

out of Release 9 and 4G LTE standards.  (Id.)  Even though Ericsson's late submission violated

3GPP rules, the new Chairman of the RAN1 Working Group (a representative of ALU) accepted

Ericsson's submission.  (Id. ¶ 79.)

TruePosition states that throughout the ensuing series of RAN1 Working Group meetings

discussing simulations for UTDOA, the alleged conspiracy by the Corporate Defendants

continued to take shape.  (Id. ¶ 80.)  For instance, TruePosition states that the ALU RAN1

Working Group Chairman, with Ericsson's support, denied TruePosition the sufficient time to

discuss UTDOA so as to make progress in the RAN1 Working Group meetings.  (Id.)  Ericsson

repeatedly insisted in the RAN1 Working Group that TruePosition could not assume that the

RAN2 and RAN3 Working Groups would support the needed changes for UTDOA when

running its simulations, but RAN1 Working Group simulations for OTDOA had expressly been

permitted to presume that all necessary support for OTDOA would be provided in the RAN2 and RAN3 Specifications.  (Id.)  According to TruePosition, the ALU RAN1 Working Group Chairman approved Ericsson's position.  (Id.)  Over a series of meetings, TruePosition alleges that Ericsson consistently made the performance requirements for UTDOA more stringent and unreasonable.  (Id.)  The RAN1 Working Group did not impose such atypical simulation conditions on other LTE positioning technologies, including OTDOA.  (Id.)  In furtherance of the agreement among the Corporate Defendants, TruePosition alleges that the ALU RAN1 Working Group Chairman approved Ericsson's demands delaying the progress for UTDOA over multiple months of meetings.  (Id.)

In November 2009, at an important RAN1 Working Group meeting, TruePosition alleges that both Ericsson and Qualcomm submitted simulations skewed against UTDOA, using sham assumptions of extreme conditions far more severe than the simulation conditions for OTDOA.[15] (Id. ¶ 81.)  Specifically, TruePosition alleges that Ericsson and Qualcomm submitted their late submissions in order to justify a decision by the ALU RAN1 Working Group Chairman to defer the UTDOA Work Item until future meetings, and allow OTDOA to be included in Release 9. (Id.)  In furtherance of the conspiracy, as well as in violation of 3GPP rules, TruePosition alleges that the ALU RAN1 Working Group Chairman accepted the late submissions, denied TruePosition and others an adequate opportunity to review and respond to the submissions, gave credit to the submissions, and used the submissions to further the conspiracy to delay and oppose the standardization for UTDOA.  (Id.)

The Release 9 cut-off period regarding the Corporate Defendants' 2008 Work Item and

---

[15]The November 2009 RAN1 Working Group meeting was an important meeting because it was supposed to be the final session before the cut-off for including technologies in Release 9.  (Am. Comp. ¶ 81.)

TruePosition's UTDOA Work Item concerning positioning technology was extended to the March 2010 RAN Plenary Group meeting.  (Id. ¶ 81.)  At one meeting, Ericsson opposed further progress for UTDOA on the premise that its simulation results were inconsistent.  (Id.) TruePosition asserts that the only inconsistent results were regarding the simulation results performed by Ericsson and Qualcomm and permitted by the ALU RAN1 Working Group Chairman.  (Id.)  With the support of AT&T, TruePosition objected arguing that the Corporate Defendants' proposed simulation parameters were patently unreasonable.  (Id. ¶ 82.)  When challenged, TruePosition alleges that Ericsson could not prove the need for such extreme requirements and could not provide any valid reason why UTDOA needed to meet more stringent requirements than other comparable LTE work items.  (Id.)

During the March 2010 RAN Plenary Group meeting, AT&T and T-Mobile USA supported the advancement of UTDOA past the evaluation phase and into specification work. (Id. ¶ 83.)  Due to opposition from Ericsson, as well as the controversies surrounding the simulations by Ericsson and Qualcomm, and approved by ALU, the RAN Plenary Group Chairman assigned the task of establishing an agreed set of assumptions at the RAN1 Working Group level, and then conducting new simulations and coming to a conclusion by September 2010.  (Id.)  This, TruePosition asserts excluded UTDOA from Release 9 and pushed it into Release 10, while the OTDOA 2008 Work Item was allowed another extension in Release 9. (Id.)  In June 2012, OTDOA was officially included in Release 9.  (Id.)

TruePosition asserts that the Corporate Defendants held positions of power within two of the three RAN Working Groups; namely, a representative of ALU was the Chairman of the RAN1 Working Group and a Qualcomm representative was Chairman of the RAN3 Working

Group.  (Id. ¶ 84.)  Even though the representative from Ericsson no longer held a position as Chairman of the RAN1 Working Group, TruePosition asserts that Ericsson still improperly attended planning meetings of the RAN Group leadership.  (Id.)  TruePosition alleges that the Corporate Defendants used these behind closed doors opportunities, including a September 2012 RAN Plenary Group meeting, to delay and prejudice the leadership against UTDOA standardization.  (Id.)

