**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|                                              |   |                |
|----------------------------------------------|---|----------------|
| TRUEPOSITION, INC.,                          | : |                |
|                                              | : |                |
| Plaintiff,                                   | : | CIVIL ACTION   |
|                                              | : |                |
| v.                                           | : | No. 11-4574    |
|                                              | : |                |
| LM ERICSSON TELEPHONE COMPANY                | : |                |
| (TELEFONAKTIEBOLAGET LM ERICSSON),           | : |                |
| QUALCOMM, INC.,                              | : |                |
| ALCATEL-LUCENT USA, INC.,                    | : |                |
| EUROPEAN TELECOMMUNICATIONS                  | : |                |
| STANDARDS INSTITUTE, and                     | : |                |
| THIRD GENERATION PARTNERSHIP                 | : |                |
| PROJECT a/k/a 3GPP,                          | : |                |
|                                              | : |                |
| Defendants.                                  | : |                |

_____

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                        **OCTOBER 4, 2012**

Presently before the Court is the Motion to Dismiss Plaintiff TruePosition, Inc.'s

("TruePosition") Amended Complaint by Defendant Third Generation Partnership Project a/k/a

3GPP ("3GPP"), TruePosition's Response in Opposition to 3GPP's Motion to Dismiss, as well

as 3GPP's Reply Brief.  For the reasons provided below, the Motion to Dismiss will be denied.

### I.    BACKGROUND[1]

This action stems from the alleged anticompetitive conduct of major players in the

international telecommunications market within the context of a Standard-Setting Organization

("SSO").  (Am. Compl. ¶¶ 1-9.)  TruePosition describes itself as a "leading innovator in

_____

[1] A more in-depth factual and procedural background is provided in the Court's prior Memorandum Opinion dated
August 21, 2012.  See TruePosition, Inc. v. LM Ericsson Tel. Co., No. 11-4574, 2012 WL 3584626 (E.D. Pa. Aug.
21, 2012).

developing and marketing high accuracy location products that operate over cellular telecommunications networks."  (Id. ¶ 3.)  TruePosition alleges that LM Ericsson Telephone Company (Telefonaktiebolaget LM Ericsson), Qualcomm, Inc. and Alcatel-Lucent USA, Inc. (collectively, the "Corporate Defendants") abused their positions of authority within 3GPP by violating its rules and procedures in order to conspire to exclude TruePosition's positioning technology,[2] Uplink Technology ("UTDOA"), from the newest and most advanced 4th generation ("4G") global standard for mobile telecommunications technologies, known as Long Term Evolution ("LTE").  (Id. at ¶ 1.)  This global standard is created by 3GPP, a SSO, which "establishes global standards for mobile communications technologies, including mobile phone location technologies."[3]  (Id.)

According to TruePosition, "[m]ore than 55 million cellular callers in the United States each year are located by TruePosition products, assisting police, fire, and ambulance services in saving lives and enabling law enforcement to combat criminal activity and terrorist threats."  (Id. at ¶ 3.)  In the United States, the Federal Communications Commission ("FCC") has set regulatory requirements mandating that all mobile voice networks be able to locate 911 callers.  (Id.)  UTDOA, TruePosition's positioning technology, "has been successfully deployed on more than 90,000 cell tower sites in the United States to meet FCC requirements."  (Id.)  TruePosition states that "inclusion in the 3GPP standard is vital to commercial success" because "[e]xclusion from the standard guarantees commercial failure and, in most instances, absolute foreclosure

---

[2] "Positioning technology" refers to technology used to locate mobile handsets.  (Am. Compl. ¶ 3.)

[3] Another SSO, European Telecommunications Standards Institute ("ETSI"), was also named as a defendant in this action.  (See Am. Compl.)  ETSI was voluntarily dismissed from this action with prejudice on August 10, 2012.  (Doc. No. 130.)

from the market."  (Id. ¶ 4.)

