## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
|
TRUEPOSITION, INC.,                              :
                                                 :
                          Plaintiff,             :        CIVIL ACTION
                                                 :
                    v.                           :        No. 11-4574
                                                 :
LM ERICSSON TELEPHONE COMPANY                    :
(TELEFONAKTIEBOLAGET LM ERICSSON),               :
QUALCOMM, INC.,                                  :
ALCATEL-LUCENT USA, INC.,                        :
EUROPEAN TELECOMMUNICATIONS                      :
STANDARDS INSTITUTE, and                         :
THIRD GENERATION PARTNERSHIP                     :
PROJECT a/k/a 3GPP,                              :
                                                 :
                          Defendants.            :
_____:

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                              **OCTOBER 9, 2013**

Presently before the Court is TruePosition, Inc.'s ("TruePosition") Motion for Judgment on the Pleadings Concerning Counterclaims and Certain Affirmative Defenses of Defendant Third Generation Partnership Project ("3GPP"), and 3GPP's Opposition to Plaintiff TruePosition, Inc.'s Motion for Judgment on the Pleadings, as well as TruePosition's Reply thereto.  For the reasons provided below, the Motion for Judgment on the Pleadings will be granted.

## I.    BACKGROUND[1]

This action stems from the alleged anticompetitive conduct of major players in the

_____

[1] A more in-depth factual and procedural background is provided in the Court's prior Memorandum Opinion dated October 4, 2012.  See TruePosition, Inc. v. LM Ericsson Tel. Co., No. 11-4574, 2012 WL 3584626 (E.D. Pa. Aug. 21, 2012).

international telecommunications market within the context of a Standard-Setting Organization ("SSO").  Am. Compl. ¶¶ 1-9.  TruePosition describes itself as a "leading innovator in developing and marketing high accuracy location products that operate over cellular telecommunications networks."  Id. ¶ 3.  TruePosition alleges that LM Ericsson Telephone Company (Telefonaktiebolaget LM Ericsson), Qualcomm, Inc. and Alcatel-Lucent USA, Inc. abused their positions of authority within 3GPP by violating its rules and procedures in order to conspire to exclude TruePosition's positioning technology,[2] Uplink Technology ("UTDOA"), from the newest and most advanced 4th generation ("4G") global standard for mobile telecommunications technologies, known as Long Term Evolution ("LTE").  Id. at ¶ 1.  This global standard is created by 3GPP, a SSO, which "establishes global standards for mobile communications technologies, including mobile phone location technologies."[3]  Id.  TruePosition states that "inclusion in the 3GPP standard is vital to commercial success" because "[e]xclusion from the standard guarantees commercial failure and, in most instances, absolute foreclosure from the market."  Id. ¶ 4.

TruePosition filed an action against all of the Defendants alleging violations of federal antitrust law, specifically Section 1 of the Sherman Act, 15 U.S.C. § 1.[4]  Id. ¶¶ 139-153.  3GPP

----

[2] "Positioning technology" refers to technology used to locate mobile handsets.  Am. Compl. ¶ 3.  According to TruePosition, "[m]ore than 55 million cellular callers in the United States each year are located by TruePosition products, assisting police, fire, and ambulance services in saving lives and enabling law enforcement to combat criminal activity and terrorist threats."  Id.  In the United States, the Federal Communications Commission ("FCC") has set regulatory requirements mandating that all mobile voice networks be able to locate 911 callers.  (Id.)  UTDOA, TruePosition's positioning technology, "has been successfully deployed on more than 90,000 cell tower sites in the United States to meet FCC requirements."  Id.

[3] Another SSO, European Telecommunications Standards Institute ("ETSI"), was also named as a defendant in this action.  See Am. Compl.  ETSI was voluntarily dismissed from this action with prejudice on August 10, 2012.  (Doc. No. 130.)

[4] Pursuant to 28 U.S.C. § 1331, federal question jurisdiction exists based upon the Sherman Act, 15 U.S.C. § 1.

filed an Answer, Affirmative Defenses and Counterclaims against TruePositon.  (Doc. No. 157)
Pursuant to Federal Rule of Civil Procedure 12(c), TruePosition filed a Motion for Judgment on
the Pleadings seeking the dismissal of 3GPP's counterclaims and certain affirmative defenses.
(Doc. No. 186.)  3GPP filed a response opposing TruePosition's Motion, and TruePositon filed a
Reply Brief.  (Doc. Nos. 196, 198.)  For the reasons set forth below, we grant TruePosition's
Motion for Judgment on the Pleadings.