According to TruePosition, ALU was focused primarily on OTDOA, but was considering the development of an implementation of UTDOA that eliminated the need for standalone LMUs.  (Id. ¶ 85.)  Having consistently manufactured UTDOA positioning equipment, TruePosition was ready to compete for sales to 4G carriers.  (Id.)  After sessions were held in Athens, Greece, and Biarritz, France, a representative from ALU asked TruePosition to delay work on standardizing UTDOA.  (Id.)  After each request, TruePosition's representatives refused. (Id.)

In mid-2012, TruePosition sets forth that in furtherance of the conspiracy, ALU abused its position as RAN1 Work Group Chairman and confidently stated in public that UTDOA would be standardized in Release 11, even though, at that time, UTDOA had only been pushed out of Release 9 and into Release 10.  (Id.)  At a September 2010 RAN Plenary Group meeting, an ALU representative admitted to TruePosition that ALU intended to delay standardization of UTDOA into Release 11.  (Id.)  During this meeting, TruePosition and two major United States carriers supported UTDOA moving forward promptly out of the RAN1 Working Group onto the specification work performed in the RAN2 and RAN3 Working Groups enabling UTDOA to remain on schedule for standardization in Release 10.  (Id. ¶ 86.)  Even though neither Ericsson

nor Qualcomm produced additional accuracy simulations, TruePosition alleges that the Corporate

Defendants acted together and used their leadership positions to manufacture arguments and

controversies  in order to successfully delay a decision on the progress for UTDOA until the next

RAN Plenary Group meeting in December 2010.  (Id.)

In October 2010, at a RAN1 Working Group meeting, TruePosition and others submitted

and presented simulation results favorable to UTDOA standardization.  (Id. ¶ 87.)  ALU sought

to standardize for UTDOA only a technology known as Sounding Reference Signal ("SRS")

method.  (Id.)  According to TruePosition, this SRS method required and burdened far more of a

carrier's network resources than the Semi-Persistent Scheduling ("SPS") method developed and

advocated by TruePosition, and which TruePosition simulations proved to be accurate and

reliable well within FCC requirements.  (Id.)  TruePosition presented simulations for a combined

SPS/SRS implementation that showed more accurate and more reliable results than SRS alone;

however, ALU presented UTDOA simulation data showing better results for SRS alone than

even a combined SRS/SPS implementation.  (Id.)  According to TruePosition, the ALU results

were flawed and pretextual because it was not technologically possible that SRS alone would

perform better than a combined SRS/SPS solution.  (Id.)  Based on ALU's results, the Corporate

Defendants opposed any effort relating to SPS standards support.  (Id.)  In an attempt to end the

discussion, the ALU RAN1 Working Group Chairman wanted to defer the entire UTDOA Work

Item until the next RAN Plenary Group Meeting.  (Id.)  Rather than further delaying the

standardization of  UTDOA, TruePosition placed on the record an objection to the omission of

the SRS method.  (Id.)

After TruePosition and others presented their timely-submitted simulations, Ericsson

informed the ALU RAN1 Working Group Chairman that it, just moments earlier, posted a revised contribution which was a document that proposed a section outlining a new and controversial "Way Forward" for future evaluations that was prejudicial to and would significantly delay UTDOA standardization. (Id. ¶ 88.)  Despite the fact that the contribution violated 3GPP rules by failing to be announced or timely distributed to the Working Group, the ALU Chairman proceeded to use Ericsson's "Way Forward" as the baseline for the meeting record. (Id.)  Such action by the ALU Chairman was in violation of 3GPP procedures. (Id.)

The RAN1 Working Group compiled a report of the UTDOA simulation results for submission to the RAN Plenary Group Meeting to be held in December 2010. (Id. ¶ 90.)  This Plenary Group Meeting was where decisions would be made regarding whether UTDOA might be included in Release 10. (Id.)  Although a TruePosition representative was the rapporteur responsible for the UTDOA Work Item, and should have been tasked with creating the report, the ALU RAN1 Working Group Chairman assigned the responsibility for the compilation of the report to an ALU representative. (Id.)  TruePosition alleges that it was an Ericsson representative who created the compilation and knowingly included the facially-flawed and discredited Qualcomm results. (Id.)  Ericsson removed the flawed Qualcomm results after TruePosition again objected to it based on many unexplained discrepancies in the Qualcomm paper. (Id.)  Due to the removal of the flawed results by Ericsson and Qualcomm, TruePosition agreed to withhold its objections to other contentious items. (Id.)  After those items passed, TruePosition claims that the ALU Chairman permitted the Ericsson representative to reinsert the flawed Qualcomm data, and accepted the table with the "sham" Qualcomm results resorted, all without the knowledge of the RAN1 Working Group as a whole. (Id.)