TruePosition alleges that all of the Defendants' actions violated federal antitrust law, specifically Section 1 of the Sherman Act, 15 U.S.C. § 1.[4]  (Id. ¶¶ 139-153.)  The Corporate Defendants jointly moved to dismiss the Amended Complaint in its entirety.  On August 21, 2012, this Court issued a Memorandum Opinion and Order denying the motion deciding that the Amended Complaint plausibly states a claim against the Corporate Defendants for violation of Section 1 of the Sherman Act under the dismissal standard announced in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and clarified in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  3GPP now moves for dismissal of the Amended Complaint arguing that TruePosition has failed to state a claim against it for which relief can be granted.[5]  We deny 3GPP's Motion to Dismiss concluding that dismissal is not warranted at this time.

## II.    **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the complaint must be construed in the light most favorable to the plaintiff.  Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220 (3d Cir. 2011) (citing In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010)).  Federal

---

[4]Pursuant to 28 U.S.C. § 1331, federal question jurisdiction exists based upon the Sherman Act, 15 U.S.C. § 1.

[5]3GPP also seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  See Fed. Civ. R. C. P. 12(b)(1).  Relying upon an argument asserted by ETSI in its dismissal motion, 3GPP argues that the Amended Complaint should be dismissed based upon ripeness and standing issues.  (3GPP's Mot. to Dismiss Am. Compl. at 2 n.3.)  Prior to its dismissal, ETSI filed a Motion to Dismiss arguing, in part, that there were outstanding ripeness and standing issues.  (Doc. No. 102.)  In their Joint Motion to Dismiss, the Corporate Defendants joined in ETSI's dismissal motion.  (Doc. No. 103.)  In our August 21, 2012 Memorandum Opinion, we dismissed ETSI's arguments regarding ripeness and standing.  (Doc. No. 132.)  Since we have already decided the pertinent arguments set forth by ETSI, we deny 3GPP's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) based upon the arguments of ripeness and standing.

Rule of Civil Procedure 8(a)(2) requires "only 'a short and plain statement of the claim showing

the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is

and the grounds upon which it rests.'"  Twombly, 550 U.S. at 555 (quoting Conley v. Gibson,

355 U.S. 41, 47 (1957)).

"[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of the cause of

action will not do."  Twombly, 550 U.S. at 555.  In Twombly, the United States Supreme Court

"set forth the 'plausibility' standard for overcoming a motion to dismiss and refined the approach

in Iqbal."  Burtch, 662 F.3d at 220 (citing Twombly, 550 U.S. at 557; Iqbal, 556 U.S. at 680).  In

other words, Rule 8 requires that a complaint contain factual allegations that, taken as a whole,

render the plaintiff's entitlement to relief plausible.  W. Penn Alleg. Health Sys., Inc. v. UPMC,

627 F.3d 85, 98 (3d Cir. 2010).  "This 'does not impose a probability requirement at the pleading

stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery

will reveal evidence of the necessary element.'"  Id. (quoting Phillips v. County of Alleg., 515

F.3d 224, 234 (3d Cir. 2008); Twombly, 550 U.S. at 556).

When deciding the sufficiency of a complaint "courts should disregard the complaint's

legal conclusions and determine whether the remaining factual allegations suggest that the

plaintiff has a plausible - as opposed to merely conceivable - claim for relief."  Id. (citing Iqbal,

129 U.S. at 1949-50; Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)).

Under both Twombly and Iqbal, a court must take the following three steps in order to determine

the sufficiency of a complaint:

> First, the court must take note of the elements a plaintiff must
> plead to state a claim.  Second, the court should identify the

> allegations that, because they are no more than conclusions, are not
> entitled to the assumption of truth.  Finally, where there are well-
> pleaded factual allegations, a court should assume their veracity
> and then determine whether they plausibly give rise to an
> entitlement of relief.

Burtch, 662 F.3d at 221 (quoting Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir.