## II.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed - but
early enough not to delay trial - a party may move for judgment on the pleadings."  Under Rule
12(c), judgment on the pleadings may be granted "only if, viewing all the facts in the light most
favorable to the nonmoving party, no material issue of fact remains and the moving party is
entitled to judgment as a matter of law."  Knepper v. Rite Aid Corp., 675 F.3d 249, 257 (3d Cir.
2012) (citing Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008)); see also Sikirica v.
Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005).  When a motion for judgment on the
pleadings is based upon the defense that a party has failed to state a claim, it is analyzed under
the same standards applied to a Rule 12(b)(6) motion.  See Revell v. Port Auth. of N.Y. & N.J.,
598 F.3d 128, 134 (3d Cir. 2010) (citing Turbe v. Gov't of the V.I., 938 F.2d 427, 428 (3d Cir.
1991)).  "The only notable difference between these two standards is that the court, for a motion
on the pleadings, reviews not only the complaint but also the answer and written instruments
attached to the pleadings."  Brautigam v. Fraley, 684 F. Supp. 2d 589, 591–92 (M.D. Pa. 2010);
see also Phillips v. Transunion, LLC, No. 12-1058, 2012 WL 1439088, at *3 (E.D. Pa. Apr. 25,
2012).

3

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the complaint must be construed in the light most favorable to the plaintiff. Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220 (3d Cir. 2011) (citing In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010)). Federal Rule of Civil Procedure 8(a)(2) requires "only 'a short and plain statement of the claim showing the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

"[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." Twombly, 550 U.S. at 555. In Twombly, the United States Supreme Court "set forth the 'plausibility' standard for overcoming a motion to dismiss and refined the approach in Iqbal." Burtch, 662 F.3d at 220 (citing Twombly, 550 U.S. at 557; Iqbal, 556 U.S. at 680). In other words, Rule 8 requires that a complaint contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible. W. Penn Alleg. Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Id. (quoting Phillips v. Cnty. of Alleg., 515 F.3d 224, 234 (3d Cir. 2008); Twombly, 550 U.S. at 556).

When deciding the sufficiency of a complaint "courts should disregard the complaint's legal conclusions and determine whether the remaining factual allegations suggest that the plaintiff has a plausible - as opposed to merely conceivable - claim for relief." Id. (citing Iqbal,

4

129 U.S. at 1949-50; <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009)).

Under both <u>Twombly</u> and <u>Iqbal</u>, a court must take the following three steps in order to determine the sufficiency of a complaint:

> First, the court must take note of the elements a plaintiff must plead to state a claim.  Second, the court should identify the allegations that, because they are no more than conclusions, are not entitled to the assumption of truth.  Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief.

<u>Burtch</u>, 662 F.3d at 221 (quoting <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010)).  "It is, of course, true that judging the sufficiency of a pleading is a context-dependent exercise."  <u>W. Penn</u>, 627 F.3d at 98 (citing <u>Iqbal</u>, 129 S. Ct. at 1950; <u>Twombly</u>, 550 U.S. at 567-68; <u>Phillips</u>, 515 F.3d at 232).

## III.   DISCUSSION

### A.   Counterclaims

3GPP's Counterclaims against TruePositon are as follows: Count I - Breach of Contract; Count II - Specific Performance; Count III - Declaratory Judgment - Equitable Estoppel; and Count IV - Declaratory Judgment - Waiver.  TruePosition argues that all of 3GPP's Counterclaims fail as a matter of law, and seeks judgment on the pleadings to dismiss them.  The parties agree that Pennsylvania law controls the instant action.  We will address each counterclaim in turn.