32

At the December 2010 RAN Plenary Group meeting, UTDOA was accepted as a work item. (Id. ¶ 91.) In light of the controversies that TruePosition alleges the Corporate Defendants manufactured during the RAN1 Working Group Meetings, the RAN Plenary Group subjected UTDOA standardization to the following two conditions: (1) UTDOA standardization would be pushed out to Release 11 (September 2012 would be the earliest); and (2) UTDOA would be standardized only for the SRS transmission method favored by the Corporate Defendants and would not provide for either the option to use only the SPS method or a hybrid of both the SRS and SPS methods. (Id.) According to TruePosition, the Corporate Defendants were successful in their concerted efforts to obtain, at a minimum, a three-year head start for OTDOA products over TruePosition's UTDOA technology, which is "[a] potentially insurmountable lead in the fast-paced race to implement 4G networks in the United States." (Id. ¶ 92.) TruePosition also asserts that they obtained additional competitive advantages by limiting standardization solely to the less effective SRS implementations of UTDOA rather than the superior SPS or SPS/SRS hybrid methods. (Id.)

TruePosition does not end its conspiracy theory here, but goes on to allege that the Corporate Defendants further conspired to limit any UTDOA standardization to implementations integrated within RAN equipment and to exclude standardization of standalone implementations. (Id.) At the RAN Plenary Group meeting in December 2010, the RAN Plenary Group reviewed the Work Item on positioning to determine whether the item could roll from Release 10 to Release 11. (Id. ¶ 93.) On the final day of the meeting, a representative of Ericsson orally recited a long list of proposed changes to the text of the Work Item. (Id.) Ericsson requested that the Chairman issue the Work Item with its requested changes and note them as approved without

33

any further review.  (Id.)  TruePosition objected to the late comments.  (Id.)  According to

TruePosition, the Ericsson representative had not distributed his comments in writing to the RAN

Plenary Group; however, he had given them in advance to an ALU representative because the

ALU representative already had prepared a version of the Work Item from the written changes

provided to him from Ericsson, and asked for their approval.  (Id.)  Again, TruePosition's

representative objected noting that the RAN Plenary Group did not have time to review the

document, the proposed changes were substantive and substantial and TruePosition had

comments about the changes.  (Id.)  Thus, TruePosition asserts that the version of the report

released after the meeting differed from the circulated draft and now indicated that this

assignment discussion had not concluded and would continue to be debated at the March 2011

RAN Plenary Group Meeting.  (Id.)

 According to normal procedure, the UTDOA Work Item would progress into the RAN2

Work Group, which is chaired by a Samsung representative.  (Id. ¶ 94.)  TruePosition alleges

that, in furtherance of the conspiracy, Ericsson and Qualcomm argued at the RAN Plenary Group

meeting that the UTDOA Work Item should be assigned to the RAN3 Working Group, which is

chaired by a Qualcomm representative with an Ericsson representative as Vice Chairman.  (Id.)

The Plenary Group decided that the RAN2 Working Group would handle the "stage 2" work and

the RAN3 Working Group would take over at "stage 3."  (Id.)  TruePosition states that the

Ericsson RAN3 Vice Chairman revealed his intention to fight this assignment by declaring that

after the RAN2 Working Group makes its decisions about UTDOA standardization, the RAN3

Working Group will "fix" them.  (Id.)  TruePosition alleges that Ericsson and Qualcomm

opposed the transfer of the UTDOA Work Item into the RAN2 Working Group because the

RAN2 Chairman from Samsung had been open and neutral towards standardization.  (Id. ¶ 95.)

The Samsung RAN2 Working Group Chairman had accepted proposals to standardize, as

options, different positioning methods in commercial use, including in a standalone LMU that

could be offered by vendors other than RAN network equipment or handset manufacturers.  (Id.)

He had observed that it was logical to include standardization in standalone LMUs, and not just

in RAN equipment, due to the more than 90,000 existing standalone UTDOA commercial

implementations in the United States.  (Id.)  Pointing out that ALU had proposed to exclude all

standalone UTDOA implementations, TruePosition says that Qualcomm and Ericsson objected

to this statement by the Samsung RAN3 Working Group Chairman.  (Id.)