2010)).  "It is, of course, true that judging the sufficiency of a pleading is a context-dependent

exercise."  W. Penn, 627 F.3d at 98 (citing Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 567-

68; Phillips, 515 F.3d at 232).

## III.   <u>DISCUSSION</u>

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of

trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  Under Section 1 of the

Sherman Act, a plaintiff must plausibly allege the following three elements: (1) an agreement; (2)

imposing an unreasonable restraint of trade within a relevant product market; and (3) resulting in

antitrust injury, that is "injury of the type the antitrust laws were intended to prevent and . . . that

flows from that which make defendants' acts unlawful."  Ins. Brokerage, 618 F.3d at 315.

3GPP contends that TruePosition's claims against it should be dismissed because its

theory of liability with respect to 3GPP is one of acquiescence.  (3GPP's Mem. Law Support

Mot. to Dismiss Am. Compl. at 6.)  3GPP argues that it is alleged to have purportedly been on

notice of the Corporate Defendants' alleged misconduct, and to have failed to remedy it.  (Id. at

6-7.)  This alleged "inaction," according to 3GPP, does not show the requisite agreement

necessary to support a claim under Section 1 of the Sherman Act.[6]  (Id.)  TruePosition argues that

3GPP mischaracterizes its claim.  (TruePosition's Mem. Law Support Opp'n 3GPP's Mot. to

Dismiss at 2.)  TruePosition avers that the Amended Complaint does not rest solely on a theory

of "acquiescence," but asserts that 3GPP is liable under the Sherman Act for concerted

anticompetitive acts that the Corporate Defendants allegedly committed while acting as 3GPP's

agents within the scope of the apparent authority given to them by 3GPP.  (Id.)  TruePosition

argues that the "Amended Complaint details how the Corporate Defendants openly and

repeatedly manipulated their power as Chairmen of multiple 3GPP committees, and thereby

invoked the standard-setting authority of 3GPP to exclude UTDOA from two releases of the

3GPP standards."  (Id.)  The Court agrees with TruePosition.  Consequently, we will deny

3GPP's Motion to Dismiss.

     To prevail on a Section 1 claim, a plaintiff is required to establish the existence of an

agreement, at times also referred to as a conspiracy or concerted action.  W. Penn, 627 F.3d at 99

(citing Twombly, 550 U.S. at 553; Gordon v. Lewistown Hosp., 423 F.3d 184, 207 & n.16 (3d

Cir. 2005)).  The existence of an agreement "requires some form of concerted action, which we

define as unity of purpose or a common design and understanding or a meeting of minds or a

conscious commitment to a common scheme."  Burch, 662 F.3d at 221 (citations omitted).

Regardless of the motivation, unilateral action is not a violation of Section 1.  Id. (citation

omitted).  An agreement may be pleaded by a plaintiff by either alleging direct or circumstantial

---

[6]3GPP argues that any allegations regarding its alleged failure to supervise its members would constitute, at most, a possible breach of contract or a negligence claim, but not a conspiracy claim under the Sherman Act. (3GPP's Mem. Law Support Mot. to Dismiss at 11.)  While TruePosition does argue that 3GPP failed to supervise, it is TruePosition's claims pertaining to the Corporate Defendants' acts as agents of 3GPP with its apparent authority that are the focus and deciding factors of whether the Amended Complaint plausibly alleges an antitrust conspiracy claim against 3GPP.

evidence or a combination of the two.  Id.

### A.    American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.
####        456 U.S. 556 (1982)

Regarding the liability of standard-setting organizations under Section 1 of the Sherman

Act, the United States Supreme Court's decision in American Society of Mechanical Engineers,

Inc. v. Hydrolevel Corp., 456 U.S. 556 (1982), is instructive.  In Hydrolevel, the Supreme Court

relied upon general principles of agency law to determine that the American Society of

Mechanical Engineers ("ASME") could be held liable for the actions of its officers and agents

undertaken with apparent authority.[7]  456 U.S. at 570-71.  Focusing on the great power possessed

by ASME, as well as how its codes and standards influenced policies and affected entities'

abilities to do business, the Hydrolevel Court held that imposing liability based upon apparent

authority comported with the intent of the antitrust laws.  Id.