#### 1.     *Counterclaim Count I - Breach of Contract*

Under Pennsylvania law, the formation of a contract requires (1) the parties' manifestation of a mutual intention to be bound by an agreement; (2) terms that are sufficiently

definite so as to be enforceable; and (3) consideration.  <u>Century Indem. Co. v. Certain
Underwriters at Lloyd's, London</u>, 584 F.3d 513, 533 (3d Cir. 2009) (citations omitted).  "'[I]n
order for there to be an enforceable contract, the nature and extent of its obligation must be
certain; the parties themselves must agree upon the material and necessary details of the
bargain.'"  <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 585-87 (3d Cir. 2009)
(quoting <u>Lombardo v. Gasparini Excavating Co.</u>, 123 A.2d 663, 666 (1956)).  "In other words,
we look to see whether 'the terms are sufficiently definite to be specifically enforced.'"  (<u>Id.</u>)
(quoting <u>Channel Home Ctrs. v. Grossman</u>, 795 F.2d 291, 298-99 (3d Cir. 1986)).  "Whether the
terms are sufficiently definite is a question of law."  <u>Id.</u> (citations omitted).  "'The burden of
proving the existence of a contract lies with the party relying on its existence.'"  <u>Guzzi v.
Morano</u>, No. 10-1112, 2013 WL 4042511, at *10 (E.D. Pa. Aug. 8, 2013) (quoting <u>Edmondson
v. Zetusky</u>, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996)).

     3GPP argues that TruePosition breached its obligations under its Working Procedures.
3GPP states that it is "an association of regional standard setting organizations ('SSOs') known
as 3GPP's Organizational Partners, and their members, formed to develop globally applicable
telecommunications specifications."  (3GPP's Resp. Opp'n Pl.'s Mot. for Judgment on Pleadings
at 3) (citing Counterclaim ¶ 5.)  "3GPP's technical specifications are developed collaboratively
by 3GPP's members - and not by 3GPP itself - based on technical merit as determined through
the consensus of 3GPP's members in accordance with 3GPP's Working Procedures."[5]  (<u>Id.</u>)
(citing Counterclaims ¶¶ 3, 18.)  "The development of technical specifications in 3GPP is

---

[5]"The membership of 3GPP consists of more than 400 companies, including TruePosition and Defendants Ericsson,
Qualcomm and Alcatel-Lucent.  (3GPP's Resp. Opp'n Pl.'s Mot. for Judgment on Pleadings at 3) (citing
Counterclaims ¶¶ 6-8.)

governed by 3GPP's Working Procedures."  (Id. at 4) (citing Counterclaim ¶ 15.)  "Once a technical specification has been developed within 3GPP, it may be promulgated as a technical standard by each Organizational Partner in its respective region."  (Id.) (citing Counterclaim ¶ 7.)

3GPP argues that the Working Procedures "impose specific responsibilities and expectations on 3GPP members as a condition for participation in 3GPP."  (Id.) (citing Counterclaim ¶ 19.)  3GPP states that the responsibilities and expectations include obligations under Article 8[6] to "commit[] to support 3GPP and to contribute technically or otherwise to one or more of the [Technical Specification Groups ("TSG")]" and to "act in 3GPP in their own right and carry the full responsibility for their contributions," and the "expectation" under Article 39[7] that members contribute to and progress [work items they support] throughout the drafting phases."  (Id.) (citing Counterclaim ¶ 19.)  Also, 3GPP argues that the Working Procedures

---

[6]3GPP's Working Procedures Article 8 states in pertinent part:

> Article 8: Membership in an Organizational Partner is a pre-requisite for Individual Membership of 3GPP.  All entities registered as members of an Organizational Partner and eligible for participation in the technical work of that Organizational Partner, can become Individual Members of 3GPP if they are committed to support 3GPP and:
>
> to contribute technically or otherwise to one or more of the Technical Specification Groups within the 3GPP scope;
> . . .
>
> Individual Members act in 3GPP in their own right and carry the full responsibility for their contributions.

[7]3GPP's Working Procedures Article 39 states in pertinent part:

> Article 39: The supporting Individual Members are expected to contribute to and progress the new work item throughout the drafting process.

impose the specific responsibility for submitting timely objections or appeals to challenged Work

Items ("WI"), conduct or decisions within 3GPP.  (Id.)  Specifically, 3GPP states that Article 40[8]

provides that it "is the responsibility of any objecting Individual Member . . . to discuss . . . with

the [Technical Specification Group ("TSG")] Chairman," any substantial objection the member

has to the adoption of a new Work Item as part of 3GPP's work programme by the end of the

month following the month the Work Item was adopted, and "[i]f it is not possible to resolve the

objection, it is the responsibility of the Individual Member or Partner to raise the issue with the

[Project Coordination Group ("PCG")]."  (Id.) (citing Counterclaim ¶ 21.)  Likewise, according

to 3GPP, Article 29[9] provides that "[a]n Individual Member of 3GPP who opposes a Chairman's

ruling on a vote taken within a TSG or [Working Group] may submit its case to the PCG for

decision.  In such cases the Individual Member shall also inform the relevant TSG or WG

Chairman."  (Id. at 6.) (citing Counterclaim ¶ 22.)