TruePosition alleges that in furtherance of the conspiracy, the Corporate Defendants

succeeded in their attempt at reducing the role in the standardization process of the Samsung

chaired RAN2 Working Group.  (Id. ¶ 96.)  During the RAN Plenary Group meeting in March

2011, the Ericsson RAN3 Vice Chairman asked to return the discussion to the topic of

TruePosition's first document, even though the discussion concerning all of the documentation in

TruePosition's UTDOA Work Item had previously been concluded and a different agenda topic

had been discussed.  (Id.)  The Ericsson RAN3 Working Group Chairman challenged the

placement of TruePosition's UTDOA Work Item in the RAN2 Working Group which

TruePosition states was an issue that had been previously decided.  (Id.)  After a lengthy debate,

the Plenary Group Chairman settled the issue by indicating that the work would start in the

RAN2 Working Group, but the RAN3 Working Group would review the RAN2 Working

Group's work.  (Id.)  This, TruePosition points out, was a virtually unprecedented request by the

Ericsson RAN3 Vice Chairman.  (Id.)

During the 2011 RAN2 Working Group meeting, Ericsson, supposedly in concert with ALU, objected to standardization for TruePosition's technology by criticizing the alleged complexity of supporting standalone LMUs.  (Id. ¶ 97.)  AT&T, which had purchased tens of thousands of standalone LMUs, supported standardization and prevailed by referring to the successful LMU deployment in the United States, and insisting that it would be logical and beneficial to preserve its option to upgrade LMUs that it had acquired and might acquire in the future.  (Id.)

During the May-June 2011 RAN Plenary Group meeting, Ericsson, again, insisted that the RAN3 Working Group would review the work of the Samsung chaired RAN2 Working Group before it could include UTDOA within its portion of the Specification.  (Id. ¶ 98.)  The Samsung Chairman remarked that companies should have sufficient resources to send representatives to complete the work within the RAN2 Working Group, and made an usual public remark expressing concern that certain big companies should not use referrals between groups to "play games" with RAN2 Working Group's standardization process.  (Id.)

The August 2011 RAN2 Working Group meeting had a key decision involving an architecture design for UTDOA scheduled to be presented by TruePosition.  (Id. ¶ 99.)  ALU strenuously opposed TruePosition's design and wanted to standardize a different architecture favoring only RAN equipment vendors and prejudicing standalone equipment manufacturers.  (Id.)  ALU also preempted TruePosition's presentation proposing that the architecture decision be sent to the RAN3 Working Group (where Qualcomm and Ericsson hold Chairman positions).  (Id.)  According to TruePosition, the neutral Samsung Chairman of the RAN2 Working Group, and the majority of the Group, approved TruePosition's architecture.  (Id.)  In conjunction with

36

ALU, Ericsson reminded the group that the RAN3 Working Group would review all RAN2 Working Group decisions.  (Id.)

In November 2011, the RAN1 Working Group held a meeting where Ericsson submitted a lengthy contribution that would require all standalone LMU deployments to use separate antenna.  (Id. ¶ 100.)  Notably, the 90,000 LMUs currently deployed by TruePosition share the same antenna used by RAN equipment, and there are no technological reasons to require a separate antenna.  (Id.)  In fact, separate antenna for standalone LMUs would substantially increase deployment costs to the RAN vendors' competitors in the positioning markets, i.e., TruePosition.  (Id.)  Ericsson's submission was circulated on the day that the meeting began and, therefore, was well past the deadline in violation of 3GPP rules.  (Id.)  Nevertheless, the ALU Chairman of the RAN1 Working Group refused to enforce the 3GPP due process rules accepting the untimely submission.  (Id.)  ALU supported Ericsson's proposal.  (Id.)

From the outset, all simulations of UTDOA were performed using "Wideband" signaling, and all work on UTDOA standardization proceeded for nearly three years on the basis that Wideband would be used for UTDOA.  (Id. ¶ 101.)  Beginning in September 2011, over the course of several RAN1 and RAN3 Working Groups, Ericsson insisted that UTDOA should be standardized for less than full Wideband signaling, and such would need to be completed before any UTDOA standardization could progress.  (Id.)  According to TruePosition, this action promoted the conspiracy by interposing months of additional delay against UTDOA standardization.  (Id.)  Additionally, it would render standalone implementations less effective than UTDOA implementations integrated into RAN equipment because the RAN vendor would always have the discretion to use Wideband signaling for positioning technology integrated into

37

its own equipment, no matter what 3GPP standards prescribe.  (Id.)  As for standalone

implementations that need to interoperate with RAN equipment, they would be limited according

to the standard.  (Id.)  TruePosition offered a compromise to allow Wideband UTDOA

standardization first and consider other solutions in parallel, but the Qualcomm RAN3 Working

Group Chairman deemed TruePosition's UTDOA Work Item to be at a stalemate where no

further progress could occur.  (Id.)  He then informed the RAN Plenary Group in the December

2011 meeting about the stalemate.  (Id.)  TruePosition states that the Corporate Defendants'

collusive actions have brought the standardization of UTDOA to a virtual standstill.  (Id.)