The facts of Hydrolevel are relevant to this case.  Plaintiff, Hydrolevel, Inc.

("Hydrolevel"), produced a low-water fuel cutoff device for use in heating boilers which

included a time delay.  Id. at 560.  Hydrolevel received business from an important client that had

previously purchased the product of the dominant competitor in the low-water fuel cutoff device

market, McDonnell & Miller, Inc. (M&M).  Id.  The M&M device did not include a time delay.

Id.  M&M was a member of ASME which promulgated the industry's highly-influential model

codes.  Id. at 559–60.  The model codes are advisory, but have a powerful influence.  Id.  They

are adopted by federal regulations, 46 States, and all but one of the Canadian Provinces.  Id. at

---

[7]Using the Restatement (Second) of Agency § 8 (1957), the Hydrolevel Court defined "apparent authority" as "'the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.'"  Hydrolevel, 456 U.S. at 566 n.5 (quoting Restatement (Second) of Agency § 8).

559.  "[I]f a manufacturer's product cannot satisfy the applicable ASME code, it is at a great disadvantage in the marketplace."  Id.

The vice president of M&M was vice chairman of the ASME subcommittee that produced the segment of the model code governing low-water fuel cutoff devices.  Id.  Sensing that Hydrolevel's device would intrude into M&M's market share, the M&M executive, in his capacity as vice chairman of the subcommittee, conspired with the chairman of the subcommittee to create an inquiry letter to ASME's Boiler and Pressure Vessel Committee asking whether a fuel cutoff device with a time delay would satisfy the requirements of the ASME Code.  Id. at 561.  The chairman, who helped to author the inquiry, drafted a response to the letter condemning fuel cutoff devices that incorporate a time delay as unsafe.  Id.  He was able to retain control over the draft response by treating the response as unofficial.  Id.  The draft response was inaccurate.  Id.  Utilizing the chairman's draft response verbatim, and without checking its accuracy, the secretary of the subcommittee issued a letter condemning the low-water level cutoff device with a time delay as unsafe under ASME's standards, and it was mailed on ASME stationary.  Id. at 561–62.

Based on that statement, M&M orchestrated an effective publicity campaign stating that Hydrolevel's device violated ASME's model code.  Id. at 562.  Consequently, Hydrolevel's business suffered.  Id.  The Court pointed out that "M&M successfully used its position within ASME in an effort to thwart Hydrolevel's competitive challenge."  Id.  After several months, Hydrolevel learned about the subcommittee's interpretation from a former customer.  Id.  In response to Hydrolevel's ensuing complaints, ASME initiated an investigation which ultimately concluded that no wrongdoing had occurred.  Id. at 563–64.

Hydrolevel filed suit against M&M and ASME alleging violations of Sections 1 and 2 of the Sherman Act.  Id. at 564.  M&M settled the suit with Hydrolevel, and the case went to trial against ASME.  Id.  The jury returned a verdict in favor of Hydrolevel which the United States Court of Appeals for the Second Circuit subsequently affirmed concluding that ASME could be held liable if its agents had acted within the scope of their apparent authority.  Id. at 565.

On a writ of certiorari, the issue before the Supreme Court was whether ASME could be held liable under the antitrust laws for the acts of its agents performed with apparent authority. Id. at 559.  The Court definitively answered in the affirmative.  Id.  The Court concluded that ASME's liability under a theory of apparent authority is consistent with the intent behind the antitrust laws reasoning that ASME's agents had the power to restrain competition because of the tremendous influence of ASME's model code.  Id. at 570–71.  Focusing on the force of ASME's reputation, the Court stated:

> [A] standard-setting organization like ASME can be rife with opportunities for anticompetitive activity.  Many of ASME's officials are associated with members of the industries regulated by ASME's codes.  Although, undoubtedly, most serve ASME without concern for the interests of their corporate employers, some may well view their positions within ASME, at least in part, as an opportunity to benefit their employers.  When the great influence of ASME's reputation is placed at their disposal, the less altruistic of ASME's agents have an opportunity to harm their employers' competitors through manipulation of ASME's codes.