       3GPP stresses that "[c]ompliance with these Articles is critical to ensuring that 3GPP

---

[8]3GPP's Working Procedures Article 40 states in pertinent part:

> Article 40: A new Work Item shall be adopted by the PCG [Project
> Coordination Group] unless a substantial objection is received
> from an Individual Member or Partner during this period.  At the
> end of the period, the 'new' flag shall be removed (even if there is
> an objection) and it is the responsibility of any objecting Individual
> Member or Partner to discuss their objections with the TSG
> Chairman.  If it is not possible to resolve the objection, it is the
> responsibility of the Individual Member or Partner to raise the
> issue with the PCG.

[9]3GPP's Working Procedures Article 29 provides in pertinent part:

> Article 29: An Individual member of 3GPP who opposes a
> Chairman's ruling on a vote taken within a TSG or WG [Work
> Group] may submit its case to the PCG for decision.

technical specifications are developed in a fair and impartial manner based on objective technical merit and in accordance with 3GPP's Working Procedures."  (Id.) (citing Counterclaim ¶ 23.) 3GPP states that "[t]he objection and appeals measures set forth in Articles 29 and 40 of [its] Working Procedures are particularly important because 3GPP lacks the capacity sua sponte to review, reverse or modify decisions by the TSGs or Working Groups absent timely and procedurally proper appeals by members pursuant to those Articles."  (Id.) (citing Counterclaim ¶ 23.)

3GPP argues that "[b]eginning in 2008 and continuing through the present, TruePosition knowingly and repeatedly failed to comply with its obligations under Articles 8, 29, 39 and 40 of the Working Procedures relating to the consideration of O-TDOA and U-TDOA for inclusion in the 3GPP LTE technical specification."  (Id. at 7.)  3GPP further argues that "because 3GPP can only reverse or modify decisions pursuant to procedurally proper objections or appeals from members, TruePosition's noncompliance with its obligations to 3GPP foreclosed the possibility that any technical or procedural issues could have been timely addressed by persons with technical expertise and experience in 3GPP's technical specification development process."  (Id. at 8.) (citing Counterclaim ¶ 44.)  3GPP goes on to state that "TruePositon's noncompliant course of conduct with respect to the specific Working Procedures at issue thus undermined 3GPP's processes and the effective development by 3GPP members of technical specifications supported by the consensus of such members."  (Id.) (citing Counterclaim ¶ 45.) These harms, according to 3GPP, "were exacerbated by TruePosition's filing of this lawsuit in July 2011 (which 3GPP does not allege violated the Working Procedures) with full knowledge of its failure to comply with its obligations under Articles 8, 29, 39 and 40 of the Working Procedures, and its

attempt through this lawsuit to include U-TDOA in the 3GPP LTE technical specification through judicial intervention rather than based on technical merit and in accordance with the Working Procedures."[10]  (Id.) (citing Counterclaims ¶¶ 45-46.)

TruePositon counters 3GPP's breach of contract claim by arguing that Articles 8, 29, 39 and 40 of 3GPP's Working Procedures are not a contract, but are rules of procedure.[11]  Relying upon the permissive language within the Articles, TruePosition argues that "[o]n their face, the procedures cited by 3GPP manifest no intent to impose the type of binding obligation that would expose Individual Members to claims of injury and damage by 3GPP."  (TruePosition's  Mot. for Judgment on Pleadings at 8.)  TruePosition argues that "the use of optional procedures, permissive 'may' clauses, and indefinite, hortatory statements, do not create enforceable contractual obligations."  (TruePosition's  Reply Br. at 2-3.)  According to TruePosition, "the language of the Working Procedures Articles upon which [3GPP] hinges its Counterclaims is comprised of non-madatory phrases like 'can' or 'may' (Articles 8 and 29); 'responsibility . . . to discuss' (Article 40), 'commit[] to support,' (Article 8); and 'are expected to contribute to and