     *b.  Analysis of Law With The Facts*

In order to determine whether a complaint states a plausible entitlement to relief, the

Court must first identify, and then disregard, those factual allegations which constitute nothing

more than "legal conclusions" or "naked assertions."  See Blood Reagents, 756 F. Supp. 2d at

628 (citing Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 555, 557).  In the recitation of the

extensive facts of this case, we disregarded all of TruePosition's conclusions and assertions that

virtually all of the Corporate Defendants' actions were due to their agreement to conspire against

TruePosition and its UTDOA technology.  We did not give credence to such assertions.  Instead,

we only included the factual assertions within the Amended Complaint that did not include

speculation about motive by TruePosition.

"The resulting 'nub' of plaintiff's Complaint must describe more than parallel conduct; it

must include 'factual enhancements' that raise the entitlement to relief above the speculative

level."  Id.; see also Alvord-Polk,, 37 F.3d at 1013 ("The evidence must give rise to more than

speculation.")  It is important to point out that the allegations in the Complaint must be viewed as

a whole.  Id. (citations omitted).  In order to survive a motion to dismiss, the allegations "must be

placed in a context that raises a suggestion of a preceding agreement."  Id. (citing Insurance

Brokerage, 610 F.3d at 300, 314-16).

      In this case, the resulting "nub" of TruePosition's Amended Complaint includes factual

enhancements raising an entitlement to relief above the speculative level.  The Amended

Complaint is replete with examples of parallel conduct by the Corporate Defendants within the

confines of a standard setting organization.  This action is not an antitrust action involving the

typical example of parallel conduct found in price fixing, but, instead, involves the behavior of

the Corporate Defendants in an organization that sets the standards of an industry that are pivotal

to the success of themselves, as well as their competitors.  As the Court of Appeals for the Third

Circuit ("Third Circuit") stated,

> That 'private standard-setting by associations
> comprising firms with horizontal and vertical
> business relations is permitted at all under the
> antitrust laws [is] only on the understanding that it
> will be conducted in a nonpartisan manner offering
> procompetitve benefits,' . . . and in the presence of
> 'meaningful safeguards' that 'prevent the standard-
> setting process from being biased by members with
> economic interests in stifling product competition.

Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 309-10 (3d Cir. 2007) (citing Allied Tube &

Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 501, 506 (1988); Am. Soc. of Mech. Eng'rs,

Inc. v. Hydrolevel Corp., 456 U.S. 566, 572 (1982)).  Notably, "a standard-setting organization . .

. can be rife with opportunities for anti-competitive activity."  Hydrolevel, 456 U.S. at 571.

It is within the context of a standard setting organization that the acts of the Corporate

Defendants must be viewed.

While the Corporate Defendants attempt to have the Court examine each allegation against them in isolation, we view the allegations in the Amended Complaint as a whole.  See Blood Reagents, 756 F. Supp. 2d at 630 ("[T]he allegations in a complaint must be viewed as a whole.").  "[I]n assessing whether a trade association (or any group of competitors) has taken concerted action, a court must examine all the facts and circumstances to determine whether the action taken was the result of some agreement, tacit or otherwise, among members of the association."  Alvord-Polk, 37 F.3d at 1008 (footnote omitted).  It is clear that in the standard setting organizational setting, opportunities for agreement are prolific.  However, "when evidence shows communications which provided an opportunity for agreement, a plaintiff must still produce evidence permitting an inference that an agreement in fact existed."  Alvord-Polk, Inc., 37 F.3d at 1013.

Viewing the allegations in the Amended Complaint as a whole, TruePosition has sufficiently pleaded facts permitting an inference that the Corporate Defendants entered into an agreement to preclude TruePosition's UTDOA positioning technology from the 2008 Work Item and to prevent or protract UTDOA's standardization.  If we were to "cherry pick" each allegation in the Amended Complaint against each specific Corporate Defendant, our analysis of whether TruePosition has plausibly alleged an agreement would be piecemeal and inconsistent.  Neither the alleged scope of the conspiracy nor how all of the allegations are intermingled on top of one another would be adequately assessed.  It is by viewing the Amended Complaint in its entirety that the total scope of the alleged conspiracy can be fully understood.