Id. at 571.  Thus, the Court stated that "a rule that imposes liability on the standard-setting organization - which is best situated to prevent antitrust violations through the abuse of its reputation - is most faithful to the congressional intent that the private right of action deter antitrust violations."  Id. at 572-73.

Moreover, the Court determined that ASME could be held liable even though it did not

9

ratify the actions of its agents.  Id. at 573.  The Court explained that a ratification rule would have anticompeittve effects contrary to the purposes of the antitrust law because ASME could conceivably avoid liability by ensuring that it was ignorant of its agents' conduct and, therefore, would do as little as possible to oversee its agents.  Id.

In addition, the Court held that ASME could be held liable for the acts of its agents whether they intended to benefit ASME or not because "whether they act in part to benefit ASME or solely to benefit themselves or their employers, ASME's agents can have the same anticompetitive effects on the marketplace."  Id. at 574.  The Court went on to state:

> The anticompetitive practices of ASME's agents are repugnant to the antitrust laws even if the agents act without any intent to aid ASME, and ASME should be encouraged to eliminate the anticompetitive practices of all its agents acting with apparent authority, especially those who use their positions in ASME solely for their own benefit or the benefit of their employers.

Id. at 574.  "As the [Hydrolevel] Court made clear, what determined ASME's corporate liability to Hydrolevel under the antitrust laws was not the presence or absence of benefit to ASME from the agents' frauds, but rather the creation of apparent authority in the agents by ASME."  In re Matter of Am. Biomaterials Corp., 954 F.2d 919, 924 (3d Cir. 1992).

In Alvord–Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996 (3d Cir. 1994), the United States Court of Appeals for the Third Circuit ("Third Circuit") analyzed whether, in an antitrust dispute, a trade association could be "charged with acting through agents with whom it ha[d] imbued with apparent authority."[8]  37 F.3d at 1009.  Discussing Hydrolevel, and relying upon

---

[8] In Alvord-Polk, the Third Circuit noted that the Hydrolevel Court focused on ASME as a SSO viewing it "as [an] 'extra-governmental agency' regulating its own industry."  Alvord-Polk, 37 F.3d at 1008 n.10.  The Third Circuit also noted that "the case before [it] does not involve standard-setting or industry-regulation activity on [defendant's] part."  Id.

general agency principles, the Third Circuit concluded that a principal will be held liable for an antitrust violation if an agent acting with apparent authority violates the antitrust laws.[9]  Id.

### B.      Analysis

TruePosition relies on the Hydrolevel Court's decision and reasoning regarding apparent authority to assert its Section 1 Sherman Act antitrust claim against 3GPP.  It argues that "[a]s in Hydrolevel, TruePosition alleges coordinated action between employees of the Corporate Defendants among themselves and acting as Chairmen of multiple 3GPP committees." (TruePosition's Mem. Law Support Opp'n to 3GPP's Mot. to Dismiss at 12.)  In their roles as Chairmen of various key 3GPP committees, TruePosition argues that the Corporate Defendants conspired to exclude TruePosition's UTDOA technology from 3GPP standards by "exercis[ing] and abus[ing] the power of their positions to cause 3GPP to exclude UTDOA from the 3GPP standards, and TruePosition from the relevant markets." (Id. at 13.)