---

[10]TruePosition asserts that 3GPP's Counterclaims ask this Court to find in its Working Procedures a prospective waiver of TruePositon's antitrust remedies.  (TruePosition's Reply Br. at 1.)  Regarding 3GPP's Counterclaims, TruePosition asserts that "[t]he only damages alleged here by 3GPP are associated with defending this antitrust litigation filed by TruePositon, which again demonstrates why 3GPP's Counterclaims are simply an attempted end-run around the antitrust laws."  (Id. at 7.)  Specifically, TruePosition states "[n]owhere does 3GPP explain how a breach of contract claim that arises only after and because an antitrust suit has been filed does not involve a waiver of remedies under the Sherman Act."  (Id. at 4.)  "A contract term or condition that violates public policy is void and is thus unenforceable."  Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 569-70 (3d Cir. 2002) (citation omitted).  3GPP states that "nowhere do the Counterclaims allege a breach arising from TruePosition's filing of the lawsuit, or that by virtue of its membership in 3GPP and contractual obligations arising therefrom TruePosition agreed to forego claims under the antitrust laws."  (3GPP's Resp. Opp'n Pl.'s Mot. for Judgment of Pleadings at 12.)  We do not address this issue because we find that Articles 8, 29, 39 and 40 of the Working Procedures are not definite enough to support the creation of an enforceable contract.

[11]TruePosition's antitrust claims make reference to provisions of the same Working Procedures.  See Am. Compl. ¶¶ 34-36 (stating that "The antitrust validity of standard-setting efforts . . . depends upon . . . strict compliance with[] meaningful due process safeguards sufficient to prevent concerted actions to bias the standard-setting process in a manner that unfairly favors members having economic interests in restraining trade.")

10

progress' (Article 39)."  (Id. at 6.)  As such, TruePosition argues that "[t]he cited Articles are not mandatory in nature and cannot possibly form the basis of a breach of contract claim for 3GPP." (Id.)

We find that even if the parties did intend to form a contract, the terms of Working Procedures Articles 8, 29, 39 and 40 are too indefinite to be enforced.  The lack of specificity regarding a 3GPP members' obligations makes the Articles too indefinite to support the formation of a contract.  "To be enforceable, an agreement must be certain about 'the nature and extent of its obligation[s].'"  Shell's Disposal & Recycling, Inc. v. City of Lancaster, 504 F. App'x 194, 202 (3d Cir. 2012) (quoting Am. Eagle Outfitters, 584 F.3d at 585).  "That requirement does not mean that the presence of any interpretive ambiguity renders an agreement unenforceable."  Id. (citing Am. Eagle Outfitters, 584 F.3d at 585).  "Rather, a contract fails for indefiniteness when it is 'impossible to understand' what the parties agreed to because the essential terms are ambiguous or poorly defined."  Id. (Am. Eagle Outfitters, 584 F.3d at 585).

"Pennsylvania has adopted the Restatement (Second) of Contracts regarding whether terms are sufficiently definite to form a contract."  Guzzi, 2013 WL 4042511, at *11 (citing Reed v. Pitts. Bd. of Pub. Educ., 862 A.2d 131, 135 (Pa. Commw. Ct. 2004)).  The Restatement provides as follows:

> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left

11

> open or uncertain may show that a manifestation of intention is not
> intended to be understood as an offer or as an acceptance.

Id. (quoting Restatement (Second) of Contracts § 33 (1981)). "'The essential terms must be definite enough to provide a basis for enforcing the agreement.'" Id. (quoting Waterford Mortg. Co. v. Integrated Alarm Servs. Grp., Inc., No. 06–3967, 2008 WL 4589630, at *3 (E.D. Pa. Oct. 14, 2008)). "'If a court, due to indefiniteness or incompleteness, is unable to determine if a contract was performed, the court must find no contract existed in the first place.'" Id. (quoting Reed, 862 A.2d at 135 (citing Restatement (Second) of Contracts § 33 cmt. c (1979)); see also Sloan v. Frascella, No. 12-3609, 2013 WL 4433366, at *3-4 (E.D. Pa. Aug. 16, 2013) (finding the lack of specificity regarding a term of an alleged oral employment agreement did not support the creation of a contract) (citing Caisson Corp. v. Ingersoll–Rand Co., 622 F.2d 672, 678 (3d Cir. 1982) (noting where certain essential elements are missing from a contract, "the lack of specificity may make enforcement so difficult that the courts will hold there was no enforceable contract")); Mazzella v. Koken, 739 A.2d 531, 537 (1999) ("If, however, there exist ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce[,] such an agreement must be set aside."); Lombardo, 123 A.2d at 665 (the Pennsylvania Supreme Court found that a specific contract failed for indefiniteness, noting that the enforceability of a contract depends upon certainty of the parties' obligations and mutual agreement over the necessary details of the bargain).