From the exclusion of TruePosition's UTDOA technology from the section of the 2008 Work Item proposing the technologies to be included within the 3GPP standard until the alleged

40

prevention and push back of standardization using positions of power within the RAN Working Groups, it is plausible that the Corporate Defendants agreed on a common plan to prevent or delay the standardization of UTDOA while, at the same time, obtaining a considerable lead for a proposed positioning technology that would directly or indirectly benefit them in different ways. By viewing the allegations in the Amended Complaint as a whole, and not dismembering them, we consider the following as actions, amongst others, as support for the inference that the Corporate Defendants acted as part of a conspiracy: submitting the proposal of the 2008 Work Item which included UTDOA within the "Justification" section, but did not include it within the section proposing the technologies to be included within the 3GPP standard; consistent late submissions; questionable timing of submissions and objections; using positions of power within the RAN Working Groups to circumvent 3GPP due process rules; imposing unreasonable and questionable preconditions, as well as testing and simulation parameters, on the standardization of UTDOA that were not placed upon other proposed positioning technologies; supposedly submitting false and pretextual simulation results in an attempt to discredit UTDOA and to prevent its inclusion in Release 9 while advancing their own proposed positioning technology; attempting to preclude standardization of UTDOA for standalone equipment implementations when all of the successful existing implementations of UTDOA rely upon only standalone implementations; the exclusion of SPS transmission methods by restricting any standardization solely to SRS methods; exclusion of TruePosition's preferred Wideband SRS method; and using their positions as Chairmen of relevant 3GPP committees to suppress competition from UTDOA, as well as other positioning technologies by others, and to advance technologies beneficial to them.

When viewing the Amended Complaint in its entirety, the allegations give rise to more than speculation. TruePosition's allegations of conspiracy are indeed plausible. That is not to say that we find the allegations probable, which is not required at this stage, but we do find that when read together they do raise a reasonable expectation that discovery will reveal evidence of an illegal agreement. Accordingly, we conclude that TruePosition has sufficiently alleged the first requirement of a Section 1 Sherman Act claim that the Corporate Defendants were parties to an agreement. This conclusion, however, does not end our analysis. We must now satisfy ourselves that the second requirement of a Section 1 claim under the Sherman Act - the unreasonable restraint element - is met.

**B. <u>Unreasonable Restraint on Trade</u>**

In addition to demonstrating the existence of a conspiracy or agreement, "the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." <u>Ins. Brokerage</u>, 618 F.3d at 316; <u>see also</u> <u>Am. Needle. Inc. v. NFL</u>, - U.S. -, 130 S. Ct. 2201, 2209 (2010) ("The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade."); <u>Burtch</u>, 662 F.3d at 221 (stating that the second requirement of Section 1 of the Sherman Act mandates that a plaintiff show "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade"). It is well established that this provision only prohibits "unreasonable" restraints of trade. <u>Race Tires Am., Inc. v. Hoosier Racing Tire Corp.</u>, 614 F.3d 57, 75 (3d Cir. 2010). This requirement is analyzed under either the per se standard or the rule of reason standard. <u>Burtch</u>, 662 F.3d at 221

"The per se illegality rule applies when a business practice 'on its face, has no purpose

except stifling competition.'" Id. (quoting Eichorn v. AT&T Corp., 248 F.3d 131, 143 (3d Cir. 2001)).  Agreements falling under established per se illegality categories are "conclusively presumed to unreasonably restrain competition." Id. at 222 (citing Ins. Brokerage, 618 F.3d at 316). "Paradigmatic examples are 'horizontal agreements among competitors to fix prices or to divide markets.'" Id. (citation omitted).  "Per se illegality 'is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" Id. (quoting Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010)).  We do not reach TruePosition's argument that the conspiracy is per se illegal because we find that TruePosition has met the more demanding "rule of reason" standard.

Agreements that do not fall under per se illegality are analyzed under the "rule of reason" to determine whether they are an unreasonable restraint on trade.  "Under the rule of reason analysis, the plaintiff bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." Id. (quote and quotation marks omitted); see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 660 F. Supp. 2d 590, 602 (W.D. Pa. 2009) ("In actions involving a vertical restraint . . . courts apply the 'rule of reason' analysis.")  Satisfying this burden typically includes a demonstration of defendants' market power. Id. (citations omitted).  At the pleading stage, a plaintiff may satisfy the unreasonable restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets. West Penn, 627 F.3d at 100 -101 (citations omitted).  Anticompetitive effects include the following: increased prices; reduced output; and reduced quality. Id.