3GPP makes several arguments asserting that TruePosition's theory of antitrust liability based upon Hydrolevel is misplaced.  (3GPP's Mem. Law Support Mot. to Dismiss at 12.)  First, 3GPP asserts that TruePosition's allegations that the Corporate Defendants could only achieve their alleged unlawful conspiracy by abusing and violating 3GPP's rules renders the Hydrolevel decision inapposite.  (Id. at 13.)  We are of the opinion that they do not.  TruePosition's allegations that the Corporate Defendants consistently abused and violated 3GPP's rules and regulations go directly toward its assertions that the Corporate Defendants acted under the apparent authority of 3GPP as Chairmen and a Vice Chairman of key 3GPP subcommittees in

---

[9]The Alvord-Polk Court based its reasoning, in part, upon the Restatement (Second) of Agency §§ 215 et seq., which states that a principal is liable for the torts of its servants and for its servants' tortious conduct.  Alvord-Polk, 37 F.3d at 1009.

order to manipulate 3GPP's standardization process for their alleged unlawful conspiratorial objective.  According to the Amended Complaint, "the success of the conspiracy has depended on the Corporate Defendants' combined ability to coordinate actions that violated 3GPP rules and to facilitate those violations by abusing their authority as Chairmen."  (Am. Compl. ¶ 2.)  It is because of, and not in spite of, their apparent authority as Chairmen of pertinent 3GPP subcommittees that the Corporate Defendants were supposedly able to abuse 3GPP's standardization process, including its rules and regulations, for their own benefit and were able to supposedly disadvantage a competitor.  As Chairmen of the pertinent 3GPP subcommittees, the Corporate Defendants were agents of 3GPP acting on behalf of 3GPP, even when their actions violated 3GPP's rules and regulations.  It is TruePosition's allegations regarding the Corporate Defendants' actions as agents of 3GPP through their Chairmanship positions of 3GPP's subcommittees that makes <u>Hydrolevel</u> directly applicable to this case.

3GPP also argues that the <u>Hydrolevel</u> decision does not relieve TruePosition of the requirement of alleging concerted action by 3GPP in connection with the alleged conspiracy by the Corporate Defendants.  (3GPP's Mem. Law Support Mot. to Dismiss at 13.)  "[T]he <u>Hydrolevel</u> rule that an association's economic power may justify its being held liable for the actions of its agents cannot be extended to defeat the 'concerted action' requirement of section 1."  <u>Alvord-Polk</u>, 37 F.3d at 1009.  "[A] principal will be liable for an antitrust violation if an agent acting with apparent authority violates the antitrust laws, as one did in <u>Hydrolevel</u>, by conspiring with another person."  <u>Id.</u> (citing <u>Hydrolevel</u>, 456 U.S. at 572).  Arguing that the Amended Complaint alleges actions by the Corporate Defendants, not 3GPP itself as an entity, 3GPP asserts that the failure to allege any concerted action by itself is fatal to TruePosition's

claims against 3GPP regardless of <u>Hydrolevel</u>.  (3GPP's Mem. Law Support Mot. to Dismiss at 7.)  We disagree.

TruePosition has alleged that there was coordinated action between employees of the Corporate Defendants among themselves and acting as agents of 3GPP through their leadership roles as Chairmen of multiple key 3GPP committees.  Throughout the Amended Complaint, TruePosition alleges that the Corporate Defendants only succeeded in their conspiracy to exclude the inclusion of UTDOA in the 4G LTE Standard by agreeing to carefully orchestrate their violations of 3GPP's rules and manipulate 3GPP's processes through their positions of power as Chairmen within key 3GPP subcommittees.  (Am. Compl. ¶¶ 36, 41, 49, 54, 58, 59, 61, 64-73, 78-82, 83-95, 97, 99-113, 115.)  For instance, paragraph 36 of the Amended Complaint states, in part, that "[t]o achieve their objective, the Corporate Defendants needed not only to violate these 3GPP rules, but to do so collusively because defendants shared control of the necessary decision points, and because the decisions had to occur at a particular time and sequence.  The structure of 3GPP presents rife opportunities for such unlawful collusion."  (<u>Id.</u> ¶ 36.)  Without possessing the apparent authority of 3GPP through their positions of power, TruePosition asserts that the Corporate Defendants' alleged conspiracy would have failed.  (<u>Id.</u> ¶¶ 41, 49, 102-106.) According to TruePosition, "the success of the conspiracy has depended on the Corporate Defendants' combined ability to coordinate actions that violated 3GPP rules and to facilitate those violations by abusing their authority as Chairmen."[10]  (<u>Id.</u> ¶ 2.)