Articles 8, 29, 39 and 40 are material and essential given the fact that 3GPP specifically relies upon them as the alleged contract provisions that speak directly about the parties' obligations and entitlements, and they are the Articles upon which it rests its breach of contract Counterclaim.  Although material and essential, the parties obligations are unclear under the

Articles.  For instance, the Articles are ambiguous as to the following matters:

- the meaning of "carry the full responsibility" for a Member's own contributions (Article 8);

- what is specifically required of a member who opposes a Chairman's ruling on a vote (i.e., Article 29 states "[a]n individual Member of 3GPP who opposes a Chairman's ruling on a vote . . . may submit its case to the PCG for decision");

- what obligations, if any, are required by Article 39, which states "[t]he supporting Individual members are expected to contribute and progress the new work item throughout the drafting process;"

- what obligations, if any, does a Member have when they are instructed that "it is the responsibility of any objecting Individual Member or Partner to discuss their objections with the TSG Chairman" and "[i]f it not possible to resolve the objection, it is the responsibility of the Individual Member or Partner to raise the issue with the PCG" (Article 40); and

- what occurs if Individual Members or Partners do not abide by the Articles.

It is telling that the Articles do not discuss what actions constitute a breach and what would occur if a Member fails to abide by their terms.  See Restatement (Second) of Contracts § 33(2) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."); see also Sloan, 2013 WL 4433366, at *3-4 ("Because it is unclear what actions of the Defendants would constitute a breach of the alleged agreement, there is no way for a factfinder to determine if Defendants actually breached Sloan's contract.").  As a result, the factfinder, as well as this Court, are left in the untenable position of determining what actions actually constitute a breach without being able to rely upon the requisite certainty of the Articles' terms.

The ambiguity of the language flowing from the Articles negatively impacts their ability to be enforced.  The terms of the Articles are insufficiently indefinite to warrant enforcement.

13

Key matters, and material terms, have been left undetermined requiring us to set aside the Articles for indefiniteness.  See Am. Eagle Outfitters, 584 F.3d at 585-87.  In sum, we find that even if the parties intended to form an agreement as to Articles 8, 29, 39, and 40, the terms of that alleged agreement fail for indefiniteness.[12]  Because 3GPP fails to demonstrate that the terms of Articles 8, 29, 39 and 40 are sufficiently definite to enable their enforcement, TruePosition's Motion for Judgment on the Pleadings is granted as to 3GPP's Counterclaim I - Breach of Contract.

### 2.    *Counterclaim Count II - Specific Performance*

Counterclaim Count II alleges a claim for specific performance.  "We note that specific performance is an equitable remedy for breach of contract permitting the court 'to compel performance of a contract when there exists in the contract an agreement between the parties as to the nature of the performance.'"  Giordano v. Claudio, 714 F. Supp. 2d 508, 532 (E.D. Pa. 2010) (quoting Lackner v. Glosser, 892 A.2d 21, 31 (Pa. Super. Ct. 2006); Geisinger Clinic v. Di Cuccio, 606 A.2d 509, 521 (Pa. Super. Ct. 1992)).  As previously discussed, we concluded that Articles 8, 29, 39, and 40 are too indefinite to create an enforceable contract between TruePosition and 3GPP.  Therefore, we find that Counterclaim Count II fails to state a claim for specific performance.  Accordingly, we grant the Motion for Judgment on the Pleadings with

---

[12] 3GPP points the Court to cases which have found that rules and bylaws of an association are binding contracts between the association and its members.  (3GPP's Resp. Opp'n Pl.'s Mot. for Judgment on Pleadings at 13-14) (citations omitted).  We find this attempted analogy unpersuasive here because our ruling is based upon the indefiniteness of 3GPP's Working Procedures Articles 8, 29, 39 and 40, rendering them unenforceable, and not on the basis of whether they constitute a binding contract between the parties.  This distinction is pivotal because it takes this case outside of the argument asserted by 3GPP concerning the question of whether the bylaws or rules of an association are legally enforceable agreements in the nature of a contract.  We, also, note that the fair, reasonable and non-discriminatory ("FRAND") license terms set forth by the European Telecommunication Standards Institute and the Institute of Electrical and Electronics Engineers, which have been found to be contractual, see Apple, Inc. v. Motorola Mobility, Inc., 886 F. Supp. 2d 1061, 1084 (W.D. Wis. 2012), are not at issue here.

respect to Counterclaim Count II - Specific Performance.