Here, the Amended Complaint alleges that the relevant products in this case are highly

accurate positioning technologies that locate mobile devices by making measurements of signals from the cellular network.  (Am. Compl. ¶ 123.)  The two relevant markets for these products are for public safety and for law enforcement and security.[16]  (Id.)  TruePosition states that "the market for high accuracy positioning technology for mobile communications devices for purposes of public safety (e.g., E-911) is defined geographically by those governments that have mandated positioning capability through regulations."  (Id. ¶ 134.)  "The geographic market for high accuracy positioning technology for public safety purposes currently is the United States because it is the only government with regulations that currently mandate high accuracy positioning capability."  (Id. ¶¶ 10, 134.)  TruePosition, which spent approximately twenty-five million dollars on research and development relating to positioning technology, states that the geographic innovation market is global for purposes of security and law enforcement.  (Id.)

The Amended Complaint plausibly suggests that by excluding UTDOA technology from 3GPP standards for 4G LTE networks, the conspiracy has foreclosed competition for UTDOA positioning products.  (Id. ¶ 137.)  This foreclosure has limited consumer and manufacturer choices, as well as constrained and slowed down innovation.  (Id.)  These allegations are sufficient to suggest that the conspiracy produced anticompetitive effects in the relevant markets. We note "that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support an inference of conspiracy."  Alvord-Polk, 37 F.3d at 1011 n.13.  Competition is a hallmark of a free market.  However, when viewing the allegations

---

[16]TruePosition explains that "[h]igh accuracy positioning capability is a necessary feature where required by government regulation or by a government request for proposals."  (Am. Compl. ¶ 125.)  "Certain governments require highly accurate positioning capability to promote public safety and to support domestic security and law enforcement."  (Id.)  TruePosition states that customers for highly accurate positioning capability include wireless carriers and law enforcement.  (Id.)

in the Amended Complaint as a whole, especially in the standard setting organizational context, we do not find that the alleged anticompetitive effects of the alleged actions of the Corporate Defendants are outweighed by any countervailing pro-competitive benefits.  See Insurance Brokerage, 618 F.3 at 316.

### C.  Antitrust Injury

"An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." West Penn, 627 F.3d at 101 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  Id. (quotation and quotation marks omitted)   It is the antitrust-injury requirement that assists in ensuring "that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for . . . damages."  Id. (citing Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 342 (1990)) ("[An] injury, although causally related to an antitrust violation, nevertheless will not qualify as an 'antitrust injury' unless it is attributable to . . . a competition-*reducing* aspect or effect of the defendant's behavior.")  The antitrust laws were enacted to protect competition, not competitors.  Atl. Richfield, 495 U.S. at 338 (citation omitted).  "As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market . . . and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends."  Id. (citations and internal citations omitted).

TruePosition alleges an antitrust injury within the confines of the Sherman Act.  That is,

45

TruePosition has shown injury flowing from the alleged anticompetitive activities of the Corporate Defendants.  Stressing that 3GPP standardization is an absolute prerequisite for competition in the relevant positioning markets, TruePosition's allegations that the Corporate Defendants' conspiracy has foreclosed present competition for UTDOA positioning products for 4G networks leads to the conclusion that TruePosition has currently been foreclosed from developing, manufacturing or selling its UTDOA positioning products for 4G LTE networks to carriers in the United States and worldwide.  (Am. Compl. ¶¶ 137-38.)  Also stemming from its allegations of the Corporate Defendants' alleged conspiracy, TruePosition asserts that is has been foreclosed from bidding for potential contracts to sell its UTDOA positioning products and from upgrading for 4G networks the existing universal LMUs already purchased by its customers for 2G and 3G networks.  (Id. ¶ 138.)  Additionally, it argues that its efforts to sell positioning equipment for 2G and 3G networks has been substantially harmed because it cannot assure potential customers that the equipment can be upgraded until 3GPP creates a standard for standalone UTDOA implementations on 4G networks.  (Id.)

Examination of TruePosition's alleged injuries reveals that they are the type for which compensation promotes the designated purpose of the antitrust law; namely, the preservation of competition.  The Corporate Defendants' alleged conspiracy which includes allegations of abuse of power of influential positions within a standards setting organization resulting in the preclusion or forestalling of another company's technology directly threatens competition.  "There is no doubt that members of [trade and standard setting associations] often have economic incentives to restrain competition and that the product standards by such associations have a serious potential for anticompetitive harm."  Allied Tube & Conduit Corp., 486 U.S. at 500

(citations omitted).  It is not just the fact that the alleged conspiracy in this case is set within the confines of a standard setting organization, but it is the alleged abuse of positions of power within that organization and the alleged results of such actions leading to the stalling and preclusion of another company's technology from an industry standard that impairs competition by depriving access of some consumers to a desired product, as well as extinguishing quality competition within the relevant market.