As the facts are set forth in the Amended Complaint, and granting all reasonable

---

[10]To illustrate the apparent authority that the Corporate Defendant received from GPP, the Amended Complaint states that the Corporate Defendants "are members of and participate actively in 3GPP, and exert strong influence over 3GPP.  In addition to their general industry dominance, these three companies currently control and, in recent years, have controlled the Chairman positions of key committee groups."  (Am. Compl. ¶ 14.)

inferences to TruePosition, 3GPP is charged with acting through agents whom it has imbued with apparent authority.  Such alleged action involved concerted action.  This is not a case involving mere membership in a standard-setting organization.  It is well-settled that "mere membership, even when coupled with knowledge of wrongful conduct of the association, is insufficient to establish knowing participation."  Carpet Grp. Int'l. v. Oriental Rug Importers Ass'n, Inc., 256 F. Supp. 2d 249, 273 (D.N.J. 2003); see also In re Processed Egg Prods. Antitrust Litig., 821 F. Supp. 2d 709, 733 (E.D. Pa. 2011) ("[A]llegations of mere membership and attendance at meeting are insufficient to suggest agreement to a conspiracy.")   It is the Corporate Defendants' alleged unlawful conspiratorial conduct taken with 3GPP's apparent authority as Chairmen of the relevant committees that makes 3GPP potentially liable for their actions.  Under the facts presented in the Amended Complaint, 3GPP cannot consider itself as separate and distinct from the actions of the Corporate Defendants when they were acting with 3GPP's apparent authority.  Thus, 3GPP's argument that TruePosition has not alleged concerted action by 3GPP in connection with the alleged conspiracy by the Corporate Defendants does not provide a basis for dismissal.

3GPP further argues that it did not affirmatively acquiesce in any conspiratorial conduct.  It also argues that the only conduct alleged with respect to itself is inaction which, as a matter of law, is insufficient to state an antitrust conspiracy claim.  (3GPP's Mem. Law Support Mot. to Dismiss at 9-12.)  We find that TruePosition alleges minimally sufficient facts to plausibly suggest that 3GPP assented to the alleged conspiracy through the Corporate Defendants' actions taken with the apparent authority of 3GPP holding leadership positions within its committees.  This is not a case where most of the alleged unlawful activities were conducted by the Corporate

Defendants outside the confines of 3GPP but, rather, the majority of the allegations specifically involve the actions of the Corporate Defendants as Chairmen of 3GPP's committees thwarting and using its standardization process to disadvantage a competitor.  While TruePosition does claim that 3GPP did not act to enforce its rules and procedures against the Corporate Defendants' alleged abuses as Chairmen of its committees, these are not the sole claims against 3GPP.  It is TruePosition's allegations pertaining to the creation of apparent authority in the agents of 3GPP, i.e., the Corporate Defendants actions taken when acting as Chairmen of 3GPP's committees, that determines 3GPP's corporate liability pursuant to Hydrolevel under the antitrust laws.