      **3.**       ***Counterclaim Count III - Declaratory Judgment - Equitable Estoppel And***
                ***Counterclaim Count IV - Declaratory Judgment - Waiver***

Counterclaim Count III seeks a declaratory judgment that TruePosition be estopped from challenging the development of the 3GPP LTE technical specification and from seeking to have its UTDOA incorporated into the 3GPP LTE technical specification other than pursuant to and in accordance with the Working Procedures. (See Counterclaim III.) In Counterclaim Count IV, 3GPP seeks a declaration that TruePositon, as a result of its alleged violation of 3GPP's Working Procedures Articles 8, 29, 39 and 40, voluntarily and intentionally waived its right to object to prior decisions or conduct by 3GPP working committees, Chairmen or members relating to development of the 3GPP LTE technical specification. (See Counterclaim IV.)

TruePosition argues that there is no case or controversy warranting a declaratory judgment because it is not asking for the Court to intervene in UTDOA's standardization. (TruePosition's Mem. Law Support Mot. for Judgment on Pleadings at 11.) Pointing to its Prayer For Relief, TruePosition argues, and we agree, that it does not seek our intervention in the standardization of UTDOA. (Id. at 12.) TruePosition asserts that it seeks damages from 3GPP regarding alleged violations of the Sherman Act, and injunctive relief against future violations of the Sherman Act. (Id.) TruePositon states that it has never sought to attain standardization other than through 3GPP's Working Procedures. (Id.)

3GPP points out, and TruePosition agrees, that TruePosition has made progress towards standardization of UTDOA through means of the Working Procedures.[13] (3GPP's Mem. Law

---

[13] "On June 13, 2013, 3GPP's Radio Access Network ('RAN') Technical Specification Group approved the U-TDOA technology for inclusion in Release 11 of the 4G/LTE technical specification, in accordance with the 3GPP Working Procedures, and without judicial intervention." (3GPP's Mem. Law Opp'n TruePositon's Mot. for

Opp'n TruePositon's Mot. for Judgment on Pleadings at 2-3; TruePositon's Reply Br. at 8.)

TruePosition argues that such progress supports its argument that it has not sought inclusion in

the standard through any other means than through the Working Procedures.  (TruePosition's

Reply Br. at 8.)

We find that 3GPP's Counterclaim Counts III and IV fail as a matter of law.  The

Declaratory Judgment Act provides: In the case of actual controversy within its jurisdiction . . .

any court of the United States, upon the filing of an appropriate pleading, may declare the rights

and other legal relations of any interested party seeking such declaration, whether or not further

relief is or could be sought."  28 U.S.C. § 2201(a).  Courts have interpreted the remedy to be

"limited to cases and controversies in the constitutional sense."  Wyatt, V.I., Inc. v. Gov't of the

V.I., 385 F.3d 801, 805 (3d Cir. 2004) (citations omitted).  "A plaintiff seeking a declaratory

judgment must possess constitutional standing but need not have suffered 'the full harm

expected.'"  Constitution Party of Penn. v. Cortes, 712 F. Supp. 2d 387, 398 (E.D. Pa. 2010)

(quoting Khodara Envtl., Inc. v. Blakey, 376 F.3d 187, 193 (3d Cir. 2004)).  "A plaintiff seeking

a declaratory judgment has Article III standing if there is substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment."  Id. (quoting Khodara Envtl., Inc., 376 F.3d at 193; The St. Thomas–St.

John Hotel & Tourism Ass'n v. V.I., 218 F.3d 232, 240 (3d Cir. 2000)).