In light of the foregoing, we conclude that TruePosition has plausibly alleged an antitrust injury.  Making this finding establishes that TruePosition's Amended Complaint has plausibly alleged the three requisite elements of a Section 1 claim under the Sherman Act.  It is important to point out that it is possible that the actions of the Corporate Defendants were not the result of collusive illegal behavior in violation of the Sherman Act.  However, at this early stage of the litigation, "neither Twombly nor Insurance Brokerage requires an antitrust plaintiff to plead facts that, if true, definitively rule out all possible explanations."  Blood Reagents, 756 F. Supp. 2d at 642 (citations omitted).  Considering all of the well-pleaded factual allegations against the backdrop of a standard setting organization, the Amended Complaint plausibly avers a conspiracy between the Corporate Defendants in violation of Section 1 of the Sherman Act.

### D.  Ripeness

As previously explained in footnote 5, the Corporate Defendants joined in ETSI's Motion to Dismiss, and the only pertinent argument relatable to them is the ripeness of TruePosition's claims.  "Article III of the Constitution limits the federal judicial power to Cases or Controversies."  Constitution Party of PA v. Cortes, 712 F. Supp. 2d 387, 395 (E.D. Pa. 2010) (quoting Khodara Envtl., Inc. v. Blakey, 376 F.3d 187, 193 (3d Cir. 2004)) (quotation marks

omitted).  "Courts enforce the case-or-controversy requirement through the several justiciability doctrines, including standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions."[17]  Id. (quoting Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 137 (3d Cir. 2009)) (quotation marks omitted).  "The ripeness doctrine determines 'whether a party has brought an action prematurely, and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'"  Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, 580 F.3d 185, 190 (3d Cir. 2009) (quoting Peachlum v. City of New York, 333 F.3d 429, 433 (3d Cir. 2003)).  The ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  Doe v. County of Centre, PA, 242 F.3d 437, 453 (3d Cir. 2001).

The ripeness argument in this case is based upon the assertion that TruePosition's antitrust claim is not fit for judicial review because it is based entirely on an uncertain or contingent future event that may not occur as anticipated, or may not occur at all; namely, the exclusion of UTDOA technology from the 4G LTE Specification, which is still being developed.  The Amended Complaint does include allegations pertaining to the inclusion of TruePosition's UTDOA Work Item into 3GPP's 4G LTE Specification.  This claim may indeed be altered should the UTDOA Work Item be included in the Specification.  However, TruePosition's Amended Complaint is not solely based upon this one and only claim.  It also includes additional claims and allegations concerning actions by the Corporate Defendants that, if true, exemplify

---

[17]"The standing and ripeness doctrines are related, as '[e]ach is a component of the Constitution's limitation of the judicial power to real cases and controversies.'"  Constitution Party of PA, 712 F. Supp. 2d at 395 (quoting Presbytery of N.J. of Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994)).

antitrust activity in violation of Section 1 of the Sherman Act. TruePosition asserts that it has already suffered concrete injury by losing sales and having its UTDOA products appear less marketable as a result of being excluded from the 4G LTE Standard for the past few years. Also, TruePosition argues that by being excluded from the Specification thus far, a competing technology, OTDOA, has gained an insurmountable head start. As for the 4G LTE Specification, TruePosition's Amended Complaint alleges, due to the coordinated actions of the Corporate Defendants, that its UTDOA Work Item has been subjected to conditional terms (i.e., omission of the SRS method) that are not optimal for UTDOA technology. "Where . . . the defendant is alleged to have engaged already in conduct that violates a plaintiff's rights, the force of a ripeness challenge is diminished." Dasrath v. Continental Airlines, Inc., 228 F. Supp. 2d 531, 546 (D.N.J. 2002) (citing Doe v. County of Centre, 242 F.3d at 453).

In light of the foregoing, we conclude that TruePosition's action is not premature. TruePosition has purportedly suffered injury due to the alleged antitrust actions of the Corporate Defendants since 2008. Inclusion within the 4G LTE Standard alone would not remedy all of the alleged antitrust wrongs supposedly suffered by TruePosition. In addition, it would be a hardship to withhold relief due to the allegations of antitrust violations and resultant harm already supposedly experienced by TruePositon. As a result, the dispute at issue is sufficiently concrete to satisfy the constitutional and prudential requirements of the ripeness doctrine. Consequently, the Corporate Defendants' argument for dismissal based upon ripeness is denied.

## V. CONCLUSION

In order to survive the Corporate Defendants' Motion to Dismiss, TruePosition has plausibly stated a claim for a violation of Section 1 of the Sherman Act. The allegations of an

illegal conspiracy between the Corporate Defendants are plausible when viewed in context and as a whole.  The Corporate Defendants' argument for dismissal premised upon ripeness is denied. The Corporate Defendants' Motion to Dismiss is denied.  Likewise, the Corporate Defendants' request for oral argument is denied.

An appropriate Order follows.