3GPP argues that the Amended Complaint only alleges that 3GPP provided a structure in which its members could develop standards, and did not engage in any relevant standard development activities.[11]  (3GPP's Mem. Law Support Mot. to Dismiss at 8.)  Pursuant to the alleged facts of this case, and granting all reasonable inferences in TruePosition's favor, a rational jury could conclude that 3GPP did more than serve as a mere structure for its members to develop standards.  As previously explained, by cloaking the Corporate Defendants with its apparent authority as its agents, i.e., leadership positions of  important committees within the standardization process, 3GPP can be held liable for the actions of its agents committed with that apparent authority.  "When [a SSO] cloaks its subcommittee officials with the authority of its reputation, [the SSO] permits those agents to affect the destinies of businesses and thus gives them the power to frustrate competition in the marketplace."  Hydrolevel, 456 U.S. at 571.  Here, there is no question that the Amended Complaint includes allegations that the Corporate

---

[11]3GPP asserts that it is not an entity, but does not develop the argument.  (3GPP's Mem. Law Support Mot. to Dismiss at 1, 8.)  Throughout its Motion to Dismiss, 3GPP moves for dismissal under the assumption that it is an entity.  (Id.)  Consequently, we proceed upon the premise that 3GPP is an entity.

Defendants acted on 3GPP's behalf within their apparent authority given to them by 3GPP when supposedly engaging in their alleged unlawful conspiratorial conduct regarding their actions as Chairmen of 3GPP's committees.  Notably, the <u>Hydrolevel</u> Court stressed that a SSO cannot avoid liability by ensuring that it remains ignorant of its agents' conduct and the antitrust laws because it would encourage a SSO to do as little as possible to oversee its agents resulting in an increasing likelihood that a SSO's reputation would be used for anticompetitive ends.[12]  <u>Id.</u> at 573.

3GPP asserts that TruePosition's Amended Complaint does not allege that it had any motive to join in any conspiracy against TruePosition.  (3GPP's Mem. Law Support Mot. to Dismiss at 8.)  Whether the Corporate Defendants' alleged fraudulent actions as 3GPP's agents were intended to benefit 3GPP is of no consequence.  <u>See</u> <u>Hydrolevel</u>, 456 U.S. at 574 (stating that a rule requiring that a SSO should not be held liable unless its agents act with an intent to benefit it "falls short because it is simply irrelevant to the purposes of the antitrust laws").  The <u>Hydrolevel</u> Court explained the general rules of agency law as follows:

> [U]nder general rules of agency law, principals are liable when their agents act with apparent authority and commit torts analogous to the antitrust violation presented by this case . . . .  [A] principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority.

456 U.S. at 565-66 (citations and footnote omitted).  Pursuant to an apparent authority theory, the <u>Hydrolevel</u> Court further explained that  "[l]iability is based upon the fact that the agent's

---

[12] "It is important to note that the standard of knowing participation in a conspiracy is not onerous."  <u>Carpet Grp.</u>, 256 F. Supp. 2d at 273.  "Knowing participation may occur when members tacitly or expressly ratify the known illegal actions of the association or individual members."  <u>Id.</u> (citation omitted).  TruePosition asserts that 3GPP is liable because it ratified the Corporate Defendants' anticompetitive conduct by promoting and promulgating standards that improperly excluded UTDOA.  (TruePosition's Mem. Law Opp'n 3GPP's Mot. to Dismiss at 2 n.4.)  We will not address TruePosition's argument regarding ratification since we find in TruePosition's favor on other grounds.

position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Id. at 567 (citation omitted).  Thus, it is the creation of apparent authority by 3GPP, and not the presence or absence of benefit to it, that determines its corporate liability to TruePosition under the antitrust laws.  See In re Matter of Am. Biomaterials Corp., 954 F.2d at 924.  Consequently, 3GPP's argument based upon a lack of motive fails.

## IV.   **CONCLUSION**

Granting all reasonable inferences to TruePosition, we conclude that the Amended Complaint plausibly alleges that 3GPP, acting through the Corporate Defendants as its agents, joined the alleged conspiracy.  Given the governing case law, 3GPP's Motion to Dismiss TruePosition's Amended Complaint must be denied.  Likewise, 3GPP's request for oral argument is denied.

An appropriate Order follows.

17