In its Counterclaim Counts III and IV, 3GPP fails to establish that the parties have

adverse interests or a substantial controversy of sufficient immediacy and reality to warrant

---

Judgment on Pleadings at 2-3.)  3GPP further states that "U-TDOA will thus be included in Release 11 when it is
issued by 3GPP, likely, later this year."  (Id. at 3.)  Acknowledging that it has made progress within 3GPP,
TruePositon states that it hopes that UTDOA will be included in Release 11, but there is no guarantee.
(TruePosition's Reply Br. at 7.)

declaratory relief.  Regarding 3GPP's equitable estoppel Counterclaim, TruePosition has clearly

stated that it does not seek inclusion of its UTDOA technology into 3GPP's standard other than

through the rules of procedure outlined in 3GPP's Working Procedures.  TruePositon does not

seek this Court's intervention in the standardization process, and we do not seek any involvement

in such.  It appears that the standardization process is continuing and that progress regarding

UTDOA's inclusion in the 4G/LTE technical specification is moving forward.  Regarding its

waiver Counterclaim, 3GPP says that it is based on TruePosition's abandonment of its

contractual right and obligation to timely appeal any conduct within 3GPP that it thought was

improper.  (3GPP's Mem. Law Opp'n TruePositon's Mot. for Judgment on Pleadings at 23.)

Since we have found that Articles 8, 29, 39 and 40 are too indefinite to form an enforceable

contract, 3GPP's waiver Counterclaim fails.  Accordingly, Counterclaim Counts III and IV do

not allege a "case of actual controversy" and must be dismissed for lack of jurisdiction.

**B. <u>Affirmative Defenses</u>**

TruePosition argues for the dismissal of 3GPP's affirmative defenses thirteen, fourteen

and fifteen as legally insufficient since they are based upon the same grounds as Counterclaim

Counts I, III and IV respectively.  (TruePosition's Mem. Law Support Mot. for Judgment on

Pleadings at 3 n.6.)  In response, 3GPP does not assert any new arguments regarding its

affirmative defenses, but refers back to its arguments that its counterclaims are legally sufficient.

(3GPP's Mem. Law Opp'n TruePositon's Mot. for Judgment on Pleadings at 24 n.13.)

Therefore, 3GPP applies the same arguments regarding its Counterclaims to these affirmative

defenses.

Federal Rule of Civil Procedure 12(f) states that "[t]he court may strike from a pleading

an insufficient defense or any redundant . . . matter." Fed. R. Civ. P. 12(f). Both parties agree that affirmative defenses thirteen, fourteen, and fifteen rest on the same legal grounds as Counterclaim Counts I, III and IV. These Counterclaims have been dismissed as legally insufficient. Consequently, the affirmative defenses are redundant of the legally-insufficient Counterclaims and are hereby stricken. BJ Energy LLC v. PJM Interconnection, LLC, Nos. 08-3649, 09-2864, 2010 WL 1491900, at *2 (E.D. Pa. Apr. 13, 2010) ("An affirmative defense is legally insufficient where it cannot succeed under any set of facts which may be inferred from the allegations of the pleading.")

## IV.   CONCLUSION

Since 3GPP fails to demonstrate the existence of sufficiently definite terms of Working Procedures Articles 8, 29, 39 and 40, TruePosition's Motion for Judgment on the Pleadings is granted as to 3GPP's Counterclaim Count I for breach of contract. Based upon the dismissal of Counterclaim Count I, we conclude that Counterclaim Count II fails to state a claim for specific performance. Likewise, Counterclaim Counts III and IV, seeking declaratory judgments of equitable estoppel and waiver respectively, are dismissed for lack of jurisdiction since they do not allege a case of actual controversy. Also, 3GPP's affirmative defenses thirteen, fourteen and fifteen, which are based upon the same grounds as Counterclaim Counts I, III and IV, are stricken as redundant and legally insufficient for the reasons described above.

Leave to amend will not be granted. "Though leave to amend should be freely given in the interest of justice, Fed. R. Civ. P. 15(a), the motion is committed to the district court's sound discretion." Williams v. Phila. Hous. Auth., 826 F. Supp. 952, 953-54 (E.D. Pa. 1993) (citing Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983)). "The court may deny leave

to amend, among other reasons, on the basis of the futility of the amendment."  Id. (citing Foman v. Davis, 371 U.S. 178, 182 (1962) (other reasons include undue delay, bad faith or dilatory motive, and undue prejudice to opposing party); Averbach v. Rival Mfg. Co., 879 F.2d 1196, 1203 (3d Cir. 1989)); see also Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.").  "An amendment is futile if the amended complaint cannot withstand a motion to dismiss."  Id. at 954; see also Shane, 213 F.3d at 115 ("In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6).  Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency.")  In light of our rulings on all of 3GPP's Counterclaims, we find that any amendment would be futile.  Consequently, 3GPP's request for amendment is denied.

　　　　　An appropriate Order follows.

19